[1] The Review Tribunal is composed of Hon. Nelda Rodriguez, Justice, Thirteenth Court of Appeals, Corpus Christi, designated Chair of the Tribunal pursuant to Texas Rule for Removal or Retirement of Judges 12; Hon. Tom Gray, Chief Justice, Tenth Court of Appeals, Waco; Hon. Sam Griffith, Justice, Twelfth Court of Appeals, Tyler; Hon. Steve McKeithen, Chief Justice, Ninth Court of Appeals, Beaumont; Hon. Terry McCall, Justice, Eleventh Court of Appeals, Eastland; Hon. Brian P. Quinn, Justice, Seventh Court of Appeals, Amarillo; and Hon. Josh R. Morriss, III, Chief Justice, Sixth Court of Appeals, Texarkana. See Tex.R. Rem'l/Ret. Judg. 12(a) (West 2004). *Page 662 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 663 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 664 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 665 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 666 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 667 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 668 
 OPINION
This proceeding concerns the recommendations of the State Commission on Judicial Conduct ("the Commission") that Petitioner, the Honorable Charles Ronald Rose, Justice of the Peace, Precinct 1-A, Dallas County, Texas, be removed from that office and that this Review Tribunal prohibit him from holding judicial office in the future.[2] Judge Rose petitions the Tribunal to reject the Commission's recommendations. The Examiner responds on behalf of the Commission through special counsel.[3] We will deny Judge Rose's petition, will order his removal from office, and will order that he be prohibited from holding judicial office in the future.
Judge Rose's case has received international, national, regional, and extensive local attention.[4] *Page 670 
 LEGAL BACKGROUND
In general, judicial discipline proceedings have "four important objectives: to deter injudicious conduct; to provide a means by which judges can be disciplined in appropriate cases; to vindicate by an independent report a judge who has been unfairly criticized; and, most important of all, to enable aggrieved litigants or others to air their complaints."[5] DAVID PANNICK, JUDGES 97 (1987). In the Texas Constitution, in particular, "[t]he general purpose of the judicial conduct provisions was to encourage judicial accountability and trustworthiness. . . ." JANICE C. MAY, THE TEXAS STATE CONSTITUTION: A REFERENCE GUIDE 207 (1996). Their purpose "is not necessarily to punish, but to maintain, if not enhance, the honor and dignity of the judiciary of the entire State of Texas and to uphold the administration of justice for the benefit of all its citizens." In re Canales, 113 S.W.3d 56, 64 (Tex.Rev.Trib. 2003, pet.denied);[6] In re Barr, 13 S.W.3d 525, 533
(Tex.Rev.Trib. 1998, pet.denied) (op. on orig. submission);accord In re Thoma, 873 S.W.2d 477, 484-85 (Tex.Rev.Trib. 1994, no pet.).
Accordingly, the Texas Constitution provides a mechanism for the removal of judges. See Tex. Const. art. V, § 1-a(6)-(14). The Constitution provides, in relevant part:
 Any Justice or Judge of the courts established by this Constitution . . . may, subject to the other provisions hereof, be removed from office for willful or persistent violation of rules promulgated by the Supreme Court of Texas, incompetence in performing the duties of the office, willful violation of the Code of Judicial Conduct, or willful *Page 671 
or persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public discredit upon the judiciary or administration of justice.
Id. § 1-a(6)(A).[7] "[T]he electorate itself has approved this limitation on its ability to elect the judge of its choosing." In re Lowery, 999 S.W.2d 639, 662 (Tex.Rev.Trib. 1998, pet.denied).
In that connection, the Constitution establishes Texas's State Commission on Judicial Conduct. See Tex. Const. art. V, §1-a(2); Tex. Gov't Code Ann. § 33.002(a) (Vernon 2004); see alsoid. § 33.001(a)(4) (Vernon 2004). The Constitution provides that "[t]he Legislature may promulgate laws in furtherance of" Section 1-a "that are not inconsistent with its provisions." Tex. Const. art. V, § 1-a(14). The Legislature has done so in Texas Government Code Chapter 33, which governs proceedings before the Commission. See generally Tex. Gov't Code Ann. §§ 33.001-33.051 (Vernon 2004).[8] The Constitution also *Page 672 
provides that "[t]he Supreme Court shall by rule provide for the procedure before the Commission. . . ." Tex. Const. art. V, §1-a(11). The Court has done so in promulgating the Texas Rules for Removal or Retirement of Judges.[9] See Tex.R. Rem'l/Ret. Judg. (West 2004). The Legislature has further mandated that the Commission publish an annual report including "an explanation of the commission's processes." Tex. Gov't Code Ann. § 33.005(a), (b)(3); e.g., State Comm'n Jud. Conduct Ann. Rep. (2003), http://www.scjc.state.tx.us/ANNUAL — REPORT — 2003.pdf (Nov. 17, 2003). Because "the Commission is in the best position to describe the judicial disciplinary process," its reports are considered authoritative. 48 Robert P. Schuwerk 
Lillian B. Hardwick, Texas Practice: Handbook of Texas Lawyer and Judicial Ethics ch. 33 introd. at 1133 (2003); see Lowery,999 S.W.2d at 652 n. 4.
The Texas Constitution provides that "[t]he judicial power of the State shall be vested" in part "in Courts of Justices of the Peace." Tex. Const. art. V, § 1; see id. § 19. The Section 1-a removal procedure thus applies to justices of the peace. Id. § 1-a(6); Lowery, 999 S.W.2d at 650.
Section 1-a mandates that "[t]he Commission shall keep itself informed as fully as may be of the circumstances relating to the misconduct . . . of particular persons" subject to removal under the section. Tex. Const. art. V, § 1-a(7). The Commission must "receive complaints or reports, formal or informal, from any source in this behalf." Id.; see Tex. Gov't Code Ann. § 33.0211
(written complaints); Thoma, 873 S.W.2d at 483. The Commission may act "upon receipt of a verified statement, upon its own motion, or otherwise." Tex.R. Rem'l/Ret. Judg. 3(a).
Upon receipt of information relating to misconduct, the Commission must "make such preliminary investigations as it may determine." Tex. Const. art. V, § 1-a(7). "The commission may conduct a preliminary investigation of the circumstances surrounding an allegation or appearance of misconduct . . . of a judge to determine if the allegation or appearance is unfounded or frivolous." Tex. Gov't Code Ann. § 33.022(a); see Tex.R. Rem'l/Ret. Judg. *Page 673 
3(a); Thoma, 873 S.W.2d at 483. This preliminary investigation must be "as is appropriate to the circumstances." Tex.R. Rem'l/Ret. Judg. 3(a).
After an initial screening, an allegation or appearance of misconduct is "dismissed administratively when a complainant's writing or claim fails to state an allegation of judicial misconduct, or the Commission has no jurisdiction over the judge." STATE COMM'N JUD. CONDUCT ANN. REP. 10 (2003); see id.
at 14; SCHUWERK HARDWICK, HANDBOOK OF TEXAS LAWYER AND JUDICIAL ETHICS § 35.01, at 1154. "For example, the Commission lacks jurisdiction if a complaint concerns a federal judge or someone who is not a judge, such as a police officer." SCHUWERK 
HARDWICK § 35.02, at 1162 n. 23.
"If, after conducting a preliminary investigation . . ., the commission determines that an allegation or appearance of misconduct . . . is unfounded or frivolous, the commission" must "terminate the investigation." Tex. Gov't Code Ann. § 33.022(b);see Tex.R. Rem'l/Ret. Judg. 3(b). "The Commission may dismiss a case after conducting an investigation and review of the allegations." State Comm'n Jud. Conduct Ann. Rep. 10 (2003). "Reasons for these dismissals include insufficient or no evidence of misconduct," that "the judge was acting within his or her discretion," or that "the allegation is an issue for appellate review." Id. The standard of sufficiency of the evidence for purposes of dismissal is "much lower" than the preponderance of the evidence. Schuwerk Hardwick, Handbook of Texas Lawyer and Judicial Ethics § 35.02, at 1162 n. 25.
If the Commission does not determine that the allegation or appearance of misconduct is unfounded or frivolous, then the Commission must "conduct a full investigation of the circumstances surrounding the allegation or appearance of misconduct." Tex. Gov't Code Ann. § 33.022(c)(1)(A); see Tex.R. Rem'l/Ret. Judg. 4(a). Likewise, if the Commission determines that "sufficient cause exists to warrant full inquiry into the facts and circumstances indicating that a judge may be guilty of willful or persistent conduct which is clearly inconsistent with the proper performance of his duties or casts public discredit upon the judiciary or the administration of justice," the Commission must "conduct a full investigation into the matter." Tex.R. Rem'l/Ret. Judg. 4(a). Upon commencement of a full investigation, the Commission may order the judge to "submit a written response to the allegation or appearance of misconduct." Tex. Gov't Code Ann. § 33.022(c)(2)(A)(i); see Tex.R. Rem'l/Ret. Judg. 4(c). The Commission may also order the judge to "appear informally before the commission." Tex. Gov't Code Ann. §33.022(c)(2)(A)(ii); see Tex.R. Rem'l/Ret. Judg. 6. "To the extent that they do not conflict with the Rules for Removal or Retirement of Judges, the civil rules of procedure" govern proceedings before the Commission. Canales, 113 S.W.3d at 66;accord Barr, 13 S.W.3d at 533 (op. on orig. submission); see
Tex. Gov't Code Ann. §§ 33.022(j), 33.027; Tex.R. Rem'l/Ret. Judg. 10(d)(1).
"After such investigation as it deems necessary, the Commission may in its discretion issue a private or public admonition, warning, reprimand, or requirement that the" judge "obtain additional training or education." Tex. Const. art. V, § 1-a(8);see Tex. Gov't Code Ann. § 33.001(a)(10). Such "[a] sanction is remedial in nature." Tex.R. Rem'l/Ret. Judg. 1(e). "It is issued prior to the institution of formal proceedings to deter similar misconduct by a judge or judges in the future, to promote proper administration of justice, and to reassure the public that the *Page 674 
judicial system of this state neither permits nor condones misconduct." Id.
"All papers filed with and proceedings before the Commission" are "confidential, unless otherwise provided by law." Tex. Const. art. V, § 1-a(10); see Tex.R. Rem'l/Ret. Judg. 17. The Government Code provides, however, that "the papers filed with and proceedings before the commission are confidential prior to the filing of formal charges." Tex. Gov't Code Ann. § 33.032(a). The Government Code also provides that "[t]he formal hearing and any evidence introduced during the formal hearing . . . shall be public." Id. § 33.032(b); see Tex.R. Rem'l/Ret. Judg. 17(a).
Instead of issuing a sanction, "if the Commission determines that the situation merits such action, it may institute formal proceedings. . . ." Tex. Const. art. V, § 1-a(8). "`Formal proceedings' means the proceedings ordered by the commission concerning the public censure [or] removal . . . of a judge." Tex. Gov't Code Ann. § 33.001(a)(7); see Tex.R. Rem'l/Ret. Judg. 1(i). If the Commission so determines, it must "without delay" serve the judge with "written notice of the institution of formal proceedings." Tex. Gov't Code Ann. § 33.022(g); see
Tex.R. Rem'l/Ret. Judg. 10(a)(1), (3); Canales,113 S.W.3d at 64. The notice of formal proceedings must "specify in ordinary and concise language the charges against the judge and the alleged facts on which the charges are based and the specific standards contended to have been violated." Tex. Gov't Code Ann. § 33.022(h); see Tex.R. Rem'l/Ret. Judg. 10(a)(2). "The judge is entitled to file a written answer to the charges against the judge. . . ." Tex. Gov't Code Ann. § 33.022(h); see Tex.R. Rem'l/Ret. Judg. 10(b). The Constitution provides a judge "the right of discovery of evidence . . . after formal proceedings are instituted." Tex. Const. art. V, § 1-a(11); see Tex. Gov't Code Ann. § 33.027.
After the institution of formal proceedings, the Commission may "order a formal hearing to be held before it concerning the public censure [or] removal" of a judge subject to removal under Section 1-a(6). Tex. Const. art. V, § 1-a(8); see Tex. Gov't Code Ann. § 33.001(a)(7); Canales, 113 S.W.3d at 64. Instead of holding a public hearing before the Commission, the Commission "may in its discretion request the Supreme Court to appoint an active or retired District Judge or Justice of a Court of Appeals, or retired Judge or Justice of the Court of Criminal Appeals or the Supreme Court, as a Master." Tex. Const. art. V, §1-a(8); see Tex.R. Rem'l/Ret. Judg. 10(c)(2); Canales at 64. Chapter 33 and the Rules refer to such a master as a "special master." See Tex. Gov't Code Ann. § 33.001(a)(12); Tex.R. Rem'l/Ret. Judg. 1(d). "[C]omplaints that have been referred to a special master . . . have usually involved fairly complex factual situations." See Schuwerk Hardwick, Handbook of Texas Lawyer and Judicial Ethics § 36.03, at 1177. A special master has "all the power of a District Judge in the enforcement of orders pertaining to witnesses, evidence, and procedure." See Tex. Const. art. V, § 1-a(8). The special master must "hear and take evidence in any" formal proceeding and "report thereon to the Commission." See id. The special master's report must "contain a brief statement of the proceedings had and his findings of fact based upon a preponderance of the evidence with respect to the issues presented by the notice of formal proceedings" and, if the judge files an answer, with respect to the issues presented by the answer. Tex.R. Rem'l/Ret. Judg. 10(h)(1). At the hearing before the Commission or the special master, "[t]he examiner or other authorized person . . . present[s] the case in support of the charges in *Page 675 
the notice of formal proceedings." Id. 10(d)(1); see Tex. Gov't Code Ann. § 33.001(a)(5); Tex.R. Rem'l/Ret. Judg. 1(j).
Either the examiner or the judge may file with the Commission "a statement of objections to the report of the special master, setting forth all objections to the report and all reasons in opposition to the findings as sufficient grounds for removal." Tex.R. Rem'l/Ret. Judg. 10(i); see Canales, 113 S.W.3d at 64. "If no statement of objections to the report of the special master is filed within the time provided, the findings of the special master may be deemed as agreed to, and the commission may adopt them without a hearing." Tex.R. Rem'l/Ret. Judg. 10(j);see Barr, 13 S.W.3d at 533 (op. on orig. submission). "If a statement of objections is filed, or if the commission in the absence of such statement proposes to modify or reject the findings of the special master, the commission shall give the judge and the examiner an opportunity to be heard orally before the commission. . . ." Tex.R. Rem'l/Ret. Judg. 10(j). "The Commission may adopt the Special Master's findings in whole or in part, modify the findings, totally reject them and enter its own findings, or order a hearing for the taking of additional evidence." State Comm'n Jud. Conduct Ann. Rep. 12 (2003); see
Tex.R. Rem'l/Ret. Judg. 12(l) (1). "After adopting findings of fact, the Commission issues its conclusions of law." STATE COMM'N JUD. CONDUCT ANN. REP. 12 (2003); see Tex.R. Rem'l/Ret. Judg. 16.
If the Commission does not find good cause for removal or censure, it "may dismiss the case" or order a lesser sanction. Tex.R. Rem'l/Ret. Judg. 10(m); see Canales, 113 S.W.3d at 64. "If, after formal hearing, or after considering the record and report of a Master, the Commission finds good cause therefor," the Commission may "issue an order of public censure." Tex. Const. art. V, § 1-a(8); see Tex. Gov't Code Ann. §33.001(a)(9); Tex.R. Rem'l/Ret. Judg. 10(m). "An order of censure is tantamount to a denunciation of the offending conduct, and is more severe than the remedial sanctions issued prior to a formal hearing." Tex.R. Rem'l/Ret. Judg. 10(f). Instead of censure, if the Commission finds good cause, it may "recommend to a review tribunal the removal . . . of the person in question holding an office or position" subject to removal under Section 1-a. Tex. Const. art. V, § 1-a(8); see Tex.R. Rem'l/Ret. Judg. 10(m). A recommendation of removal must be "by affirmative vote of six of" the Commission's eleven members. Tex.R. Rem'l/Ret. Judg. 10(m);see Tex. Const. art. V, § 1-a(2).
"A recommendation of the commission for the removal . . . of a judge" is "determined by a review tribunal." Tex.R. Rem'l/Ret. Judg. 12(a); see Tex. Gov't Code Ann. § 33.001(a)(9); Tex.R. Rem'l/Ret. Judg. 1(h). "A tribunal to review the Commission's recommendation for the removal" of a person subject to removal under Section 1-a(6) "is composed of seven (7) Justices or Judges of the Courts of Appeals who are selected by lot by the Chief Justice of the Supreme Court" from a member designated by each Court. Tex. Const. art. V, § 1-a(9); see Tex. Gov't Code Ann. §33.001(a)(9); Tex.R. Rem'l/Ret. Judg. 1(h), 12(a).
When the Commission recommends removal to a review tribunal, the Commission must "thereupon file with the tribunal the entire record before the Commission." Tex. Const. art. V, § 1-a(8);see Tex.R. Rem'l/Ret. Judg. 12(b), 16. The Commission must also "make written findings of fact and conclusions of law with respect to the issues of fact and law in the proceeding." Tex.R. Rem'l/Ret. Judg. 16. *Page 676 
A judge may file with the review tribunal "[a] petition to reject the recommendation of the commission for removal." See
Tex.R. Rem'l/Ret. Judg. 12(c). A judge's "[f]ailure to file a petition within the time provided may be deemed a consent to a determination on the merits based upon the record filed by the commission." Id. 12(d). The petition must "specify the grounds relied on" and must be accompanied by a brief. Id. 12(c); seeid. 12(e).
The review tribunal must "review the record of the proceedings on the law and facts." Tex. Const. art. V, § 1-a(9). "To the extent that they do not conflict with the Rules for Removal or Retirement of Judges, the civil rules of procedure," including the appellate rules, govern judicial conduct proceedings.Canales, 113 S.W.3d at 66; accord Barr, 13 S.W.3d at 533 (op. on orig. submission); see Tex.R. Rem'l/Ret. Judg. 12(e), (g); Tex.R.App. P. Accordingly, waiver rules apply. "Predicates for complaints on appeal must be preserved at the trial court level by motion, exception, objection, or some other vehicle." Barr
at 555-57 (op. on orig. submission) (citing PGP Gas Prods., Inc.v. Fariss, 620 S.W.2d 559, 560 (Tex. 1981)); see Tex.R.App. P. 33.1; City of Fort Worth v. Zimlich, 29 S.W.3d 62, 73 (Tex. 2000). "As applied to an action to remove a judge from office," the judge "and the Commission . . . are restricted on appeal to the issues and theories on which the case was tried before the Special Master and presented to the Commission on Judicial Conduct, and the Review Tribunal, absent fundamental error, is not authorized to consider an issue or theory that was not before the trial court." Barr at 556 (op. on orig. submission) (citingGulf Consol. Int'l, Inc. v. Murphy, 658 S.W.2d 565, 566 (Tex. 1983)); see Universal Health Servs., Inc. v. Renaissance Women'sGroup, P.A., 121 S.W.3d 742, 748 (Tex. 2003). "Even constitutional arguments not asserted in the trial court are waived on appeal." Barr at 556 (op. on orig. submission);accord In re L.M.I., 119 S.W.3d 707, 711 (Tex. 2003), cert.denied, ___ U.S. ___, 124 S.Ct. 2175, 158 L.Ed.2d 733 (2004). Likewise, the harmless-error rule applies. Lowery,999 S.W.2d at 651-52; Thoma, 873 S.W.2d at 513; see Tex.R.App. P. 44.1. Also, the Rules of Appellate Procedure governing the form and content of briefs in appellate courts "govern the form and contents of briefs" in review tribunals "except where express provision is made to the contrary or where the application of a particular rule would be clearly impracticable, inappropriate, or inconsistent." Tex.R. Rem'l/Ret. Judg. 12(e); see Tex.R.App. P. 4, 49 Tex. B.J. 556, 559 (Tex. Tex.Crim.App. 1986) (amended 1997) (current version at Tex.R.App. P. 9); id. 74, 49 Tex. B.J. 556, 579 (Tex. Tex.Crim.App. 1986) (amended 1997) (current version at Tex.R.App. P. 38). Thus, "as in the case of appeals in civil cases, [in] complaints in cases brought pursuant to the Rules for the Removal or Retirement of Judges, failure to advance legal analysis, legal citations, and appropriate references to the record will serve as the foundation for waiver of such complaints on appeal." Canales at 72 (citing Fredonia StateBank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994)); accord Barr at 555 (op. on orig. submission); see
Tex.R.App. P. 38.1(h); Wilmer-Hutchins Indep. Sch. Dist. v.Smiley, 97 S.W.3d 702, 706 (Tex.App.-Dallas 2003, pet. denied). Such complaints should be overruled as inadequately briefed.See Tex.R.App. P. 38.1(h); Vickery v. Vickery,999 S.W.2d 342, 352-53 (Tex. 1999); McCarthy v. State, 65 S.W.3d 47, 49 n. 2 (Tex.Crim.App. 2001), cert. denied, 536 U.S. 972,122 S.Ct. 2693, 153 L.Ed.2d 862 (2002). We recognize that the number of judicial conduct cases in Texas is fortunately *Page 677 
small. See Canales at 64. But even in making an argument for which there is no authority directly on point, a party "must ground his contention in analogous case law or provide the Court with the relevant jurisprudential framework for evaluating his claim." Tong v. State, 25 S.W.3d 707, 710 (Tex.Crim.App. 2000) (op. on orig. submission).
"Within 90 days after the date on which the record is filed with the review tribunal," the tribunal must "order public censure . . . or removal, as it finds just and proper, or wholly reject the recommendation." Tex. Const. art. V, § 1-a(9). "The review tribunal, in . . . an order for removal, may prohibit" a judge "from holding judicial office in the future." Id. The Constitution provides that "[u]pon . . . an order for removal, the office in question shall become vacant." Id.
"A motion for rehearing" of the review tribunal's judgment "may not be filed as a matter of right." Tex.R. Rem'l/Ret. Judg. 14. The review tribunal's judgment "may direct that no motion for rehearing will be entertained, in which event the judgment will be final on the day and date of its entry." Id."If the . . . review tribunal does not so direct and the judge wishes to file a motion for rehearing," he or she must timely "present the motion together with a motion for leave to file the same to the clerk of the . . . review tribunal. . . ." Id. The review tribunal may take "such action as" it "deems proper." See id.
A judge "may appeal a decision of the review tribunal to the Supreme Court under the substantial evidence rule." Tex. Const. art. V, § 1-a(9); see Tex.R. Rem'l/Ret. Judg. 13.
 PROCEDURAL HISTORY
This statement of the facts is based largely on the findings of the Commission.[10] (See IV C.R. No. 58.) Because of the exceptional nature of the proceedings, we set out the facts in some detail.
Events Leading to the Complaint Filed by Dallas CountyCommissioners Court
Judge Rose took office as Justice of the Peace, Precinct 8, Place 1, Dallas County, Texas, in 1989. (IV C.R. No. 58, at [2], Find. 1.)
Judge Rose's court first began to have administrative problems at least as early as April 1992. At that time, Judge Rose's chief clerk was Belinda Brown. (IV C.R. No. 58, at 9, Find. 38.) From April through October 1992, the court failed to file monthly activity reports with the Dallas County budget office. (Exam'r Ex. E-2, at 3, No. 17; see IV C.R. No. 58, at 3, Find. 9.) The county budget office required monthly reports. (IV C.R. No. 58, at 10, Find. 45); see Tex. Loc. Gov't Code Ann. § 111.065 (Vernon 1999). The activity report reported the number of cases filed and the number disposed of in each of several categories. (See Exam'r Ex. E-35.)
In November 1992, Judge Rose was re-elected. (See I R.R. at 18, 82-83.)[11] *Page 678 
In November and December 1992, the court failed to file monthly activity reports. (See IV C.R. No. 58, at 3, Find. 9.)
In December 1992, the court first began to have financial problems. On December 23, 1992, the Dallas County Auditor conducted a cash count in the court.[12] (IV C.R. No. 58, at 3, Find. 8; id. at 4, Find. 11.) The count found thirty unreceipted checks totaling $3,668.50 and $430 in unreceipted cash. (Id.) As the current Dallas County Auditor, Virginia Porter, testified at the evidentiary hearing, the problem with receiving funds without issuing a receipt is that "it's a high internal control risk because there is no way to test that that money came in and was recorded properly or was missing." (II R.R. at 217.) The earliest date on an unreceipted check was September 9, 1992. (IV C.R. No. 58, at 3, Find. 8.)
On December 29, 1992, the auditor addressed a letter to Judge Rose. (IV C.R. No. 58, at 3, Find. 8; Exam'r Ex. E-1.) The auditor informed Judge Rose of the results of the recent cash count. (Id.) The auditor reminded Judge Rose of his duty to receipt monies received by the court timely, and to deposit them timely. (Id.) The auditor recommended to Judge Rose that "all monies received by [his] court be promptly receipted and deposited consistent with State Law and procedures promulgated by the County Auditor." (Exam'r Ex. E-1 (emphasis in orig.).) Judge Rose's chief clerk discussed the letter with him. (IV C.R. No. 58, at 3, Find. 8.)
In January 1993, the court did not file a monthly activity report. (See IV C.R. No. 58, at 3, Find. 9.)
On January 25, 1993, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 4, Find. 11; Exam'r Ex. E-2, at [1], Find. 1; see IV C.R. No. 58, at 3, Find. 9.) The count found seven unreceipted checks totaling $544.00 and $364.00 in unreceipted cash. (Exam'r Ex. E-2, at [1], Find. 1.)
On February 12, 1993, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 4, Find. 11; Exam'r Ex. E-2, at [1];see IV C.R. No. 58, at 3, Find. 9.) The count found twenty-one unreceipted checks totaling $2,705.02 and $300.00 in unreceipted cash. (Exam'r Ex. E-2, at [1], Find. 1.)
In February through May 1993, the court did not file monthly activity reports. (See IV C.R. No. 58, at 3, Find. 9.)
On May 28, 1993, the auditor addressed to Judge Rose a memorandum concerning an audit of the court for Fiscal Years 1989 and 1990. (IV C.R. No. 58, at 3, Find. 9; Exam'r Ex. E-2.) The audit found "several depositing discrepancies." (IV C.R. No. 58, at 3, Find. 9.) Among these discrepancies was that actual deposits for the audit period were $991.50 less than the totals reported by the court. (Exam'r Ex. E-2, at 2, Find. 8.) The audit also found that the *Page 679 
court failed to issue writs of capias timely.[13] (IV C.R. No. 58, at 3, Find. 9.) The audit found that, in forty-one cases in which Judge Rose had allowed the defendant an extension of time in which to pay a fine, the defendant had not made payment, but the court had nonetheless failed to issue a capias. (Exam'r Ex. E-2, at 3, Find. 10.) The audit also found "improper fees or fines." (IV C.R. No. 58, at 3, Find. 9.) The court sometimes failed to charge a fee required by law, and sometimes charged a fee less than or greater than that required by law. (Exam'r Ex. E-2, at 2, Find. 9.) Fees were sometimes applied to the wrong case or the wrong court. (Id. at 3, Find. 16.) Fines paid through the Dallas County Sheriff were not posted at all. (Id., Find. 15.) The audit also found that "many cases could not be found or properly identified." (IV C.R. No. 58, at 3, Find. 9.) The court could not find case files for twenty-four cases. (Exam'r Ex. E-2, at 3, Find. 13.) Also, no cases were found at all for four citations filed by the sheriff in the court. (Id., Find. 14.) The memorandum also noted that the court did not make a deposit on January 10, 1993, and did not make that deposit until January 26. (Id. at [1], Find. 2.) The auditor recommended to Judge Rose that "[a]ll funds received by court personnel should be receipted immediately. . . . No one should tender money to court [sic] without receiving an official county receipt." (Id. at 4, Recommend. 1 (emphasis in orig.).) The auditor also recommended that "[e]very case filed in the court should be posted to the JP accounting system as soon as possible." (Id., Recommend. 7.) The auditor also reminded Judge Rose of the duty to file monthly activity reports, and of their importance: "These reports provide essential information for staffing as well as revenue projections and fee analyses." (Id., Recommend. 14.) Belinda Brown discussed the audit memorandum with Judge Rose. (IV C.R. No. 58, at 3, Find. 9.)
On November 12, 1993, the auditor performed a cash count in the court. (IV C.R. No. 58, at 4, Find. 11; Exam'r Ex. E-3; see IV C.R. No. 58, at 3, Find. 10.) The count found twenty unreceipted checks or money orders totaling $4,503.47 and $10 in unreceipted cash. (IV C.R. No. 58, at 3, Find. 10; Exam'r Ex. E-3.) The oldest unreceipted check was dated November 30, 1992. (IV C.R. No. 58, at 3, Find. 10.) One check, in the amount of $2,792.14, was dated April 9, 1993. (Id.)
On November 24, 1993, the auditor conducted a follow-up count. (Exam'r Ex. E-3; see IV C.R. No. 58, at 3, Find. 10.) Of the checks identified on November 12 as being unreceipted, only one had been receipted. (IV C.R. No. 58, at 3, Find. 10.)
On December 3, 1993, the auditor addressed a memorandum to Judge Rose concerning the November cash count and follow-up count. (IV C.R. No. 58, at 3, Find. 10; Exam'r Ex. E-3.) The auditor recommended to Judge Rose that "all monies received in [his] court be promptly receipted and deposited consistent with State Law and procedures promulgated by *Page 680 
the County Auditor." (Exam'r Ex. E-3 (emphasis in orig.).) Belinda Brown discussed the memorandum with Judge Rose. (IV C.R. No. 58, at 3, Find. 10.)
On March 24, 1994, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 4, Find. 11; Exam'r Ex. E-4.) The count found nine unreceipted checks totaling $3,330.16 and $22.00 in unreceipted cash. (Id.)
On March 29, 1994, the auditor addressed to Judge Rose a memorandum concerning the previous five cash counts in the court. (IV C.R. No. 58, at 4, Find. 11; Exam'r Ex. E-4.) The auditor again recommended to Judge Rose that "all monies received by [his] court be promptly receipted and deposited consistent with State Law and procedures promulgated by the County Auditor." (IV C.R. No. 58, at 4, Find. 11 (emphasis in orig.); see Exam'r Ex. E-4.) The auditor notified Judge Rose that, "as many uncashed checks are void after 90 days, failure to promptly deposit may mean lost revenue for the county." (Exam'r Ex. E-4.) Belinda Brown discussed the memorandum with Judge Rose. (IV C.R. No. 58, at 4, Find. 11.)
In June 1994, the court did not file a monthly activity report. (See IV C.R. No. 58, at 4, Find. 12.)
On June 19, 1994, Belinda Brown left the court. (V R.R. at 1050.)
In July 1994 through February 1995, the court did not file monthly activity reports. (See IV C.R. No. 58, at 4, Find. 12.)
By March 1995, Judge Rose had hired Freddie Brown as his chief clerk. (See Resp't Ex. R-36, at [1].)
In March 1995, the court did not file a monthly activity report. (See IV C.R. No. 58, at 4, Find. 12.)
On April 11, 1995, the auditor addressed to Judge Rose a memorandum concerning undeposited checks. (IV C.R. No. 58, at 4, Find. 12; Exam'r Ex. E-5.) The auditor provided specific guidelines on how to deal with the court's stale, undeposited checks.[14] (Exam'r Ex. E-5 app.) The auditor also noted that the court had not filed a monthly activity report since May 1994, and stated, "it is critical that the delinquent reports be filed. . . ." (Exam'r Ex. E-5, at [1].)
On March 14, May 8, and August 20, 1996, the auditor conducted cash counts in the court. (Exam'r Ex. E-15, at 2, Find. 1; see
IV C.R. No. 58, at 6, Find. 22(a).) The counts found "[l]arge numbers of unreceipted checks and money orders." (Exam'r Ex. E-15, at 2, Find. 1; see IV C.R. No. 58, at 6, Find. 22(a).) Several of the checks were stale and no longer valid. (See id.) Most of the checks had not been restrictively endorsed upon receipt. (Exam'r Ex. E-15, at 2, Find. 1; see IV C.R. No. 58, at 6, Find. 22(a).)
In November 1996, Judge Rose was re-elected. (See I R.R. at 18, 82-83.)
On December 6, 1996, the auditor conducted a cash count in the court, after the treasurer found a cash shortage of $367 in one of the court's deposits. (Exam'r Ex. E-6; see IV C.R. No. 58, at 4, Find. 13.) The count found forty-four unreceipted checks totaling $8,896.06. (Exam'r Ex. E-6; see IV C.R. No. 58, at 4, Find. 13.) The oldest check was dated November 16, 1995. (Exam'r Ex. E-6.)
On December 6, 1996, the auditor reported to Judge Rose on the cash count of the same date. (IV C.R. No. 58, at 4, Find. 13; Exam'r Ex. E-6.) The auditor found that the court had used cash overages to maintain a petty cash fund and to make purchases, contrary to county policy. *Page 681 
(Exam'r Ex. E-6, at 1, Find. 3.) The auditor recommended to Judge Rose that "[a]ll monies received by [his] court should be promptly deposited consistent with State law and procedures promulgated by the County Auditor." (Id. at 2, Recommend. 2;see IV C.R. No. 58, at 4, Find. 13.) The auditor also recommended that "[a]ll unreceipted cash should either be posted to the proper case and [sic] fees or as a cash overage, as appropriate." (Exam'r Ex. E-6, at 2, Recommend. 3.)
On March 27, 1997, the auditor performed a cash count in the court. (IV C.R. No. 58, at 4, Find. 14; Exam'r Ex. E-7, at [1].) The auditor found unreceipted funds totaling $17,809.95. (Id.) The oldest item was dated October 1995. (Id.)
On March 28 and April 4, 1997, the court's deposits contained discrepancies that had to be corrected after the fact by county Data Services. (IV C.R. No. 58, at 4, Find. 14; Exam'r Ex. E-7, at [1].)
On April 14, 1997, the auditor addressed a memorandum to Judge Rose concerning undeposited funds. (IV C.R. No. 58, at 4, Find. 14; Exam'r Ex. E-7.) The auditor also reported the recent deposit discrepancies. (IV C.R. No. 58, at 4, Find. 14; Exam'r Ex. E-7, at [1].) The auditor noted: "Since December 23, 1992, cash counts performed in the court have found unreceipted funds on hand. Management letters have addressed overages and directed court personnel to promptly receipt and deposit all funds received." (Exam'r Ex. E-7, at [1].) The auditor also warned:
 Section 113.022 of the Government Code [sic] requires a county officer to deposit funds with the County Treasurer on or before the next regular business day after the date on which the funds are received. If this deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received.[15]
(Exam'r Ex. E-7, at [1]; see IV C.R. No. 58, at 4, Find. 14;id., at 10, Find. 45.) The auditor explained, "Failure to receipt and deposit items in a timely fashion result [sic] lost revenue to Dallas County and potential internal control problems." (Exam'r Ex. E-7, at [1].)
On September 17, 1997, the auditor addressed to Judge Rose a memorandum concerning an audit of the court for Fiscal Years 1993 through 1995. (IV C.R. No. 58, at 4, Find. 15; Exam'r Ex. E-8.) The audit found "[l]arge numbers of unreceipted checks, money orders and cash . . . on hand during cash counts performed since" Fiscal Year 1993, with most checks "not being restrictively endorsed upon receipt." (Exam'r Ex. E-8, at 2, Find. 1; see IV C.R. No. 58, at 4, Find. 15.) The audit also found that 72.5% of receipts reviewed "contained errors in deposit coding and/or in the amount collected," such as "[d]epositing fees for" the Dallas Area Rapid Transit system "into State fees . . . instead of . . . the special fund." (Exam'r Ex. E-8, at 2, Finds. 6, 6(a); see
IV C.R. No. 58, at 4, Find. 15.) The audit also found discrepancies in the court's monthly activity reports. (Exam'r Ex. E-8, at 2, Find. 3.) The court had a backlog of 2610 traffic cases and 1044 bad-check cases, which had not been entered into the Justice of the *Page 682 
Peace Accounting System ("JPAS"), but were nonetheless included in activity reports. (Id. at 3, Find. 11.) This overstated the court's cases by at least fifteen percent, and by as much as forty-six percent in Fiscal Year 1995. (Id.) The audit also found that the court was still using cash overages to fund purchases, rather than depositing and reporting them. (Id. at 2, Find. 2.) The audit also found discrepancies in the court's employees' time and attendance records. (Id. at 3, Find. 16.) The auditor recommended to Judge Rose: "Monies collected should be receipted and deposited timely. Checks should be restrictively endorsed upon receipt. (See Section 113.022 of the Local Government Code)." (Id. at 4; see IV C.R. No. 58, at 4, Find. 15.) The auditor also recommended, "Court costs should be assessed and deposited on all cases based on State laws, Commissioners Court orders, etc." (Exam'r Ex. E-8, at 4, Recommend. 6; see IV C.R. No. 58, at 4, Find. 15.) The auditor further recommended, "Cases should be entered on the JP accounting system before they are included on the monthly activity reports." (Exam'r Ex. E-8, at 4, Recommend. 12.) The auditor also recommended that the time and attendance records be corrected. (Id., Recommend. 16.)
In October 1997, Judge Rose hired a new bookkeeper. (See
Resp't Ex. R-36, at [3].)
On November 10, 1997, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 4, Find. 16; id. at 5, Find. 19(b); Exam'r Ex. E-12, at 2, Find. 3; Exam'r Ex. E-54, at 3, Find. 3.) The count found a backlog of $11,184.54 in unreceipted checks, of which more than half were more than thirty days old and some more than a year old. (Id.)
On December 5, 1997, the auditor conducted a cash count in the court. (See Exam'r Ex. E-54, at 1; Exam'r Ex. E-12, at 1; IV C.R. No. 58, at 4, Find. 16.) The count found undeposited funds from as long before as October 5, totaling $50,943. (IV C.R. No. 58, at 4, Find. 16; Exam'r Ex. E-54, at 1.)
On December 8, 1997, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 4, Find. 16; id. at 5, Find. 19(b); Exam'r Ex. E-12, at 2, Find. 3; Exam'r Ex. E-54, at 3, Find. 3.) The count found a backlog of $8,934.25 of unreceipted checks, of which more than half were more than thirty days old and some more than a year old. (Id.)
On January 6, 1998, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 4, Find. 16; id. at 5, Find. 19(b); Exam'r Ex. E-12, at 2, Find. 3; Exam'r Ex. E-54, at 3, Find. 3.) The count found a backlog of $5,060.37 of unreceipted checks, of which more than half were more than thirty days old and some more than a year old. (Id.)
On January 26, 1998, the auditor forwarded to Judge Rose a draft audit report. (IV C.R. No. 58, at 4, Find. 16; see Exam'r Ex. E-54.) The audit found that "repeated deposit delays had occurred throughout 1997." (IV C.R. No. 58, at 4, Find. 16; see
Exam'r Ex. E-54, at 2.) The auditor warned Judge Rose, "The delays represent noncompliance with V.T.C.A., Local Government Code, § 113.022 which requires deposit on or before the seventh business day after the day on which the funds are received." (Exam'r Ex. E-54, at 2, Find. 1; see IV C.R. No. 58, at 4, Find. 16.) The auditor reminded Judge Rose that "[c]ontinual deposit delays provide opportunities for lapping." (Exam'r Ex. E-54, at 3.) The auditor requested Judge Rose's response by February 6, 1998. (Id. at 1.) Judge Rose did not respond. (IV C.R. No. 58, at 5, Find. 17.) *Page 683 
On February 18, 1998, Dallas County field auditor Bill Wallace personally delivered a copy of the January 26 draft audit report to Judge Rose, discussed it with him, and "emphasized certain findings to the Judge related to deposit problems of the court." (IV C.R. No. 58, at 5, Find. 17; see V R.R. at 856.)
On March 11, 1998, Judge Rose told Wallace that "he did not want to meet with the County auditor; he's too busy." (IV R.R. at 785; V id. at 860; see Resp't Ex. R-4, at [2], # 8; Resp't Ex. R-32; IV C.R. No. 58, at 5, Find. 17.) On March 18, 1998, Judge Rose again refused to meet with the auditor. (See IV C.R. No. 58, at 5, Find. 17.) On both occasions, Judge Rose directed Wallace to the chief clerk. (Id.)
In the spring of 1998, Wallace discussed with Judge Rose the conduct of Judge Rose's chief clerk, Freddie Brown. (IV C.R. No. 58, at 5, Find. 18.) Wallace believed that Brown was "grossly incompetent." (Id.; see V R.R. at 878, 879-80, 883.) Judge Rose took no action with regard to Brown. (IV C.R. No. 58, at 5, Find. 18.)
On May 5, 1998, the auditor addressed a memorandum regarding deposit problems to Judge Rose. (IV C.R. No. 58, at 5, Find. 19; Exam'r Ex. E-12.) The memorandum found "depositing problems and delays" in the court "throughout calendar year 1997" and 1998. (IV C.R. No. 58, at 5, Find. 19; see Exam'r Ex. E-12, at 1.) The auditor again warned Judge Rose, "The delays represent noncompliance with V.T.C.A., Local Government Code, § 113.022, which requires deposit on or before the seventh business day after the day on which the funds are received." (Exam'r Ex. E-12, at 1, Find. 1; see IV C.R. No. 58, at 5, Find. 19.) Among those problems, the auditor found a "[l]ack of written procedures for the new bookkeeper to follow in the receipting/balancing process." (Exam'r Ex. E-12, at 1; see IV C.R. No. 58, at 5, Find. 19(a).) The auditor also found "[n]o evidence of priority assigned to problem resolution for financial transactions." (Exam'r Ex. E-12, at 2, Find. 8; see IV C.R. No. 58, at 5, Find. 19(c).) The auditor also found an unresolved cash shortage, and again found that cash overages were being used for petty cash funds and to fund purchases. (Exam'r Ex. E-12, at 3, Find. 4.) The auditor recommended, "Deposits should be made in a timely fashion to comply with State statutes and County policies." (Id. at 2, Recommend. 1; see IV C.R. No. 58, at 5, Find. 19.) The auditor also recommended, "All cash shortages should be reported timely according to the County Policies and Procedures manual." (Exam'r Ex. E-12, at 3, Recommend. 6; see IV C.R. No. 58, at 5, Find. 19.)
On May 8, 1998, the auditor addressed to Judge Rose a memorandum concerning disbursements and receipt corrections. (IV C.R. No. 58, at 5, Find. 20; see Exam'r Ex. E-13.) The auditor notified Judge Rose that the court had not posted the majority of its special-funds checks issued after Fiscal Year 1996 to the Justice of the Peace Accounting System.[16] (IV C.R. No. 58, at 5, Find. 20; Exam'r Ex. E-13.) The auditor also notified Judge Rose that the court had not made receipt corrections that the auditor had requested on May 1. (Id.) The auditor stated the importance of these matters: "Amounts should be posted to the correct receipt code to ensure funds due the State of Texas or other governmental *Page 684 
entities are properly remitted." (Exam'r Ex. E-13.)
On September 18, 1998, the auditor conducted a cash count in the court. (IV C.R. No. 58, at 5, Find. 21; Exam'r Ex. E-14.) The count found ninety-three unreceipted checks or money orders totaling $13,878.12, and $120 in unreceipted cash. (Id.) Almost half of the checks and money orders were over thirty days old, and the earliest was dated October 16, 1995. (Id.)
Over Fiscal Years 1999 through 2001, a clerk embezzled at least $4,000 from the court. (Resp't Ex. R-34; IV R.R. at 811-13.)
On October 7, 1998, the auditor addressed a memorandum to Judge Rose concerning the September cash count. (IV C.R. No. 58, at 5, Find. 21; Exam'r Ex. E-14.) The memorandum found deposit delays that "represent[ed] noncompliance with V.T.C.A., Local Government Code, § 113.022 which requires deposit on or before the seventh business day after funds are received." (Exam'r Ex. E-14, Find. 2; see IV C.R. No. 58, at 5, Find. 21.) The auditor recommended, "Deposits should be made timely to comply with State statutes and County policies." (Exam'r Ex. E-14, Find. 2; see
IV C.R. No. 58, at 5, Find. 21.)
On March 15, 1999, the auditor addressed to Judge Rose a memorandum concerning an audit of his court for Fiscal Year 1996. (IV C.R. No. 58, at 6, Find. 22; Exam'r Ex. E-15.) The audit found "[l]arge numbers of unreceipted checks and money orders on hand" throughout the year. (Exam'r Ex. E-15, at 2, Find. 1; see
IV C.R. No. 58, at 6, Find. 22(a).) The audit also found several categories of errors in deposit coding and fee assessment, including special-fund errors. (IV C.R. No. 58, at 6, Find. 22(b); Exam'r Ex. E-15, at 2, Finds. 6-7, 10.) The audit found several discrepancies in monthly activity reports, including an overstatement of cases processed by thirty-seven percent. (IV C.R. No. 58, at 6, Find. 22(c); Exam'r Ex. E-15, at 3, Find. 11.) The audit also found that although the majority of defendants on payment plans were not making timely payments no capias was issued for them. (IV C.R. No. 58, at 6, Find. 22(d); Exam'r Ex. E-15, at 2, Find. 8.) The auditor recommended: "Monies collected . . . should be receipted and deposited timely. Checks should be restrictively endorsed upon receipt (See Section 113.022 of the Local Government Code)." (Exam'r Ex. E-15, at 3, Recommend. 1; IV C.R. No. 58, at 6, Find. 22.) The auditor also recommended, "Court costs should be assessed and deposited on all cases based on State laws, Commissioners Court orders, etc." (Exam'r Ex. E-15, at 4, Recommend. 6; IV C.R. No. 58, at 6, Find. 22.) The auditor also recommended, "A capias should be issued for all cases where payment terms are not met." (Exam'r Ex. E-15, at 4, Recommend. 8.)
On March 19, 1999, the auditor addressed to Judge Rose a memorandum concerning disbursements and receipt corrections. (IV C.R. No. 58, at 6, Find. 23; Exam'r Ex. E-16.) The auditor reminded Judge Rose of the failings in those areas that she had identified in her memorandum of May 8, 1998. (Exam'r Ex. E-16;see IV C.R. No. 58, at 6, Find. 23; cf. Exam'r Ex. E-13.) The auditor notified Judge Rose that those errors had not been corrected. (Exam'r Ex. E-16; see IV C.R. No. 58, at 6, Find. 23.) The auditor notified Judge Rose, "Special fund checks that have been disbursed, but not posted to the JPAS represent your staff's failure to properly perform their job responsibilities." (Exam'r Ex. E-16; see IV C.R. No. 58, at 6, Find. 23.) The auditor notified Judge Rose that the amount of the court's *Page 685 
errors exceeded the value of Judge Rose's bond. (Exam'r Ex. E-16.)
In late March 2000, Bill Wallace again discussed with Judge Rose the chief clerk, Freddie Brown. (IV C.R. No. 58, at 6, Find. 24.) Wallace still believed Brown to be "grossly incompetent." (See id.; V R.R. at 878, 879-80.) Judge Rose told Wallace that during Judge Rose's campaign for Congress in 1975, Brown "had helped him greatly," that "he was very, very loyal to Freddie Brown," and that "Freddie Brown would remain with him as his chief clerk as long as he was the justice of the peace." (V R.R. at 882; see IV C.R. No. 58, at 6, Find. 24.) Judge Rose then said, "that's all I want to hear about — I don't want to hear about this again." (V R.R. at 882; see IV C.R. No. 58, at 6, Find. 24.)
On March 28, 2000, the auditor conducted a cash count in the court. (Exam'r Ex. E-18, at [1], Find. 1; see IV C.R. No. 58, at 7, Find. 27.) The count found 226 unreceipted checks and money orders totaling $32,459.25. (IV C.R. No. 58, at 7, Find. 27; Exam'r Ex. E-18, at [1], Find. 1; Exam'r Ex. E-43.) Of those, three belonged to another court, two pertained to cases that had been dismissed, and two were personal checks, notwithstanding the court's policy not to accept personal checks. (Exam'r Ex. E-18, at [1], Find. 1; see IV C.R. No. 58, at 7, Finds. 27(b)-(d).)
On April 4, 2000, on the instructions of the auditor, field auditor Wallace took the unreceipted checks to the auditor's office. (IV R.R. at 796-97; V id. at 866.) Judge Rose was not in the court at the time. (IV id. at 796.) When Wallace returned to the court, he found Judge Rose "in a state of rage." (Id. at 817.) Judge Rose demanded the checks back. (Id.) Judge Rose cursed Wallace out for at least two hours, using foul language. (Id. at 817, 818.) Wallace testified that he had only been cursed at worse once, by four Marines when he was in boot camp. (Id. at 818.) Wallace refused to return to finish the audit, and had to take two days off from work because of high blood pressure resulting from his encounter with Judge Rose. (Id. at 819-20.)
On April 4, 2000, the auditor, the county's audit supervisor, and a county commissioner met with Judge Rose concerning the undeposited $32,500. (IV C.R. No. 58, at 6, Find. 25.) Judge Rose was "displeased" and "upset" about the removal of the checks. (II R.R. at 247.) The auditor again gave Judge Rose copies of previous audit reports. (IV C.R. No. 58, at 6, Find. 25.) The parties to the meeting "pointedly discussed" the statutory requirements for the deposit of funds with the treasurer. (Id.) The auditor did not deposit the checks, but returned them to Judge Rose. (II R.R. at 206.)
On April 25, 2000, the Dallas County Commissioners Court addressed a letter to Judge Rose and the other justices of the peace in the county. (IV C.R. No. 58, at 6, Find. 26; Exam'r Ex. E-17.) The Commissioners Court forwarded a memorandum from the Dallas County District Attorney, which stated:
 [T]here are primarily two State statutes that govern a Justice of the Peace's obligations to deposit money. The first statute is Section 113.022 of the Local Government Code and the second is Article 103.004 of the Code of Criminal Procedure.[17] Both of these statutes *Page 686 
place a duty on a county officer to deposit funds they have received with the County Treasurer on or before the next regular business day after the date on which the funds have been received. These statutes also recognize that in some cases the next day may not be possible and adds [sic] that in those cases, without exception, funds must be deposited on or before the seventh business day for funds belonging to the County and no more than the third business day for funds belonging to the State of Texas.
 [W]hen the County Auditor finds funds have not been timely deposited it shall be reported to the Commissioners Court at their next meeting for the purpose of initiating a suit for recovery of the outstanding monies.
(Exam'r Ex. E-17, at [1] (emphasis in orig.); see I C.R. No. 58, at 6, Find. 26.) The Commissioners Court added:
 Based on the severity of the recent failure of a Justice of the Peace to timely deposit County and State funds, in the future when we are informed by the County Auditor of an official's failure to carry out their responsibilities in a proper and lawful manner we will contact this official and offer to assist them in gaining immediate compliance. If the official does not cooperate or take necessary remedial actions, we will inform the District Attorney of our findings and ask that they compel the officer to properly perform their duties.
(Exam'r Ex. E-17, at 2; see I C.R. No. 58, at 6, Find. 26.)
On April 27, 2000, the auditor conducted a cash count in Judge Rose's court. (Exam'r Ex. E-18, at [1], Find. 1; see IV C.R. No. 58, at 7, Find. 27.) The count found that of the $32,500 backlog found on March 28, forty checks and money orders totaling $5,338.50 remained undeposited. (Exam'r Ex. E-18, at [1], Find. 1; see IV C.R. No. 58, at 7, Find. 27(e).)
On May 2, 2000, the auditor addressed a memorandum concerning undeposited funds to Judge Rose. (IV C.R. No. 58, at 7, Find. 27; Exam'r Ex. E-18.) The memorandum reported on the backlog found on March 28 and the court's efforts to dispose of it. (Id.) The report noted:
 We previously addressed deposit delays with your court in various memos since 1992. V.T.C.A., Local Government Code, § 113.022 requires that a county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date funds are received. If the deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day funds are received.
(Exam'r Ex. E-18, at 2 (emphasis in orig.); see IV C.R. No. 58, at 7, Find. 27.) The report generally recommended, "Computer receipts should be issued and deposits made in a timely manner to comply with State statutes and County policies." (Exam'r Ex. E-18, at 2, Recommend. 1; see IV C.R. No. 58, at 7, Find. 27.) The report also made some dozen specific recommendations for dealing with the court's unreceipted and undeposited funds. (Exam'r Ex. E-18, at 2.)
Beginning on June 2, 2000, the court was closed to the public on Friday afternoons in order to allow the staff additional *Page 687 
time to process the week's cases and the court's backlog. (IV C.R. No. 58, at 7, Find. 28.) Nonetheless, the court made no progress against the backlog. (Id.; III R.R. at 500.)
On September 11, 2000, the auditor addressed a memorandum to Judge Rose concerning deposit shortages and other problems in the court. (IV C.R. No. 58, at 7, Find. 29; Exam'r Ex. E-19.) The auditor noted, "Undeposited funds have been addressed repeatedly, but most recently in a memo dated May 2, 2000." (Exam'r Ex. E-19, at 3, Recommend. 3(c).) The auditor generally recommended:
 All funds received should be immediately receipted and deposited. V.T.C.A., Local Government Code, § 113.022 requires that a county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date on which the funds are received. If the deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received.
(Id. (emphasis in orig.); see IV C.R. No. 58, at 7, Find. 29.) The auditor also made several specific recommendations for dealing with deposit shortages. (Exam'r Ex. E-19, at 2-3.) The auditor also required written monthly status reports and a briefing to the Commissioners Court on the deposit shortages. (Id. at 3.)
In November 2000, Judge Rose was re-elected. (See I R.R. at 18, 82-83.)
On November 29, 2000, the auditor addressed to Judge Rose a memorandum concerning undeposited funds and late deposits. (IV C.R. No. 58, at 7-8, Find. 30; Exam'r Ex. E-20.) The auditor reported, "Unacceptable delays on deposits and processing are noted for this court." (Exam'r Ex. E-20, at [1].) The auditor also reported:
 A review of current deposit trends by your court reveals continued noncompliance with V.T.C.A., Local Government Code, § 113.002 which requires that a county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date on which the funds are received. If the deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received.
(Id. (emphasis in orig.).) The auditor found undeposited checks and money orders totaling $37,885.25 and $45,761.50 in undeposited cash from as far back as September 23. (Id.; see IV C.R. No. 58, at 7, Finds. 30(a)-(c).) The auditor also found deposits of checks and money orders totaling $25,187.25 and $14,745.25 in cash that were late by as much as forty-one days. (Exam'r Ex. E-20, at 2; see IV C.R. No. 58, at 8, Finds. 30(d)-(f).) The auditor noted, "Undeposited funds have been addressed repeatedly to your court, but to no avail." (Exam'r Ex. E-20, at [1]; see IV C.R. No. 58, at 7.) The auditor also noted, "Significant deficiencies with established internal controls related to cash handling and deposit procedures have been noted previously." (Exam'r Ex. E-20, at 2; see IV C.R. No. 58, at 7, Find. 30.) The auditor recommended that "all outstanding receipted funds be deposited immediately with the County Treasurer." (Exam'r Ex. E-20, at 2 (emphasis in orig.);see IV C.R. No. 58, at 7, Find. 30.) The auditor also stated, "Compliance with statutory deposit requirements must be followed." (Exam'r Ex. E-20, at 3 (emphasis in orig.); see IV C.R. No. 58, at 7, Find. 30.)
On December 7, 2000, the auditor addressed a memorandum to Judge Rose concerning an audit of the court for Fiscal Years 1997 and 1998. (IV C.R. No. 58, at 8, *Page 688 
Find. 31; Exam'r Ex. E-21.) The audit found cash shortages, problems in deposits, and other problems. (IV C.R. No. 58, at 8, Find. 31; Exam'r Ex. E-21, at 2-3.) The court's receipts that the auditor reviewed had an error rate of sixty-one percent in posting fees and fines. (Exam'r Ex. E-21, at 3, Find. 6; see IV C.R. No. 58, at 8, Find. 31.) The court's reports of cases filed were again overstated, by 158.8% for criminal cases in Fiscal Year 1997 and by 72.1% in Fiscal Year 1998. (Exam'r Ex. E-21, at 2, Find. 4.) The court either had not posted or had incorrectly posted all special-fund checks issued. (Id. at 3, Find. 8;see IV C.R. No. 58, at 8, Find. 31.) The memorandum also noted that by April 2000 the court had a backlog of 6,000 unprocessed traffic citations and 1,400 unprocessed bad-check cases. (Exam'r Ex. E-21, at 3, Find. 10; see IV C.R. No. 58, at 8, Find. 31.) The auditor recommended:
 Monies collected should be deposited timely. V.T.C.A., Local Government Code, § 113.022 requires that a county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date on which the funds are received. If the deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received.
(Exam'r Ex. E-21, at 4, Recommend. 1 (emphasis in orig.); see
IV C.R. No. 58, at 8, Find. 31.) The auditor also recommended, "Court costs and fines should be properly assessed/collected and deposited on all cases based on State Laws, Commissioners Court orders, etc." (Exam'r Ex. E-21, at 4, Recommend. 6; see IV C.R. No. 58, at 8, Find. 31.) The auditor also recommended: "Activity reports should be submitted monthly and corrected if errors are later identified. . . . Cases should only be reported on the activity reports that have been processed to the JPAS system for the month which is being reported." (Exam'r Ex. E-21, at 4, Find. 4.)
On February 5, 2001, the auditor addressed to the District Attorney's Office a memorandum on undeposited funds in the court. (IV C.R. No. 58, at 8, Find. 32; Exam'r Ex. E-22.) The memorandum reported the undeposited funds of which the auditor had notified Judge Rose in her memorandum of November 29, 2000. (See Exam'r Ex. E-22; cf. IV C.R. No. 58, at 7-8, Find. 30; Exam'r Ex. E-20, at 1.) The auditor reported to the district attorney that the court had not corrected deposit errors in the amount of $14,465.45, as the auditor had requested. (IV C.R. No. 58, at 8, Find. 32; Exam'r Ex. E-22.) The auditor also reported that the court had not made a deposit since December 8, 2000, and estimated that the court was holding over $200,000 in undeposited funds. (Id.) The auditor stated, "We feel this matter has reached a very critical stage and request appropriate legal action." (Exam'r Ex. E-22.)
On February 14, 2001, the county internal audit manager and two auditor staff went to the court to assist the bookkeeper in organizing funds for deposit. (II R.R. at 394; Exam'r Ex. E-33, at 3, Find. 1(w).) In the bookkeeper's office, staff found "stacks of case files with checks." (II R.R. at 394.) Inside the safe, staff found some items "were kind of mashed in there. . . . It was just kind of pushed in there. There was money shoved in all kinds of places in there that we had to pull out." (Id. at 395.) Staff found undeposited funds from as far back as September 2000 totaling $231,219.21. (Exam'r Ex. E-33, at 3, Find. 1(w); Exam'r Ex. E-31, at [3]; II R.R. at 386; see Exam'r Ex. E-44.) That amount included $107,942.51 in cash and $123,276.70 in checks. (See Exam'r Ex. *Page 689 
E-31, at [3].) Staff also found unreceipted "loose cash" totaling $1,367.00. (II R.R. at 387, 395-96.) They also found an unexplained cash shortage of $1,158.74. (Exam'r Ex. E-33, at 3, Find. 1(w); Exam'r Ex. E-31, at [4].)
On February 16, 2001, the district attorney addressed a letter to Judge Rose. (IV C.R. No. 58, at 8, Find. 33; Exam'r Ex. E-23.) The district attorney wrote, "This letter is to advise you that the Dallas County Commissioners Court has requested me to take whatever action is necessary to compel you to perform your statutory obligations to timely deposit State and County funds." (Exam'r Ex. E-23, at [1].) Concerning those duties, the district attorney noted, "By a series of letters and memorandums directed to your attention, you have been advised of your duties with respect to the deposit and receipt of funds received by your office in your official capacity." (Id.) The district attorney noted concerning those duties, "your office and the employees under your direction and control do not have discretion with respect to their duties." (Id.) The district attorney stated three requirements:
 1. Receipt and deposit of all funds by the next business day or within seven (7) business days and in no event later than thirty (30) days from the date of receipt. See, Local Government Code 113.022.
 2. Receipts should be processed and entered to the Justice of the Peace accounting system. . . . . Remittance of the funds to the county should be by scheduled courier to the County Treasurer.
 3. Remit funds to other entities as required by law (e.g., DISD, DART, etc.). . . .
 (There are many functions regarding the safeguarding of cash and monies held by public officials. The above functions are the mini[m]um required to maintain compliance with state law.)
(Id. at 2 (underlining and italics in orig.).) The district attorney warned that if Judge Rose did not comply within seven days, the district attorney would file a petition for writ of mandamus to compel Judge Rose to comply. (Id.)
On February 16, 2001, the Commissioners Court filed a complaint against Judge Rose with the Commission. (See Exam'r Ex. E-52.) The complaint alleged that Judge Rose "is continually and repeatedly ignoring his obligation to deposit monies as required by Section 113.022, Local Government Code and Article 103.004 of the Code of Criminal Procedures [sic]." (Id.) The Commissioners Court stated that Judge Rose had not deposited funds with the county since December 8, 2000, and estimated that Judge Rose was holding between $300,000 and $400,000 in undeposited funds, including between $150,000 and $200,000 in cash. (Id.) The Commissioners Court also noted that between March and April 2000 Judge Rose had failed to process 7,400 cases. (Id.)
Events Leading to the Complaint Filed by David Henderson
In March 1997, David G. Henderson received three citations for traffic offenses. (IV C.R. No. 58, at 9, Find. 43; see Resp't Ex. R-28, at [9], [17].) Henderson personally appeared in Judge Rose's court as the citations ordered, but the court did not permit him to enter a plea. (III R.R. at 567; see Resp't Ex. R-28, at [9], [17].)
On March 3, 1999, the court issued Notices of Violation to Henderson. (IV C.R. No. 58, at 9-10, Find. 43; see Resp't Ex. R-28, at [8], [13].) The notices stated, "A COMPLAINT HAS BEEN FILED WITH THIS COURT AGAINST YOU. . . ." (Resp't Ex. R-28, at [8], [13].) *Page 690 
The notices ordered Henderson to appear and enter his plea by April 30. (Id.)
In February 2000, Henderson again personally appeared in court, and entered pleas of "not guilty." (III R.R. at 570; Resp't Ex. R-28, at [5], [15].)
On December 17, 2000, the court sent Henderson notices of trial for January 10, 2001. (IV C.R. No. 58, at 10, Find. 43; Resp't Ex. R-28, at [3], [13].) On January 10, Judge Rose orally found Henderson guilty on two complaints and dismissed one complaint. (IV C.R. No. 58, at 10, Find. 43; see III R.R. at 571-72, 582.) Judge Rose did not notify Henderson which complaint Judge Rose dismissed or of which complaints Judge Rose found Henderson guilty. (IV C.R. No. 58, at 10, Find. 43; III R.R. at 571-72, 582.) Judge Rose did not sign a judgment or sentence, and no judgment or sentence was entered into the court's computer system. (See IV C.R. No. 58, at 10, Find. 43; VII R.R. at 1371;cf. Resp't Ex. R-28.) Sometime thereafter, Henderson filed a complaint against Judge Rose with the Commission. (See III R.R. at 566, 573.)
Post-Complaints Events
On February 26, 2001, the Commissioners Court filed an Application for Writ of Mandamus against Judge Rose in district court. (IV C.R. No. 58, at 8, Find. 34; Resp't Ex. R-62.)
On February 28, 2001, the district court issued a writ of mandamus to Judge Rose. (IV C.R. No. 58, at 8, Find. 35; Exam'r Ex. E-40.) The writ ordered
 that ROSE, his employees, agents, representatives, and all persons under his direction and control . . .:
 (a) Immediately deposit with the County Treasurer all . . . fees . . . and other obligations recovered in the name of the State not later than the next regular business day after the date that the money is collected. If it is not possible for ROSE to deposit the money with the County Treasurer by that date, then ROSE shall deposit the money in the County Treasury as soon as possible, but not later than the third regular business day after the day that the money is collected.
 (b) Deposit with the County Treasurer all fees, . . . funds and other money belonging to the COUNTY on or before the next regular business day after the date on which the funds are received. If this deadline is not met, ROSE must deposit the funds without exception on or before the seventh business day after the day on which the funds are received.
 (c) Provide immediate, unrestricted access to the Dallas County Auditor, her staff or designees to review any and all files in ROSE'S Court. . . .
(Exam'r Ex. E-40, at 2-3 (emphasis in orig.); see IV C.R. No. 58, at 8, Find. 35.) The writ warned, "Failure to abide by the terms of this Writ of Mandamus shall submit the offender to possible contempt citation." (Exam'r Ex. E-40, at 5.) The writ also ordered:
 (e) The County Auditor, as a designee of this Court in furtherance of the Writ of Mandamus, shall be directed to review, process and direct posting of the approximately 1,000 cases that have been filed yet not disposed of by ROSE. . . .
 (f) The County Auditor as a designee of this Court i[n] furtherance of the Writ of Mandamus, shall forthwith direct and supervise all accounting, clerical and audit functions necessary to process and dispose of all backlogged cases within *Page 691 
ninety (90) days of the issuance of the Writ of Mandamus.
(Exam'r Ex. E-40, at 3-4; see IV C.R. No. 58, at 8, Find. 35.)
On February 28, 2001, the Dallas Morning News published an article concerning Judge Rose. See Todd Bensman, CountyLawsuit Seeks Funds from JP, DALLAS MORNING NEWS, Feb. 28, 2001, at 27A, LEXIS, NEWS Library, DALNWS File. The Commission investigated the circumstances in the article as an appearance of misconduct. (See Exam'r Ex. E-26, at 6, # 6.)
On March 1, 2001, the county created a special project team to process the court's case backlog. (See IV C.R. No. 58, at 8, Find. 35; id. at 9, Find. 37.) The team removed a backlog of 20,373 citations issued as far back as 1998, on which the court had not performed any work. (Id.; Exam'r Ex. E-46; II R.R. at 404.) The special project team relieved the court of the responsibility to enter those cases into the Justice of the Peace Accounting System; the court would only have to enter cases filed in March 2001 and thereafter. (IV C.R. No. 58, at 9, Find. 37.) Nonetheless, the court immediately began to accumulate a backlog of unprocessed citations. (Id.)
On March 1, 2001, the Commission began its investigation into Judge Rose's conduct.
On March 9, 2001, Judge Rose, blaming Freddie Brown for the court's problems, fired her. (IV C.R. No. 58, at 9, Find. 36.)
On March 19, 2001, the Commission asked Judge Rose to respond to the complaints against him in writing. (Exam'r Ex. E-26.)
On March 23, 2001, the court had 789 unreceipted checks and money orders totaling $117,710.40 on hand. (Exam'r Ex. E-33, at 3, Find. 1(q); see IV C.R. No. 58, at 9, Find. 40.) The auditor requested that the court deposit them, but the court did not. (Exam'r Ex. E-33, at 3, Find. 1(q); see IV C.R. No. 58, at 9, Find. 40.)
On March 26, 2001, the auditor again requested that the court deposit the undeposited checks and money orders. (Exam'r Ex. E-33, at 3, Find. 1(q); see IV C.R. No. 58, at 9, Find. 40.)
On April 2, 2001, Judge Rose hired Belinda Brown as his chief clerk for the second time. (IV C.R. No. 58, at 9, Find. 38.)
On April 6, 2001, Judge Rose responded to the Commission's inquiry. (Exam'r Ex. E-28.) Judge Rose stated, in response to the allegations in the Dallas Morning News article, "I can now handle the workload and I can conduct the court in a lawful manner." (Id. at 4.)
On April 13, 2001, the court had 127 unreceipted checks and money orders totaling $21,109.86 on hand. (Exam'r Ex. E-33, at 3, Find. 1(q); see IV C.R. No. 58, at 9, Find. 40.)
In April and May 2001, the court did not file monthly activity reports. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On June 11, 2001, the auditor addressed a memorandum to the District Attorney's Office concerning missing and misappropriated funds in the court. (Exam'r Ex. E-31.) The memorandum reported $11,157.74 in cash shortages. (Id. at [1].)
In June and July 2001, the court did not file monthly activity reports. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On August 10, 2001, Judge Rose testified informally before the Commission. (Exam'r Ex. E-32.) Judge Rose testified that if a proposed justice court redistricting plan went into effect he intended to "go to the house," that is, to "take three years of pay" without performing regular *Page 692 
judicial services. (Id. at 14, pp. 52-53; id. at 15, p. 55;id. at 20-21, pp. 77-78.) Judge Rose's salary is over $87,000 per year. (IV C.R. No. 58, at 10, Find. 44.)
In August through November 2001, the court did not file monthly activity reports. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
Beginning in December 2001, after justice court redistricting, Judge Rose's court has been designated as Justice of the Peace Precinct 1-a, Dallas County. (IV C.R. No. 58, at [2], Find. 2);see 74 TEX. JUD. COUNCIL OFF. CT. ADMIN. TEX. JUD. SYS. ANN. REP. 347 (2002), available at
http://www.courts.state.tx.us/publicinfo/AR2002/jp/redistricted.pdf (last visited Apr. 19, 2004).
In December 2001, the court did not file a monthly activity report. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On December 31, 2001, the auditor addressed to Judge Rose a memorandum concerning an audit of his court for Fiscal Years 1999 and 2000 and part of Fiscal Year 2001. (IV C.R. No. 58, at 9, Find. 40; Exam'r Ex. E-33.) The memorandum reported numerous, continuing problems in receipting and depositing, and in other areas. (Id.) The auditor recommended:
 Monies collected should be deposited timely. V.T.C.A., Local Government Code, § 113.022 requires that a county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date on which the funds are received. If the deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received. In addition, Vernon's Ann. C.C.P. art. 103.004 further reduces the time frame to the third business day.
(Exam'r Ex. E-33, at 6, Recommend. 1(p) (emphasis in orig.);see IV C.R. No. 58, at 9, Find. 40.) The auditor also made some fifty other specific recommendations. (Exam'r Ex. E-33, at 6-10.)
In January through April 2002, the court did not file monthly activity reports. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On April 23, 2002, the auditor conducted a review of traffic citations in the court. (See Exam'r Ex. E-34, at [1], Find. 3.) The court had 3,977 unprocessed traffic citations, primarily issued between May and July 2001. (Id.; see IV C.R. No. 58, at 9, Find. 41; cf. id., Find. 37.)
In April and May 2002, the court did not file monthly activity reports. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On May 17, 2002, the Examiner filed the original Notice of Formal Proceedings against Judge Rose. (See IV C.R. No. 1.)
In June 2002, the court did not file a monthly activity report. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On July 1, 2002, Judge Rose filed his Original Answer. (See I C.R. No. 7.) Judge Rose entered a general denial, and specifically denied that he acted in bad faith or willfully. (Id. at 1, 1-2.)
In July and August 2002, the court did not file monthly activity reports. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On August 22, 2002, the Supreme Court appointed a special master.[18] (See I C.R. No. 12.)
In September 2002, the court did not file a monthly activity report. (See IV C.R. No. 58, at 9, Finds. 39, 42.) *Page 693 
On September 17, 2002, the Examiner filed the First Amended Notice of Formal Proceedings, the live pleading. (See II C.R. No. 22.) The amended notice made six charges against Judge Rose:
CHARGE I
 Rose failed to timely and properly receipt, deposit, and account for monies received by the court, which dereliction of duty involved far more than a thousand instances, occurred over a period covering more than five years, and resulted in litigation and negative media attention concerning Rose's conduct. Each and every such instance constitutes an instance of willful or persistent conduct in violation of the law or the Code of Judicial Conduct, willful or persistent conduct that is clearly inconsistent with the proper performance of his duties, or willful or persistent conduct that casts public discredit on the judiciary or the administration of justice, in violation of the standards set forth in:
 1. Article 5, Section 1-a(6)A. of the Texas Constitution;
 2. Canon 2A of the Texas Code of Judicial Conduct;[19] or
 3. Section 33.001(b) of the Texas Government Code.[20]
 CHARGE II
 Rose failed to timely and properly receipt, deposit, and account for monies received by the court, which dereliction of duty involved far more than a thousand instances, occurred over a period covering more than five years, and resulted in litigation and negative media attention concerning Rose's conduct. Each and every such instance constitutes an instance of incompetence in the performance of the duties of the office, in violation of the standards set forth in:
 1. Article 5, Section 1-a(6)A. of the Texas Constitution; *Page 694 
2. Canon 2A of the Texas Code of Judicial Conduct; or
3. Section 33.001(b) of the Texas Government Code.
CHARGE III
 Rose failed to file the required reports, which dereliction of duty involved far more than a few instances, occurred over a period covering almost two years, and continued in spite of requests to submit the monthly reports. Each and every such instance constitutes an instance of willful or persistent conduct in violation of the law or the Code of Judicial Conduct, willful or persistent conduct that is clearly inconsistent with the proper performance of his duties, or willful or persistent conduct that casts public discredit on the judiciary or the administration of justice, in violation of the standards set forth in:
 1. Article 5, Section 1-a(6)A. of the Texas Constitution;
2. Canon 2A of the Texas Code of Judicial Conduct; or
3. Section 33.001(b) of the Texas Government Code.
CHARGE IV
 Rose failed to file the required monthly reports, which dereliction of duty involved far more than a few instances, occurred over a period of almost two years, and continued in spite of requests to submit the monthly reports. Each and every such instance constitutes an instance of incompetence in the performance of the duties of the office, in violation of the standards set forth in:
 1. Article 5, Section 1-a(6)A. of the Texas Constitution;
2. Canon 2A of the Texas Code of Judicial Conduct; or
3. Section 33.001(b) of the Texas Government Code.
CHARGE V
 Rose's failure to timely execute the business of the court, considering the quantity and complexity of the business, involved approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Rose's court. Each and every such instance constitutes an instance of willful or persistent conduct that is clearly inconsistent with the proper performance of his duties or willful or persistent conduct that casts public discredit on the judiciary or the administration of justice, in violation of the standards set forth in:
 1. Article 5, Section 1-a(6)A. of the Texas Constitution;
2. Canon 2A of the Texas Code of Judicial Conduct;
 3. Canon 3B(1) of the Texas Code of Judicial Conduct;[21] or
4. Section 33.001(b) of the Texas Government Code.
CHARGE VI
 Rose's failure to timely execute the business of the court, considering the quantity *Page 695 
and complexity of the business, involved approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Rose's court. Each and every such instance is an instance of incompetence in the performance of the duties of the office, in violation of the standards set forth in:
 1. Article 5, Section 1-a(6)A. of the Texas Constitution;
2. Canon 2A of the Texas Code of Judicial Conduct;
 3. Canon 3B(1) of the Texas Code of Judicial Conduct; or
4. Section 33.001(b) of the Texas Government Code.
(II C.R. No. 22, at 7-9.)
On September 20, 2002, the auditor conducted a cash count and review of traffic citations in the court. (Exam'r Ex. E-34, at [1].) The count found unreceipted checks dated as early as August 29. (Id., Find. 2.) The review also found 3,456 unprocessed traffic citations. (Id., Find. 3.)
On October 4, 2002, the special master called the evidentiary hearing by a telephone conference, but immediately continued it to November 12.[22] (R.R. (10/4/2002); IV C.R. No. 58, at 9, Find. 42.)
On October 14, 2002, the auditor addressed to Judge Rose a memorandum concerning traffic citation and other review steps. (IV C.R. No. 58, at 9, Find. 41; Exam'r Ex. E-34.) The auditor reported on the September 20 cash count and review of traffic citations in the court. (Exam'r Ex. E-34, at [1].) The auditor also notified Judge Rose that, although the court reported that the chief clerk had been absent from work for six weeks, the county's time and attendance records showed her as having been absent only two weeks. (IV C.R. No. 58, at 9, Find. 9; Exam'r E-34, at [1], Find. 4.) The auditor recommended:
 Monies collected should be deposited timely. V.T.C.A., Local Government Code, § 113.022 requires that a county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date on which the funds are received. If the deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received. In addition, Vernon's Ann. C.C.P., art. 103.004 further reduces the time frame to the third business day.
(Exam'r Ex. E-34, at 2, Recommend. 1 (emphasis in orig.).) The auditor also recommended, "Traffic citations should always be promptly posted to your system." (Id., Recommend. 2.) The auditor also recommended, "All vacation, sick leave, comp time and approved time off should be posted in accordance with county policy. . . ." (Id., Recommend. 3.)
In October 2002, the court did not timely file a monthly activity report. (See IV C.R. No. 58, at 9, Finds. 39, 42.)
On October 18, 2002, the court filed monthly activity reports for August and September 2002. (IV C.R. No. 58, at 9, Find. 42;see Exam'r Ex. E-35, at [18]-[19].)
On November 8, 2002, the court filed seventeen monthly activity reports, for April 2001 through July 2002 and October 2002. (IV C.R. No. 58, at 9, Finds. 39, 42; see Exam'r Ex. E-35, at [1]-[17].)
On November 12, 2002, the evidentiary hearing before the special master continued. *Page 696 
(See I R.R.) The hearing concluded on November 21. (See VIIIid.)
In November and December 2002, the Examiner and Judge Rose, respectively, filed proposed findings of fact. (III C.R. Nos. 40, 43.) The Examiner's amended proposed findings of fact proposed eighty-six findings numbered 1 through 86. (Id. No. 40.) Judge Rose proposed "general findings" numbered 1 through 12, and "specific findings" designated A through T. (Id. No. 43.) The special master substantially adopted the findings of fact proposed by the parties. (See id. No. 45.) The special master reported eight "general findings of fact" numbered 1 through 8. (Id. at [1]-[2].) The special master also reported "specific findings of fact" in two series: he reported that "Examiners for the State Commission on Judicial Conduct and their Special Counsel established" eighty-three facts numbered 1 through 83, (id. at [2]-18), and reported that "Judge Charles Rose and his attorney established" facts designated A through R, (id. at 18-28).
In December 2002 and January 2003, the Examiner and Judge Rose, respectively, filed statements of objections to the special master's reported findings. (III R.R. No. 49; IV id. No. 52.)
On February 13, 2003, the Commission held a hearing on the parties' statements of objections to the special master's reported findings. (See R.R. (2/13/2003).)
On April 24, 2003, the Commission issued its Findings, Conclusions and Recommendations. (IV C.R. No. 58.) The Commission sustained the Examiner's objections to the special master's reported findings in part and overruled them in part, and sustained Judge Rose's objections in part and overruled them in part. (See id. at [1]-[2].) The Commission "adopt[ed] and affirm[ed] the Findings of Fact of the Special Master signed on December 10, 2002 as follows, with the previous rulings on the parties' Objections taken into consideration," and made forty-eight findings numbered 1 through 48. (See id. at [2]-10.) The Commission's findings included several summary findings:
 2. While acting in his capacity as Justice of the Peace, Judge Rose repeatedly failed to perform non-discretionary ministerial acts regarding the depositing, receipting and accounting of funds received by his office as required by State law, including Sections 113.021(a), 113.022, and 114.041(b) of the Texas Local Government Code.[23] *Page 697 
 3. While acting in his capacity as Justice of the Peace, Judge Rose repeatedly failed to perform non-discretionary ministerial acts regarding the filing of reports as required by State Law and Dallas County, including Sections 111.065, 114.002, 114.003, 114.042, 114.043, and 114.044 of the Texas Local Government Code.[24] *Page 698 
 4. While acting in his capacity as Justice of the Peace, Judge Rose on occasion failed to timely schedule and hear cases in accordance with the Code of Judicial Conduct.
 5. During substantial periods of time, Judge Rose has allowed cases to be entered into the system at a pace so slow that enormous backlogs and congestion have occurred. For example, from January 1, 2002 thru [sic] April 30, 2002, despite a backlog of thousands of unentered cases, Judge Rose's staff of 3 persons entered cases at a rate of only 4 per day. . . .
. . . .
 7. For at least a decade, Judge Rose persistently failed to comply with requirements for receipting, depositing and accounting for funds, has persistently failed to comply with requirements for filing monthly activity reports, and has persistently failed to process new cases to keep up with intake.
. . . .
 46. Findings of Fact Nos. [enumerated] deal with failures to timely deposit moneys. They demonstrate thousands of instances of negligent, persistent and unjustifiable failure by Judge Rose to timely execute the business of the court, considering the quantity and complexity of the business. Those findings demonstrate persistent conduct, that is clearly inconsistent with the proper performance of his duties, and willful conduct, and also persistent conduct, that casts public discredit on the judiciary and the administration of justice.
 47. Findings of Fact Nos. [enumerated] deal with failures to timely file monthly activity reports. They demonstrate dozens of instances of negligent, persistent and unjustifiable failure by Judge Rose to timely execute the business of the court, considering the quantity and complexity of the business. Those findings demonstrate persistent conduct, that is clearly inconsistent with the proper performance of his duties, and negligent conduct, and also persistent conduct, that casts public discredit on the judiciary and the administration of justice.
 48. Findings of Fact Nos. [enumerated] deal with the backlog of case activity, including the failure timely to enter new cases into the Justice of the Peace Accounting System (JPAS). They demonstrate tens of thousands of instances of negligent, persistent and unjustifiable failure by Judge Rose to timely execute the business of the court, considering the quantity and complexity of the business. Those findings demonstrate persistent conduct, that is clearly inconsistent with the proper performance of his duties, and persistent conduct, that casts public discredit on the judiciary and the administration of justice.
(IV C.R. No. 58, at [2]-3, 10.)
The Commission made the following twenty-seven conclusions of law:
CONCLUSIONS ON CHARGE I
 1. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring *Page 699 
over a period covering more than five years was a willful violation of the Code of Judicial Conduct and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 2. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years was willful conduct that was clearly inconsistent with the proper performance of his duties and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years was willful conduct that cast public discredit upon the judiciary or the administration of justice, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 4. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years was willful conduct that violated the Code of Judicial Conduct, Canon 2A, which provides, in pertinent part, "A judge shall comply with the law . . ." (specifically, by failing to comply with Sections 113.021(a), 113.022, and 114.041(b) of the Texas Local Government Code).
 CONCLUSION ON CHARGE II
 Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years constitutes incompetence in performing the duties of office and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 CONCLUSIONS ON CHARGE III
 1. Judge Rose's failure to file required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports was a willful violation of the Code of Judicial Conduct and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 2. Judge Rose's failure to file required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports was willful conduct that was clearly inconsistent with the proper performance of his duties and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to file required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports was willful conduct that cast public discredit upon the judiciary or the administration of justice, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 4. Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports was willful conduct that violated the Code of Judicial Conduct, Canon 2A, which provides, in pertinent part, "A judge shall comply with the law . . ." (specifically, by failing to comply with Sections 111.065, 114.002, and 114.003, 114.042, 114.043, *Page 700 
and 114.044 of the Texas Local Government Code).
 CONCLUSION ON CHARGE IV
 Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit monthly reports constitutes incompetence in performing the duties of office and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 CONCLUSIONS ON CHARGE V
 1. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court was a willful violation of the Code of Judicial Conduct and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 2. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court was willful conduct that was clearly inconsistent with the proper performance of his duties and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court was willful conduct that cast public discredit upon the judiciary or the administration of justice, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 4. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court was willful conduct that violated the Code of Judicial Conduct, Canon 3B(1), which provides, in pertinent part, "A judge shall hear and decide matters assigned to the judge except those in which disqualification is required or recusal is appropriate."
 CONCLUSION ON CHARGE VI
 Judge Rose's failure to timely execute the business of the court involving 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court constitutes incompetence in performing the duties of office and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 CONCLUSIONS ON PERSISTENT CONDUCT CHARGES I AND II
 1. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years constitutes persistent conduct *Page 701 
that was clearly inconsistent with the proper performance of his duties, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 2. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years constitutes persistent conduct that cast public discredit upon the judiciary or the administration of justice, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years constitutes persistent conduct that violated the Code of Judicial Conduct, Canon 2A, which provides, in pertinent part, "A judge shall comply with the law . . ." (specifically, by failing to comply with Sections 113.021(a), 113.022, and 114.041(b) of the Texas Local Government Code).
 4. Judge Rose's failure to timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period covering more than five years constitutes incompetence in performing the duties of office and further constitutes persistent conduct, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 CONCLUSIONS ON PERSISTENT CONDUCT CHARGES III AND IV
 1. Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports constitutes persistent conduct that was clearly inconsistent with the proper performance of his duties, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 2. Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports constitutes persistent conduct that cast public discredit upon the judiciary or the administration of justice, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports constitutes persistent conduct that violated the Code of Judicial Conduct, Canon 2A, which provides, in pertinent part, "A judge shall comply with the law . . ." (specifically, by failing to comply with Sections 111.065, 114.002, and 114.003, 114.042, 114.043, and 114.044 of the Texas Local Government Code).
 4. Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit monthly reports constitutes incompetence in performing the duties of office and further constitutes persistent conduct that violated Article 5, Section 1-a(6)A of the Texas Constitution.
 CONCLUSIONS ON PERSISTENT CONDUCT CHARGES V AND VI
 1. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of *Page 702 
unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court constitutes persistent conduct that was clearly inconsistent with the proper performance of his duties and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 2. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court constitutes persistent conduct that cast public discredit upon the judiciary or the administration of justice, and violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court constitutes incompetence in performing the duties of office and further constitutes persistent conduct that violated Article 5, Section 1-a(6)A of the Texas Constitution.
 3. Judge Rose's failure to timely execute the business of the court involving 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court constitutes incompetence in performing the duties of office and further constitutes persistent conduct that violated Article 5, Section 1-a(6)A of the Texas Constitution.
[sic] (IV C.R. No. 58, at 10-15.)
The Commission recommended:
 1. that the Supreme Court of Texas appoint a Review Tribunal pursuant to the provisions of Article V, Section 1-a(8) of the Texas Constitution;
 2. that Judge Charles Rose, Justice of the Peace, Precinct 1-A of Dallas, Dallas County, Texas, be removed from office; and
 3. that the Review Tribunal further issue an order, pursuant to the provisions of Article V, Section 1-a(9) of the Texas Constitution, prohibiting Judge Rose from holding judicial office in the future.
(IV C.R. No. 58, at 15.)
On May 6, 2003, Judge Rose filed his Motion for Reconsideration and/or Rehearing with the Commission. (See IV C.R. No. 61.) On May 22, the Commission denied the motion. (See id. No. 65.)
On May 28, 2003, the Supreme Court appointed this Review Tribunal. (IV C.R. No. 66.)
On June 9, 2003, the Commission filed its record with the Review Tribunal.
Judge Rose has waived the time period for the Review Tribunal's decision.
Judge Rose's term of office will expire on December 31, 2004. (IV C.R. No. 58, at 10, Find. 44.)
 ANALYSIS
Judge Rose's petition contains twenty-four numbered "good and sufficient reasons" for rejecting the Commission's recommendation. (Rose Pet. at 2-30.) His brief presents twelve unnumbered issues, which we number for convenience: *Page 703 
 [1.] Whether clerical and administrative failures in the court's processing of cases, depositing funds, and making reports are sufficient grounds to remove an elected judge from office. (An issue of first impression).
 [2.] Whether an elected judge can be removed for the insufficiencies of his court staff, who are not his employees, rather than his own personal misconduct.
 [3.] Whether the Texas constitution requires personal misconduct by the judge to support removal, rather than mere negligence in supervision of staff or lack of diligence.
 [4.] Whether the State Commission can ignore the findings of the Special Master, after the State Commission chose to have the Special Master appointed to act as the trier of fact.
 [5.] Whether the State Commission acted arbitrarily and capriciously when it ignored the findings of fact of the Special Master in making its recommendations.
 [6.] Whether the State Commission can arbitrarily and capriciously pick and chose [sic] which Findings of Fact it will adopt, and thus ignore findings related to causation and responsibility for the administrative failures.
 [7.] Whether Petitioner has been deprived of due process of law and equal protection of the laws by the actions of the State Commission in ignoring the findings of fact of the Special Master.
 [8.] Whether the conclusions and recommendations of the State Commission must be supported by, and consistent with, the findings of fact made by the trier of fact.
 [9.] Whether the Commission's recommendations should be followed when the "uncontested" and "agreed to" facts do not support its recommendation.
 [10.] Whether removal from office is the appropriate discipline under the facts of this case.
 [11.] Whether an order prohibiting the holding of judicial office in the future is appropriate discipline under the facts of this case.
 [12.] Whether the Commission's recommendations should be wholly rejected.
(Rose Br. at ix-x (line spacing added).) Judge Rose's brief's argument is divided into seven numbered sections. (Id. at 10-51.) The Examiner identifies and responds to five issues. (Exam'r Br. at x.) We generally analyze Judge Rose's case by reference to his twelve issues presented. To the extent that we cannot discern Judge Rose's issues or his arguments for them, those issues are overruled as inadequately briefed.[25]
 COURT'S FAILURE TO DISCHARGE ITS LEGAL DUTIES
In Judge Rose's first three issues, he argues that a judge cannot be disciplined for the failure of the court to fulfill its adjudicative and administrative duties. (Rose Br. at ix.) Judge Rose briefs these three issues together as Section I of his argument. (See id. at 10-12.) We will overrule these issues.
Issue 1: Removal for Court's Administrative Failures
In Judge Rose's first issue, he contends that "clerical and administrative failures in the court's processing of cases, depositing funds, and making reports are [not] sufficient grounds to remove an elected *Page 704 
judge from office." (See Rose Br. at ix.) In connection with this issue, Judge Rose notes parenthetically, "An issue of first impression." (Id. at ix.) Judge Rose briefs this issue in Section I of his argument. (See id. at 10-12.) There is precedent for removal for administrative misconduct in Texas, and precedent for lesser discipline for such misconduct is well-established. Moreover, removal for such misconduct is well-established in other states.
"Perhaps the most significant changes in the judicial role in recent years have been those relating to a judge's administrative responsibilities." JEFFREY M. SHAMAN, STEVEN LUBET JAMES J. ALFINI, JUDICIAL CONDUCT AND ETHICS § 6.01 (3d ed. 2000). The increase in judicial reporting requirements would lead to the conclusion that "there [i]s another dimension to judging, a dimension of administrative responsibility" applicable to each judge for the particular court over which that judge presides.See id. (quoting In re Alvino, 100 N.J. 92, 494 A.2d 1014,1017 (1985)). Justices of the peace, in particular, act "in many instances in an administrative capacity." 47 AM.JUR.2D Justicesof the Peace § 1 (1995).
Indeed, Texas Code of Judicial Conduct Canon 3(C) specifically concerns administrative responsibilities. See TEX. CODE JUD. CONDUCT, Canon 3(C). Canon 3(C) provides:
 A judge should diligently and promptly discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.
TEX. CODE JUD. CONDUCT, Canon 3(C)(1).
Contrary to Judge Rose's assertion, the issue of the removal of a judge for conduct similar to his is not one of first impression in Texas. See In re Hilton, No. 56 (Tex.Rev.Trib. Feb. 7, 1991) (judgment), Jud. Discipline Disability Dig. (Am. Judicature Soc'y Supp. 1989-1991), available at WESTLAW, JDDD Database.[26] In Inquiry Concerning Hilton, the examiner charged a justice of the peace with, among other misconduct: (1) receiving some $4,452 over a period of two years and failing to report it as required by Texas Local Government Code Section 114.003; and (2) failing to forward abstracts of six traffic convictions in his court to the Texas Department of Public Safety as required by former Texas Revised Civil Statutes Article 6701d, Section 152. Notice Formal Proceedings at 4-7, 10-12, Hilton
(No. 56); Report Spec. Master at 3-5, 7-8, Hilton; see Uniform Act Regulating Traffic on Highways, 50th Leg., R.S., ch. 421, § 152, 1947 Tex. Gen. Laws 967, 1001 (amended 1989) (repealed 1995) (current version at TEX. TRANSP. CODE ANN. §§ 543.201-543.206 (Vernon 1999 Supp. 2004)). A special master reported findings that the Commission had "fully met its burden of proof by a preponderance of the evidence" as to the failure to report receipts and as to three of the unreported convictions. See
Report Spec. Master at 5, 8, Hilton. The Commission affirmed the special master's findings and recommended removal. Concls. Law, Hilton. A review tribunal "approved, confirmed, and affirmed" the Commission's conclusions, and ordered removal.Hilton (judgment).
Across the country, removal for administrative misconduct is well-accepted. Since 1990, including Judge Hilton in Texas, at least fourteen judicial removal cases "involved exclusively administrative malfeasance," and in at least thirteen more, *Page 705 
"administrative lapses were part of the findings supporting removal." Discipline for Failure to Perform AdministrativeDuties, 24 JUD. CONDUCT REP. No. 4, at 3 (2003); see CYNTHIA GRAY, A STUDY OF STATE JUDICIAL DISCIPLINE SANCTIONS 9-10 (2002) (covering 1990-2001); see also Am. Judicature Soc'y, JudicialDiscipline Sanctions in 2003, at
http://www.ajs.org/ethics/story.asp?content — id=259 (Feb. 17, 2004); Nine Judges Removed in 2002, 24 JUD. CONDUCT REP. No. 4, at 1 (2003). For example, in In the Matter of Corning, the Court of Appeals of New York accepted the New York State Commission on Judicial Conduct's recommendation of removal of a town court justice for failing to deposit court funds in his official account within seventy-two hours after receipt in violation of court rules, and for failing to remit court funds to the state comptroller by the tenth day of the month following collection in violation of statutes.[27] In re Corning,95 N.Y.2d 450, 718 N.Y.S.2d 272, 741 N.E.2d 117, 118, 119-20
(N.Y. 2000) (per curiam) (interpreting N.Y. COMP.CODES R. REGS. tit. 22, § 100.3(B)(1) (LEXIS through changes received June 4, 2004) (judge shall "be faithful to the law")); see N.Y. COMP.CODES R. REGS. tit. 22, § 214.9(a) (LEXIS through changes received June 4, 2004); N.Y. UNIFORM JUST. CT. ACT § 2021(1) (Consol.Supp. 2004); N.Y. TOWN LAW § 27(1) (Consol. 1976); N.Y. VEH. TRAF. LAW § 1803(8) (Consol.Supp. 2004).[28]
Moreover, discipline less than removal for administrative misconduct is well-established in Texas. Indeed, the Commission has recently sanctioned one of Judge Rose's colleagues, Dallas County Justice of the Peace Juan Jasso, for conduct similar to Judge Rose's, although on a much smaller scale:
 In two complaints, plaintiffs' cases remained pending for years with no disposition as a result of a backlog of cases, *Page 706 
disorganization, and other administrative problems among the judge's court staff. In a third complaint, the judge was found to have engaged in fiscal mismanagement by failing to fulfill his statutory obligation to deposit monies as required by the Local Government Code and the Code of Criminal Procedure. An auditor reported to the County Commissioner's Court that the judge's court had thousands of dollars worth of unposted receipts, numerous posting errors, and approximately $6,650.00 in missing funds. These audit findings indicated that similar findings and recommendations had been made to the judge on numerous occasions in the past. Further, it was determined that the judge failed to file monthly activity reports with the Office of Court Administration ("OCA") since 2001, despite receiving notices that the reports were overdue. A follow-up audit reflected that receipts still were not being immediately given when payment was tendered, even after the judge became aware of the Commission's investigation. The Commission concluded that the judge persistently failed to maintain and monitor his civil court docket, and had failed to properly account for and deposit monies collected by his court and to timely file with the OCA the required monthly activity reports. The judge's persistent failure to comply with statutory requirements in the Local Government Code, the Code of Criminal Procedure and the Government Code was clearly inconsistent with the proper performance of his duties. [Violation of Article V, Section 1-a(6)A, Texas Constitution and Canon 2A, Texas Code of Judicial Conduct.] Public Admonition and Order of Additional Education of Justice of the Peace Juan Jasso (08/25/03).
STATE COMM'N JUD. CONDUCT ANN. REP. 27-28 (2003) (bracketed material and italics in orig.); see Tex. Gov't Code Ann. §71.035(b) (Vernon 1998) (OCA reporting requirements). See also
the following examples of improper judicial conduct similar to Judge Rose's for which judges have been disciplined:
 • "The Judge's court unreasonably delayed defendant's traffic case for eighteen (18) months after the Judge recused herself. . . . [E]ighteen (18) months was an unreasonable delay constituting an unjustifiable failure to timely execute the business of the court." STATE COMM'N JUD. CONDUCT ANN. REP. § 9 (2002), http://www.scjc.state.tx.us/ANNUAL — REPORT — 2002.pdf (last visited Mar. 2, 2004) (admonition and order of education).
 • A justice of the peace who failed to credit a defendant's fine payment to the defendant's case, failed to correct the error after it was brought to her attention, issued a warrant for the defendant's arrest on the grounds of failure to pay the fine, later denied that she had received the defendant's payment, and failed to refund the defendant's double payment timely after he paid the fine a second time, "lacked the professional competence to perform the responsibilities, including the clerical duties, required of a justice court." Discipline, 64 TEX. B.J. 291, 291 (2001) (public admonition).
 • "A judge received monies in his judicial capacity and thereafter failed to report the same to the county auditor as required by statute and county practice." STATE COMM'N JUD. CONDUCT ANN. REP. (1991), 55 TEX. B.J. 1061, 1064 (1992).
 • "A judge allowed her staff complete responsibility for the recording and *Page 707 
reporting of fines collected and the judge's inattention to her responsibility resulted in thousands of dollars being unaccounted for." Id.
 • "A judge failed to establish appropriate internal controls within his office so as to properly safeguard and account for public funds coming into the office." STATE COMM'N JUD. CONDUCT ANN. REP. (1987), 51 TEX. B.J. 464, 465 (1988).
 • "A judge failed to handle the business of his court, including accounting for county funds paid through his court." STATE COMM'N JUD. CONDUCT ANN. REP. (1985), 49 TEX. B.J. 844, 848 (1986).[29]
Accordingly, abundant precedent supports judicial discipline, including removal, for administrative misconduct. Judge Rose's first issue is overruled.
Issue 2: Discipline for Failure to Supervise Court Personnel
In Judge Rose's second issue, he contends that "an elected judge can [not] be removed for the insufficiencies of his court staff, who are not his employees, rather than his own personal misconduct." (See Rose Br. at ix.) Judge Rose briefs this issue in Section I of his argument. (See id. at 10-12.) It is well-settled, however, that a judge may be disciplined for the conduct of those under his or her direction and control. We will overrule this issue.
There is no doubt that the many duties of a court cannot be accomplished without court staff. "Although frequently the words `judge' and `court' are used interchangeably, the judge is not the court[;] and the time when, the place where, and the persons by whom the judicial functions are to be exercised, are essential to a complete idea of court." 16 Tex. Jur.3d Courts § 1 (1997) (internal footnote omitted); see Ex parte Lowery,518 S.W.2d 897, 901-902 (Tex.Civ.App.-Beaumont 1975, orig. proceeding). "In every court there must be some officer authorized to exercise each phase or element of the power *Page 708 
conferred on the court, and there can be no valid creation of a court without provision for the necessary officers." 16 Tex. Jur.3d Courts § 3.
But the judge, who necessarily delegates some of the court's responsibilities to staff, retains the obligation to see to it that his or her staff fulfills the responsibilities delegated. While, "[a]s a practical matter, much of the day-to-day work involved in the recordkeeping and reporting duties officially allocated to a judge is performed by staff[, c]harges relating to failures in such areas, even if attributable in fact to staff inadequacies, relate to the ultimate responsibility of the judge. . . ." Russell G. Donaldson, Annotation, Removal orDiscipline of State Judge for Neglect of, or Failure to Perform,Judicial Duties, 87 A.L.R.4th 727, 768 n. 18 (1991). Thus, "although the clerk performs the physical act of record keeping, the judge is ultimately responsible for the administration of his court." In re Quick, 553 So.2d 522, 525 (Miss. 1989).
Texas courts have recognized this principle. For example, former Texas Family Code Section 11.14(d) "require[d] that a record be made in all suits affecting the parent-child relationship `as in civil cases generally unless waived by the parties with the consent of the court.'" Stubbs v. Stubbs,685 S.W.2d 643, 645 (Tex. 1985) (quoting Act of May 25, 1973, 63d Leg., R.S., ch. 543, § 1, sec. 11.14(d), 1973 Tex. Gen. Laws 1411, 1418 (repealed 1995) (current version at Tex. Fam. Code Ann. § 105.003(c) (Vernon 2002))). The Texas Supreme Court held that it was "the responsibility of the trial judge to see that the court reporter performs this duty." Id.; accord Walker v.Stefanic, 898 S.W.2d 347, 349 (Tex.App.-San Antonio 1995, no writ) ("The trial judge is ultimately responsible to see that a record is made of the proceedings. . . ."); see also In reHatfield, 607 N.E.2d 384, 386 (Ind. 1993) (trial judge responsible for "one-year backlog of transcript requests" because "he is the employer and direct supervisor of the court reporters in his court").
Likewise, the Dallas Court of Appeals issued a writ of mandamus to the presiding judge of a district court for actions taken by visiting judges. See Hoggard v. Snodgrass, 770 S.W.2d 577
(Tex.App.-Dallas 1989, orig. proceeding). The court noted that "[b]ecause the visiting judge `sits for' the permanent judge, the rulings of the visiting judge are, in effect, the rulings of the permanent judge." Id. at 588. "The visiting judges acted only at the request and pleasure of the permanent judge." Id.
Therefore, "the permanent judge . . . is ultimately responsible for any order that issues from the . . . District Court." Id.
Accordingly, there is no doubt that the failure to supervise, or the under-supervision of, court staff can constitute judicial misconduct. See generally SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 6.10. Texas Code of Judicial Conduct Canon 3(C) expressly provides that in a judge's discharge of his or her administrative responsibilities, "[a] judge should require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge. . . ." TEX. CODE JUD. CONDUCT, Canon 3(C)(2). In defining "require" in that context, the Code notes that "a judge is to exercise reasonable direction and control over the conduct of those persons subject to the judge's direction and control." Id., Canon 8(B)(11). "A corollary to the judge's duty to require a high standard of performance of the judge's staff is that the judge will be held accountable for the administrative shortcomings of the judge's staff." SHAMAN ET AL. § 6.10, at 196-97. *Page 709 
In interpreting the Code of Judicial Conduct, the State Bar of Texas Committee on Judicial Ethics has long held that when a person is "under the direction and control" of a judge or judges, "it is the duty of the judge(s) who employ that person to see that the employee complies with the provisions of the code." Comm. on Jud. Ethics, State Bar of Tex., Op. 106 (1987),reprinted in 59 TEX. JUD. COUNCIL OFF. CT. ADMIN. TEX. JUD. SYS. ANN. REP. 79 (1987), available at htt p://www.courts.state.tx.us/Judethics/101-110.htm (last visited Jan. 13, 2004) (interpreting TEX. CODE JUD. CONDUCT, Canon 3(B)(2), 50 TEX. B.J. 391, 392 (1987, amended 1994) ("A judge should require his or her staff and court officials subject to the judge's direction and control to observe the standards of this Code.")). The Committee has further noted that the Code "makes no provisions for the sanctions against the employee for non-compliance with the code, but it does provide sanctions against the judge(s) in the event of non-compliance by the judge(s) in not requiring personnel under the direction and control of the judge(s) to adhere to the provisions of the code."Id.
Thus, in Texas, judges have frequently been disciplined for their failure to supervise their courts' personnel. Examples of such misconduct are:
 • "A judge allowed her staff complete responsibility for the recording and reporting of fines collected and the judge's inattention to her responsibility resulted in thousands of dollars being unaccounted for." STATE COMM'N JUD. CONDUCT ANN. REP. (1991), 55 TEX. B.J. at 1064.
 • "A judge failed to inform his staff and court officials subject to his direction and control that they are required to observe the same standards of fidelity and diligence that apply to him." STATE COMM'N JUD. CONDUCT ANN. REP. (1987), 51 TEX. B.J. at 465.
 • "A judge failed to establish appropriate internal controls within his office so as to properly safeguard and account for public funds coming into the office." Id.
This principle is recognized in other jurisdictions as well. The Supreme Court of Kansas publicly censured a district judge for the failure to issue summons and set hearings timely in juvenile cases. In re Long, 244 Kan. 719, 772 P.2d 814, 816
(1989) (per curiam). Under Kansas law, when a petition is filed under the Kansas Code for Care of Children, unless the parties are personally served at a temporary custody hearing,
 the court shall . . . [i]ssue summons stating the place and time at which the parties are required to appear and answer the allegations of the petition, which shall be within 30 days of the date the petition is filed, and deliver the summons with copies of the petition attached to the sheriff or a person specially appointed to serve it.
Kan. Stat. Ann. § 38-1532 (2000). Likewise, when a complaint is filed under the Kansas Juvenile Justice Code, unless the respondent child is personally served at a detention hearing, "the court shall . . . issue summons" to the respondent to appear within thirty days and answer the complaint. Id. § 38-1625 (2000). In Long, the Kansas Supreme Court found that in 13.9% of Code of Care for Children cases and 38.39% of Juvenile Justice Code cases, "the mandatory statutory requirements for issuance of summons were not met." Long at 816. The Court noted the district judge's "attempts to shift blame to the administrative judge," and her claim that she "was never given sufficient or loyal staff to carry out her responsibilities." Id. However, the Court held that "it is not the *Page 710 
duty of the" judge "to actually prepare and mail the summons, but it was the responsibility of" the judge "to see that the mandatory provisions of the statute for setting the hearings were followed." Id. The Court held: "We recognize that the trial judges of this state are dependent upon a number of individuals to perform many of the services essential to the orderly operation of the courts. However, whatever the proficiency of the various members of the court staff, the judge is solely responsible for the operation of the court." Id. at 818.
Similarly, the Supreme Court of Wisconsin suspended a judge for two years, in part for "his persistent failure to organize his court and supervise its personnel for the prompt and convenient disposition of judicial business." In re Van Susteren,118 Wis.2d 806, 348 N.W.2d 579, 581 (1984) (per curiam) (interpreting former WIS. SUP.CT. R. § 60.01(4) ("A judge should organize his or her court and supervise the personnel under his or her charge so that the business of the court is dispatched with promptness and convenience.") (quoted in Van Susteren at 580 n. 2)). Wisconsin law requires:
 If under formal administration final judgment is not entered in an estate within 18 months after filing of the petition for administration and the estate is not open pursuant to an order extending time, the judge shall order the attorney and the personal representative for the estate to show cause why final judgment has not been entered. . . .
Wis. Stat. § 863.35(1) (LEXIS through all 2003 legislation). Over one hundred such dormant estates were pending in the suspended judge's court, with twenty-five of them having been pending for thirteen years or more. Van Susteren at 580. The Wisconsin Supreme Court noted that the suspended judge "did not give any instructions to court personnel under his supervision concerning how to ensure that probate matters did not become delinquent, nor did he take any steps himself to deal with dormant estates."Id.
Accordingly, a judge may be disciplined, including removal, for the conduct of his or her staff.[30] Judge Rose's second issue is overruled.
Issue 3: Constitutional Argument
In Judge Rose's third issue, he contends that "the Texas constitution requires personal misconduct by the judge to support removal, rather than mere negligence in supervision of staff or lack of diligence." (Rose Br. at ix.) Judge Rose does not cite the Constitution or otherwise argue this issue under the Constitution.[31] *Page 711 
(See id. at 10-11.) Accordingly, Judge Rose waives his third issue. In any case, the Constitution expressly provides that a judge may be removed for "willful or persistent violation of rules promulgated by the Supreme Court of Texas" or "willful violation of the Code of Judicial Conduct," and it is well-settled that a judge can violate the Code of Judicial Conduct promulgated by the Supreme Court as a result of the failure to supervise the judge's staff. Tex. Const. art. V, §1-a(6)(A); see supra pp. 707-10. Judge Rose's third issue is overruled.
 FINDINGS OF FACT
In Judge Rose's fourth, fifth, sixth, and seventh issues, he complains of the findings of fact. (See Rose Br. at ix.) Judge Rose briefs these issues in Sections II through V of his argument. (See id. at 12-34.) His broad issues challenge the procedures by which the Commission acted on the special master's reported findings, and the legal and factual sufficiency of the evidence for the Commission's findings of fact. We will overrule these issues.
Procedure
In Judge Rose's fourth, fifth, sixth, and seventh issues, he complains of the procedures by which the Commission acted upon the special master's reported findings. (See Rose Br. at ix.) Judge Rose briefs these complaints together in Parts A and B of Section II, and in Sections III through V, of his argument. (Seeid. at 12-18.) Judge Rose contends that the Commission erred procedurally by "ignoring" the special master's report. (Seeid.) The gist of Judge Rose's procedural complaints is that the Commission did not adopt several of the special master's reported findings that Judge Rose considers favorable to his case. We will overrule Judge Rose's procedural challenges to the Commission's findings.
We hasten to state that the Commission did not "ignore" the special master's reported findings. The record shows that the Commission sustained Judge Rose's objections to the special master's report in part and overruled them in part, and sustained the Examiner's objections in part and overruled them in part. (IV C.R. No. 58, at [1]-[2].) We understand Judge Rose's arguments to the effect that the Commission "ignored" the special master's reported findings as a way of saying that the Commission modified those reported findings.
We note here that most of the rest of Judge Rose's arguments rest on a faulty premise. Judge Rose argues that the special master acted as the trier of fact. (See Rose Br. at 12-50.) Judge Rose argues that Texas Constitution Article V, Section 1
a(8) provides that the Commission must consider the special master's report's "findings of fact as those made by a trial judge." (Id. at 12.) In the unusual procedure before the Commission, the special master hears the evidence, and reports proposed findings to the Commission; but it is the Commission, to the extent that it adopts, modifies, or rejects the special master's report, that makes findings of fact. Barr,13 S.W.3d at 533 (op. on orig. submission); see Canales, 113 S.W.3d at 66
(hearing before Commission); but see id. at 73 n. 8 (special master "functions[s] as a trial judge and fact finder"). The review tribunal, in turn, reviews with deference the findings of fact made by the Commission, not the special master's reported findings. See Canales at 66 (judge's findings of fact); Barr
at 533 (op. on orig. submission); Lowery, 999 S.W.2d at 648
(jury's findings).
Issue 4
In Judge Rose's fourth issue, he contends that the Commission cannot "ignore *Page 712 
the findings of the Special Master, after the State Commission chose to have the Special Master appointed to act as the trier of fact." (Rose Br. at ix.) Judge Rose briefs this procedural issue in Sections III through V of his argument. (See id. at 35-45.) The Commission's decision to request the appointment of a special master does not bind the Commission to accept the special master's reported findings, regardless of whether the parties object to them. The Commission makes an independent review of the evidence reported by the special master, and makes findings of fact.
When a court refers a matter to a master or other referee, the referee assists, but does not supersede, the referring court. At English common law, masters in chancery "were not to substitute for the Chancellor but to aid him." Simpson v. Canales,806 S.W.2d 802, 806 (Tex. 1991) (orig.proceeding). Likewise, in American law, the "use of masters is `to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause,' and not to displace the court." La Buy v.Howes Leather Co., 352 U.S. 249, 256, 77 S.Ct. 309,1 L.Ed.2d 290 (1957) (quoting Ex parte Peterson, 253 U.S. 300, 312,40 S.Ct. 543, 64 L.Ed. 919 (1920)) (interpreting Fed.R.Civ.P.53(b)). "Nothing can originate before a referee, and nothing can terminate with or by his or her decision." 66 Am.Jur.2dReferences § 1 (2001). Thus, in judicial conduct proceedings before a special master, the master may not grant a dispositive motion. Lowery, 999 S.W.2d at 653.
The use of special masters in judicial conduct proceedings differs from the common use of masters in civil cases generally. The general rule for masters in civil cases provides that when the court that has referred a matter to a master receives the master's report, the court "may confirm, modify, correct, reject, reverse or recommit the report, after it is filed, as the court may deem proper and necessary in the particular circumstances of the case." Tex.R. Civ. P. 171. The referring judge thus has broad discretion in acting upon the master's report. See generallySimpson, 806 S.W.2d at 811 (discretion in appointing master);TransAmerican Natural Gas Corp. v. Mancias, 877 S.W.2d 840, 844
(Tex.App.-Corpus Christi 1994, orig. proceeding) (discretion in awarding master's fees).
Under Rule 171, in general, a master's findings that are not objected to have the same force as a jury verdict, but those that are objected to are without force. "When issues are referred to and heard by a master under rule 171, the master's report is conclusive on all issues except those specifically objected to."Young v. Young, 854 S.W.2d 698, 701 (Tex.App.-Dallas 1993, writ denied). The master's findings that are objected to are subject to trial. Martin v. Martin, 797 S.W.2d 347, 350
(Tex.App.-Texarkana 1990, no writ). "Either party is entitled to a jury trial after a Master has filed his report." Mann v.Mann, 607 S.W.2d 243, 246 (Tex. 1980). Rule 171 "does not authorize the court to make modifications or corrections without having some basis in evidence upon which to make these modifications and corrections." Martin at 350.
In this regard, the procedures for the removal of judges are inconsistent with the general application of Rule 171. Even in civil trials, however, if the trial judge refers a matter to a master for a limited, investigative purpose, "the master may serve merely as an investigator to arrange the evidence in systematic form so that it may be evaluated more readily by the" trial judge. 3 ELAINE A. GRAFTON CARLSON, TEXAS CIVIL PRACTICE § 17.16 (2d ed. 2000). This investigative capacity corresponds to *Page 713 
the capacity in which a special master serves the Commission. The Constitution provides that the Commission may request the appointment of a "Master to hear and take evidence" and "to report thereon to the Commission." Tex. Const. art. V, § 1-a(8). The Rules for Removal or Retirement of Judges provide that the special master "shall promptly prepare and transmit to the commission a report which shall contain a brief statement of the proceedings had and his findings of fact based on a preponderance of the evidence." Tex.R. Rem'l/Ret. Judg. 10(h)(1). The Rules also provide that the special master must forward, along with the master's report, the record of the evidentiary hearing before the master. Id. The Rules provide that "the findings of the special master may be deemed as agreed to, and the commission may
adopt them without a hearing." Id. 10(j) (emphasis added). Under the Rules, "`may' is permissive." Id. 1(k). The Rules clearly contemplate that the Commission has the power to "modify or reject the findings of a special master." Id. 10(j). Moreover, the Rules expressly provide that the Commission may modify or reject the special master's reported findings on its own initiative. Id."The Commission may adopt the Special Master's findings in whole or in part, modify the findings, totally reject them and enter its own findings, or order a hearing for the taking of additional evidence." State Comm'n Jud. Conduct Ann. Rep. 12 (2003). The Commission may properly do so, because it has a record of the evidence taken by the special master.
This practice is in accord with that in other jurisdictions. The American Bar Association Model Rules for Judicial Disciplinary Enforcement recommend the following procedure for the hearing of evidence by a judicial conduct commission:
 The commission may appoint a hearing officer . . . in cases where taking evidence would be burdensome on a hearing panel. . . . The hearing officer . . . makes findings of fact and submits a report to the full hearing panel with a time provided for the disciplinary counsel and the respondent to file objections. The hearing panel then reviews the report and record and makes its own findings, conclusions and recommendations. . . .
MODEL R. JUD. DISCIPLINARY ENFORCEMENT 3 cmt. at 18 (1994),available at http://www.abanet.org/cpr/juddis/home.html (last visited Feb. 13, 2004).[32] Thus, the American Bar Association Standards for Professional Discipline for Lawyers and Judges recommend that when a judicial conduct commission makes findings of fact after referring the case to a referee, the commission should "consider the report of the fact-finder `as if the hearing had been before the full commission.'" JUDITH ROSENBAUM, PRACTICES AND PROCEDURES OF STATE JUDICIAL CONDUCT ORGANIZATIONS, ch. 10, at 6 (quoting STANDARDS FOR PROF'L DISCIPLINE FOR LAWYERS JUDGES 5.19 (1979)). That is, "the intent of the recommendation is to have commissions `make an independent evaluation of the facts presented.'" Id. (quoting STANDARDS FOR PROF'L DISCIPLINE FOR LAWYERS JUDGES 5.19 cmt.). Other state commissions that use hearing officers follow the these ABA recommendations in permitting the commission to modify or reject referees' findings. Id. at 8-9; e.g., In reO'Brien, 430 Mich. 323, 422 N.W.2d 685, *Page 714 
686 (1988); Mardikian v. Comm'n on Jud. Perform.,40 Cal.3d 473, 220 Cal.Rptr. 833, 709 P.2d 852, 854 (1985).
Judge Rose argues that the Commission has no authority to modify the special master's reported findings, but "is merely granted authority to adopt those findings of the Special Master which are uncontested or `agreed to.'" (Rose Br. at 13). The Rules for Removal or Retirement of Judges provide, "If a statement of objections is filed, or if the commission in the absence of such statement proposes to modify or reject the findings of the special master, the commission shall give the judge and the examiner an opportunity to be heard orally before the commission. . . ." TEX.R. REM'L/RET. JUDG. 10(j). Judge Rose argues that Rule 10(j) gives the Commission the authority to modify or reject reported findings only "in the absence of" a statement of objections; when the parties object, he argues, the Rule does not expressly authorize modification or rejection. (See Rose Br. at 13-14.) Judge Rose argues that since both he and the Examiner filed statements of objections, the Commission was without authority to modify the special master's reported findings. (See id.) Rather, Judge Rose argues:
 Such oral hearing is for the purpose of the parties pointing out to the State Commission how certain findings may be against the great weight of evidence, or how certain findings are not supported by the evidence (either legally or factually). However, there is no authority for the State Commission to ignore findings, or to reject or modify any findings where objections are made.
(Id.) We disagree with this interpretation of the Rules, under which the Commission would have the power to hear but not to rule on objections.
If Judge Rose means to complain of the absence of an evidentiary trial on the special master's findings to which Judge Rose objected, he waived his complaint. Of course, "[a] judge is not entitled to a jury trial in formal proceedings before a special master or the commission." Tex. Gov't Code Ann. §33.022(k). But if Judge Rose wanted an evidentiary hearing before the Commission, it was necessary for him to request one. SeeTransAmerican Natural Gas Corp. v. Flores, 870 S.W.2d 10, 11 n. 2 (Tex. 1994) (orig.proceeding) (per curiam); Martin,797 S.W.2d at 350. He did not do so. (Cf. IV C.R. No. 61 (Rose Mot. Reconsideration).)
Accordingly, to the extent that Judge Rose's fourth issue presents a procedural complaint, we overrule it.
Issues 5 and 6
In Judge Rose's fifth and sixth issues, he contends that the Commission acted "arbitrarily and capriciously." (Rose Br. at ix.) In his fifth issue, he contends that the Commission "acted arbitrarily and capriciously when it ignored the findings of fact of the Special Master in making its recommendations." (Id.) In his sixth issue, he contends that the Commission cannot "arbitrarily and capriciously pick and chose [sic] which Findings of Fact it will adopt, and thus ignore findings related to causation and responsibility for the administrative failures." (Id.) Judge Rose briefs these procedural issues together in Sections III through V of his argument. (See id. at 35-45.) For example, Judge Rose complains of the Commission's rejection of the special master's reported findings to the following effect, (see id. at 17):
 2. The location of Judge Rose's court contributed to high turnover and insufficiently trained staff in the court, which caused delays in the processing of cases and funds under the Dallas County procedures. *Page 715 
. . . .
 4. The temporary employees provided by Dallas County were insufficiently trained and insufficient in number and amount of time worked, and thereby did not significantly reduce the backlog of cases in Judge Rose's court.
(III C.R. No. 45, at 24, Rose Find. K.) Judge Rose also complains concerning the special master's reported findings on Judge Rose's good character. (See Rose Br. at 17.) For example, the special master reported:
1. Judge Rose is a man of good and high character.
 2. Honesty and integrity are significant character traits, which describe Judge Rose.
 3. Judge Rose has a good reputation in the community for honesty and integrity.
 4. Judge Rose has a good reputation in the community for professionalism in the running of his courtroom.
 5. Judge Rose has a good reputation in the community for running his courtroom in a fair and impartial manner.
6. Judge Rose is an honest man.
 7. Judge Rose is dedicated to the community in which he resides.
 8. Judge Rose is a community leader who is looked up to by the public.
(III C.R. No. 45, at 23, Rose Find. J.)
In this connection, Judge Rose cites opinions in cases reviewing the decisions of administrative bodies under specific statutory schemes. Accordingly, those cases are not on point. For example, the Texas Administrative Procedures Act provides that a court reviewing an administrative agency's decision "shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . arbitrary or capricious. . . ." Tex. Gov't Code Ann. §2001.174(2) (e) (Vernon 2000); see Flores v. Employees Ret.Sys., 74 S.W.3d 532, 538 (Tex.App.-Austin 2002, pet. denied);Langford v. Employees Ret. Sys., 73 S.W.3d 560, 565
(Tex.App.-Austin 2002, pet. denied). Moreover, in the administrative cases cited by Judge Rose, the agency or board violated a "detailed administrative scheme" limiting its power to make additional findings or change the findings of the referee.Montgomery Indep. Sch. Dist. v. Davis, 34 S.W.3d 559, 564 (Tex. 2000) (interpreting Tex. Educ. Code Ann. §§ 21.251-21.260 (Vernon 1996 Supp. 2004)); see Flores, 74 S.W.3d at 539 (interpreting Tex. Gov't Code Ann. § 815.511(a) (Vernon Supp. 2004); 34 Tex. Admin. Code § 67.91(b) (2004) (Tex. Employees Ret. Sys., Hr'gs on Disputed Claims)); Langford at 566 (interpreting Tex. Gov't Code Ann. § 815.511(a); 34 Tex. Admin. Code § 67.91(b)). The Rules for the Removal or Retirement of Judges, to the contrary, give the Commission broad discretion in considering the special master's report. See Tex.R. Rem'l/Ret. Judg. 10(j).
Judge Rose also cites City of El Paso v. Public UtilityCommission for the proposition, "A decision may be found arbitrary and capricious if it is based on legally irrelevant factors, or if legally relevant factors were not considered." (Rose Br. at 36); see City of El Paso v. Pub. Util. Comm'n,883 S.W.2d 179 (Tex. 1994). As discussed below, the special master's reported findings rejected by the Commission were not legally relevant to the charges against Judge Rose, and thus the Commission need not have adopted them. A trial court may properly disregard jury findings that are immaterial. Quick v. City ofAustin, 7 S.W.3d 109, 116 (Tex. 1998) (op. on orig. submission) (citing *Page 716 Spencer v. Eagle Star Ins. Co., 876 S.W.2d 154, 157 (Tex. 1994)) (question of law). In a jury trial, "[t]he jury's answers . . . may only be disregarded if they have no support in the evidence or if they are immaterial." S.E. Pipe Line Co. v.Tichacek, 997 S.W.2d 166, 172 (Tex. 1999). Likewise, a referring court may properly disregard a master's immaterial findings. SeeN. Tex. Constr. Co. v. San Jacinto Oil Co., 42 Tex.Civ.App. 607,610, 95 S.W. 706, 708 (1906, writ ref'd). "A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings." S.E. Pipe Line at 172.
The special master's reported findings on Judge Rose's reputation and his purported excuses were immaterial. While "[r]eviewing courts generally have been sympathetic to the pressures caused by heavy workloads and inadequate staffing arrangements," workload is not considered "as a complete defense to failure of prompt disposition charges." SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 6.06. For example, the Supreme Court of Arizona has held that a judge's "defense that the system is inadequate insults the many . . . judges who, despite . . . huge case loads and inadequate staff and facilities, do their best to adhere to the Code" of Judicial Conduct. In re Peck,177 Ariz. 283, 867 P.2d 853, 861 (1994). For similar reasons, the special master's reported findings on Judge Rose's good character and reputation were immaterial. Evidence of a judge's "reputation for competence, diligence, dedication, and administrative skills, and long record of public service . . . does not excuse misconduct." GRAY, STUDY OF STATE JUDICIAL DISCIPLINE SANCTIONS at 64. And while such evidence "may be relevant to the degree of sanction, it cannot justify a less severe sanction if removal or at least suspension are otherwise justified." Id. For reasons set out in more detail below, the Commission's findings here, without regard to Judge Rose's reputation, justify removal. Seeinfra pp. 105-113. Thus, Judge Rose's excuse and reputation evidence was immaterial, and the Commission did not err in not making findings on that evidence.
Accordingly, to the extent that Judge Rose's fifth and sixth issues present procedural complaints, we overrule the issues.
Issue 7
In Judge Rose's seventh issue, he contends that he "has been deprived of due process of law and equal protection of the laws by the actions of the State Commission in ignoring the findings of fact of the Special Master." (Rose Br. at ix.) Judge Rose briefs this procedural issue in Sections III through V of his argument. (See id. at 35-45.) We will overrule this issue.
Equal Protection
As to equal protection, Judge Rose waives his issue. Judge Rose's equal-protection argument is as follows, in its entirety:
 Petitioner has also been denied equal protection of the law under the Fourteenth Amendment to the U.S. Constitution. By ignoring the 103 favorable findings of the Special Master, the Commission has not afforded Petitioner the same or similar evidentiary or procedural review that other litigants are afforded under the law.
(Rose Br. at 38.) Judge Rose's equal-protection issue, without a single citation or any argument, is inadequately briefed, and is thus waived. In any case, if Judge Rose means that judges in judicial discipline proceedings do not have the same rights as litigants in civil jury trials, then his issue is meritless. Even in jury trials, *Page 717 
the trial court may properly disregard immaterial findings by a master. See supra pp. 732-37. To the extent that Judge Rose's seventh issue presents an equal-protection complaint, we overrule the issue.
Due Process
In Judge Rose's seventh issue, he also contends that he has been deprived of due process of law. (See Rose Br. at ix, 37-38.) The Texas Constitution requires that the Rules for the Removal or Retirement of Judges "shall afford" to a judge "against whom a proceeding is instituted to cause his . . . removal, due process of law for the procedure before the Commission [and] Masters . . . in the same manner that any person whose property rights are in jeopardy in an adjudicatory proceeding is entitled to due process of law. . . ." Tex. Const. art. V, § 1-a(11). The Constitution provides, in relevant part in this context, that "[d]ue process shall include the right to notice, . . . hearing, and all other such incidents of due process as are ordinarily available in proceedings whether or not misfeasance is charged, upon proof of which a penalty may be imposed." Id.; see Tex.R. Rem'l/Ret. Judg. 10. "[I]ndividuals whose property interests are at stake are entitled to `notice and an opportunity to be heard.'" Dusenbery v. United States,534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (quotingUnited States v. James Daniel Good Real Prop., 510 U.S. 43, 48,114 S.Ct. 492, 126 L.Ed.2d 490 (1993)). Due process does not always require a hearing before the fact, but may be satisfied by a hearing after the fact. See Lujan v. G G Fire Sprinklers,Inc., 532 U.S. 189, 195-96, 121 S.Ct. 1446, 149 L.Ed.2d 391
(2001); Zinermon v. Burch, 494 U.S. 113, 127-30, 110 S.Ct. 975,108 L.Ed.2d 100 (1990).
For the most part, Judge Rose does not argue a deprivation of constitutional due process of law or due course of law, but again argues alleged statutory violations that we have already considered and dismissed. (See Rose Br. at 37-38.) We perceive, however, at least one arguable constitutional deprivation. Judge Rose argues that he "was given no notice or opportunity to be heard" on the matter of the Commission's rejection of certain reported findings of the special master. (Id. at 37.) Judge Rose raised this issue before the Commission in his Motion for Reconsideration and/or Rehearing. (IV C.R. No. 61, at 2, § III.) Judge Rose argues that the Commission "refused to reconsider" upon his filing the motion for reconsideration. (Rose Br. at 37.) The record, to the contrary, shows that the Commission considered and denied Judge Rose's motion. (IV C.R. No. 65.)
Accordingly, to the extent that Judge Rose's seventh issue presents a procedural complaint, we overrule the issue.
Substance
Under Judge Rose's fourth, fifth, sixth, and seventh issues, he also purports to attack the legal and factual sufficiency of the evidence to support the Commission's findings. (See Rose Br. at ix.) Judge Rose briefs these substantive complaints together in Section II.C of his argument. (See id. at 18-34.)
A review tribunal must "review the record of the proceedings on the law and facts." Tex. Const. art. V, § 1-a(9). When the appellate record contains a reporter's record, "the Commission's adopted findings of fact are reviewable for legal and factual sufficiency of the evidence to support them." Canales,113 S.W.3d at 68; Barr, 13 S.W.3d at 533 (op. on orig. submission);see BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 795
(Tex. 2002). *Page 718 
A review tribunal uses "the recognized standards of review of legal and factual sufficiency of the evidence . . . in determining the merits of" a judge's "removal from office," that is, "the same standards applied in reviewing the legal and factual sufficiency of the evidence supporting findings in a civil case, either by a trial court or by a jury." Canales,113 S.W.3d at 68, 69 n. 11; see Barr, 13 S.W.3d at 533 (op. on orig. submission).
In a judicial conduct proceeding before a special master, "the burden [i]s upon the Examiner for the State Commission on Judicial Conduct to establish, before the Special Master, the allegations against" the judge "by the civil standard of preponderance of the evidence." Barr, 13 S.W.3d at 533 (op. on orig. submission).
When a party challenges the legal sufficiency of an adverse finding on an issue on which it did not bear the burden of proof, a no-evidence issue is appropriate. See Croucher v. Croucher,660 S.W.2d 55, 58 (Tex. 1983); Nadolney v. Taub,116 S.W.3d 273, 279 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). "In considering a `no evidence' legal insufficiency point, we consider only the evidence that tends to support the Commission's findings and disregard all evidence and inferences to the contrary." Canales, 113 S.W.3d at 69; Barr, 13 S.W.3d at 534
(op. on orig. submission); see Zimlich, 29 S.W.3d at 69. However, a court "need not `disregard undisputed evidence that allows of only one logical inference.'" St. Joseph Hosp. v.Wolff, 94 S.W.3d 513, 519-20 (Tex. 2003) (quoting Universe LifeIns. Co. v. Giles, 950 S.W.2d 48, 51 n. 1 (Tex. 1997)). The reviewing court must "view the evidence in a light that tends to support the disputed finding." Wal-Mart Stores, Inc. v.Canchola, 121 S.W.3d 735, 739 (Tex. 2003). "If there is more than a scintilla of evidence to support the questioned finding, the legal sufficiency point fails." Canales at 69; Barr at 534 (op. on orig. submission); see Canchola at 739. The court "must `determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" St. Joseph Hosp. at 519 (quotingTransp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994)).
When a party challenges the factual sufficiency of an adverse finding on an issue on which it did not bear the burden of proof, an insufficient-evidence issue is appropriate. See Croucher,660 S.W.2d at 58; Kroger Tex. L.P. v. Suberu, 113 S.W.3d 588,596 (Tex.App.-Dallas 2003, pet. filed). An insufficient-evidence issue contends that the "evidence adduced to support the vital fact . . . is factually too weak alone to support it." Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points ofError, 38 TEX. L.REV. 361, 366 (1960). A finding should be set aside for insufficient evidence "only if the evidence that supports the . . . finding is so weak" that the finding is "clearly wrong and manifestly unjust." See W. Wendell Hall,Standards of Review in Texas, 34 ST. MARY'S L.J. 1, 172 (2002);see Canales, 113 S.W.3d at 68; Barr, 13 S.W.3d at 533 (op. on orig. submission). "As in appeals of civil matters, this Review Tribunal cannot substitute its findings for those of the Commission." Canales at 69; Barr at 533 (op. on orig. submission); see Golden Eagle Archery, Inc. v. Jackson,116 S.W.3d 757, 761 (Tex. 2003). "If there is sufficient competent evidence of probative force to support the findings and recommendation, they must be sustained." Canales at 69; Barr
at 533 (op. on orig. submission). "It is not within the province of this Review Tribunal to interfere with the Commission's resolution of conflicts in the evidence or to pass on the weight or credibility of *Page 719 
the witnesses' testimony." Id.; see Golden Eagle Archery at 761. "Where there is conflicting evidence, the findings of the Commission on such matters will be regarded as conclusive."Canales at 69; Barr at 534 (op. on orig. submission).
"Refusal of the court to make a finding requested shall be reviewable on appeal." Tex.R. Civ. P. 299; see Wagner v. Riske,142 Tex. 337, 342, 178 S.W.2d 117, 119 (1944). "[W]here the trial court has been specifically requested to make a particular finding in support of its judgment and it fails to do so, the failure is tantamount to a refusal." Vickery v. Comm'n forLawyer Discipline, 5 S.W.3d 241, 253 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). In order to prevail on such an issue, Judge Rose must show that the findings that he sought were either conclusively established as a matter of law, or that the "`failure to find' is against the great weight and preponderance of the evidence." See Cropper v. Caterpillar Tractor Co.,754 S.W.2d 646, 651 (Tex. 1988). A "great-weight" issue requires a reviewing court to "examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust."Canales, 113 S.W.3d at 68; Barr, 13 S.W.3d at 533 (op. on orig. submission); see Dow Chem. Co. v. Francis, 46 S.W.3d 237,242 (Tex. 2001); see also Golden Eagle Archery,116 S.W.3d at 761.
Judge Rose purports to bring six general points of error as to each of the Commission's forty-eight findings of fact, as well as specific issues as to certain specific findings. (Rose Br. at 19, 19-34.) Judge Rose purports to do so in sixteen pages, in which he cites to the record fewer than twenty times. (Id. at 19-34.) Moreover, to the extent that Judge Rose cites to the record, at all but about fifteen places, he cites to his proposed findings of fact reported by the special master but rejected by the Commission. (See id.) The record before us, against which we test the Commission's findings, is the record of the evidentiary hearing, including the exhibits introduced by the parties, and not the findings reported by the special master. See Canales,113 S.W.3d at 68; Barr, 13 S.W.3d at 533 (op. on orig. submission). Judge Rose's citations to the master's reported findings, thus, are of no weight in the review of the sufficiency of the evidence. In reviewing a sufficiency issue, a reviewing court will not "search the record for evidence itself." FredoniaState Bank, 881 S.W.2d at 283. Such "has never been considered part of an appellate court's duties in conducting judicial review." Id. A reviewing court "will not brief" a party's "case for him." Garcia v. State, 887 S.W.2d 862, 882 (Tex.Crim.App. 1994). To the extent that Judge Rose does not adequately brief these nearly 300 complaints, we overrule them. To the extent that Judge Rose marginally argues his sufficiency complaints, we consider each in turn.
Moreover, to a large degree, Judge Rose's complaints are the same as those that he addressed to the Commission. For example, he argues that the phrasing of some of the findings is "misleading." (Rose Br. at 26; see id. at 20, 21, 34.) While these complaints may or may not have been proper to address to the Commission, as attacks on the sufficiency of the evidence before this Review Tribunal, they have little force. To the extent that they frame sufficiency issues, we consider them as such.
For convenience, we follow Judge Rose's enumeration of his substantive sufficiency challenges. (See Rose Br. at 18-34.)
A. Judge Rose complains of twenty-nine of the Commission's forty-eight *Page 720 
findings that "the finding[s] omit to point out that in every instance the problem has been corrected." (Rose Br. at 19, 20-21 (citing V R.R. at 1062-65).) Judge Rose points to the testimony of his chief clerk to the effect that in 1993 and 1994, when cash counts discovered unreceipted and undeposited checks, money orders, and cash, she "got them receipted as soon as possible" and "corrected the situation as quickly as possible." (V R.R. at 1062; see Exam'r Exs. E-3, E-4.) The evidence, even the evidence to which Judge Rose points, hardly shows that the problems were ever corrected. The 1993 cash count found twenty unreceipted checks and money orders, the oldest being dated November 1992. (Exam'r Ex. E-3.) As of a follow-up count twelve days later, only one of the undeposited checks had been deposited. (Id.) The 1994 cash count again found unreceipted and undeposited checks and cash, and even discovered further undeposited checks from September 1992, which the auditor had not found in the 1993 counts. (Exam'r Ex. E-4.) Numerous cash counts thereafter found thousands, sometimes hundreds of thousands, of dollars in unreceipted funds not timely deposited for a period of years. (See Exam'r Exs. E-1, E-3, E-4, E-6, E-7, E-8, E-12, E-14, E-20, E-21, E-22, E-54.) As late as the month of the evidentiary hearing, some 3,200 traffic tickets, issued months before, were removed from Judge Rose's court because no work had ever been done on them. (See II R.R. at 359; v. id. at 963-64; Exam'r Ex. E-34, at [1], Find. 3.)
The Commission's failure to find that the problems in Judge Rose's court had been corrected is not against the great weight and preponderance of the evidence.
B. Next, Judge Rose complains of four of the Commission's summary findings. (See Rose Br. at 21-25.) For example, the Commission found: "Dallas County requires funds collected by the justices of the peace to be deposited in accordance with Section113.022 of the Texas Local Government Code. Dallas County requires the monthly activity report to be filed in accordance with Section 111.065 of the Texas Local Government Code." (IV C.R. No. 58, at 10, Find. 45.)
B. 1. First, Judge Rose contends that "[e]ach of these findings are [sic] legal conclusions, and not findings of fact." (Rose Br. at 21.) Judge Rose also brings this complaint concerning two other findings. ((See id. at 33, § II.C.2).F.) This contention is not supported by argument, and is thus waived. It is, in any case, meritless. A trial court's designation of "finding of fact" or "conclusion of law" is not controlling. Ray v. Farmers' StateBank, 576 S.W.2d 607, 608 n. 1 (Tex. 1979). A trial court's purported "transformation of the real character of finding, and conclusions, or finding and conclusion that might be mixed, is not reversible error." Fonseca v. County of Hidalgo,527 S.W.2d 474, 480 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.).
B. 2. Next, Judge Rose contends, "[t]hese findings are not proper interpretations of the statutes in question." (Rose Br. at 21.) Judge Rose contends that insufficient evidence supports these findings in that "there is a failure to reference Section112.002 of the Local Government Code." (Id.)
Local Government Code Section 113.021 provides, in relevant part:
 The . . . money belonging to a county shall be deposited with the county treasurer by the officer who collects the money. The officer must deposit the money in accordance with any applicable procedures prescribed by or under Section . . . 112.002. *Page 721 
Tex. Loc. Gov't Code Ann. § 113.021(a).[33] Local Government Code Section 112.002, in turn, provides, in relevant part:
 (a) [T]he county auditor shall prescribe the system of accounting for the county.
 (b) The county auditor may adopt and enforce regulations . . . that the auditor considers necessary for the speedy and proper collecting, checking, and accounting of the revenues and other funds and fees that belong to the county. . . .
Tex. Loc. Gov't Code Ann. § 112.002.
The testimony of the auditor does not expressly refer to Section 112.002. (II R.R. at 199-371.) However, she did testify that she promulgated regulations as to the time, place, and manner of making reports that should accompany the court's deposits, pursuant to her statutory authority. (Id. at 219, 220, 223, 225, 228.)
This is some evidence that the auditor promulgated the regulations pursuant to Local Government Code Section 112.002, and Judge Rose points to no contrary evidence.
C. Next, Judge Rose complains of findings concerning his "persistent" and "willful" conduct. (Rose Br. at 25-26.) The Commission found, for example, that its findings on Judge Rose's "failures to timely deposit moneys . . . demonstrate thousands of instances of negligent, persistent and unjustifiable failure by Judge Rose to timely execute the business of the court, considering the quantity and complexity of the business." (IV C.R. No. 58, at 10, Find. 46.)
C. 1. First, Judge Rose points to testimony by his chief clerk to the effect that the court's "deposit is made to the county twice a week" by means of "an armored truck that picks up those deposits and takes them to the treasury office." (VI R.R. at 1115.) From this evidence, Judge Rose infers that it was only possible for him to have failed to make deposits timely perhaps 1,000 times over ten years, not thousands of times. (Rose Br. at 26.) Judge Rose also points to one period in which the court's receipts were deposited timely. (Id. at 27 (citing Resp't Exs. R-14, R-15, R-16).)
We note, first, that the instances of failure to deposit funds timely that the Commission found are better understood as referring to each instance of the receipt of funds, rather than, as Judge Rose understands it, as each instance of an opportunity to deposit an accumulation of funds on the armored-truck schedule. The statutory duty to deposit funds timely arises each time an officer receives funds. More importantly, however, the thousands of instances of misconduct to which the Commission's summary Finding No. 46 refers includes much more than just the failure to transmit funds to the treasurer timely, although the evidence showed numerous instances of that, from 1992 through 2001. (See Exam'r Exs. E-1 through E-4, E-6; Exam'r Ex. E-7, at [1]; Exam'r Ex. E-8, at 2; Exam'r Ex. E-9; Exam'r Ex. E-12, at 1; Exam'r Ex. E-14; Exam'r Ex. E-15, at 2; Exam'r Ex. E-18, at [1]; Exam'r Ex. E-20, at [1]; Exam'r Ex. E-33, at 4.) Hundreds of checks went undeposited for periods of years, that is, hundreds of twice-a-week deposit cycles. (See Exam'r Exs. E-4 (check dated September 1992 not deposited by March 1994), E-6 (check dated November 1995 not deposited by December 1996); Exam'r Ex. E-7, at [1] (checks dated October 1995 not deposited by March 1997); Exam'r Ex. E-12, at 2 *Page 722 
(checks not deposited for over a year); Exam'r Ex. E-14 (check dated October 1995 not deposited by September 1998); Exam'r Ex. E-18, at [1] (check dated October 1995 not deposited by March 2000).) The court's cash deposits showed shortages. (Exam'r Ex. E-2, at 2; Exam'r Exs. E-6, E-9; Exam'r Ex. E-12, at 1; Exam'r Ex. E-19, at [1]; Exam'r Ex. E-31, at [1].) Fund deposits were not timely posted to the correct accounts in the correct amounts. (Exam'r Ex. E-2, at 2; Exam'r Ex. E-8, at 2 (72.5% error rate for Fiscal Years 1993-1995); Exam'r Ex. E-15, at 2; Exam'r Ex. E-16; Exam'r Ex. E-21, at 3 (61% error rate for Fiscal Years 1997-1998).)
Judge Rose points to evidence that three cash counts from June through August 2000 showed no unreceipted checks. (Resp't Exs. R-14, R-15, R-16.) We note, first, that evidence that Judge Rose complied with the law during three months out of ten years would not defeat a finding of misconduct. In any case, the exhibits to which Judge Rose points scarcely support his argument. Two do, in fact, show unreceipted checks, other than those received in the mail on the day of the count. (Resp't Exs. R-14, R-16.) Moreover, an auditor's memorandum showed that during this period, the court was withholding unreceipted checks that the court had on hand from the field auditors who were conducting the counts. (Exam'r Ex. E-19, at 2, Find. 2 Recommend. 3a.)
The Commission's findings that Judge Rose failed to deposit funds timely in thousands of instances are not against the great weight and preponderance of the evidence.
C. 2. Next, Judge Rose argues that the backlog of unprocessed cases and the failure to file monthly activity reports was not persistent or willful conduct on his part. (See Rose Br. at 28-29.) In this connection, Judge Rose points to the testimony of two of his fellow justices of the peace in Dallas County. (Id.
(citing IV R.R. at 681, 685; V id. at 1024, 1037).) Judge Rose states that Justice of the Peace Cleophas Steele, Jr., "testified that insufficient staffing is `a way of life' in the Justice of the Peace courts in Dallas county." (Id. at 28 (quoting IV R.R. at 681).) Judge Steele also testified that he was five months behind in his monthly activity reports because his chief clerk was occupied with other tasks that the judge considered more important. (IV R.R. at 685.) Justice of the Peace Thomas G. Jones testified that his monthly activity reports were "not always current," and that at the time of his testimony his court's reports were four months behind "because of the overwhelming amount of work that we have" and because "[w]e don't have the sufficient staff." (V id. at 1024, 1037.)
Yet the evidence was that Judge Rose had significantly more staff than Judges Steele and Jones. In Fiscal Year 2001, in terms of "number of cases per day per staff member," the average among all of the justice courts in Dallas County was 8.2, including Judge Rose's court. (Exam'r Ex. E-48; see III R.R. at 506-507.) Judge Rose had 6.1 cases per staff per work day, Judge Steele had 10.7, and Judge Jones had 11.9. (Exam'r Ex. E-48.) Indeed, all but two justices had more cases than Judge Rose. (Id.)
Indeed, Judge Rose's staff regularly increased, from at least four full-time employees in Fiscal Year 1995 to at least nine in Fiscal Years 1999 through 2001. (See Resp't Ex. R-36, at [1]-[7]; Exam'r Ex. E-61.) Only after redistricting was the court's allocation reduced to at least three in Fiscal Year 2002 and at least two in Fiscal Year 2003. (See Resp't Ex. R-36, at [7]-[8].) Indeed, because Judge Rose "materially misstate[d]" the number of cases processed *Page 723 
by his court, he was allocated more staff than the number to whom he would otherwise have been entitled. (Exam'r Ex. E-21, at 2, Find. 4; Exam'r Ex. E-33, at 4, Find. 5.) In Fiscal Year 1997, Judge Rose overstated his criminal cases by 158.5%. (Exam'r Ex. E-21, at 2, Find. 4.) As the auditor noted, "The court should have been able to handle the . . . workload because staffing was based on the over reported numbers." (Exam'r Ex. E-33, at 8, Find. 5.) The auditor testified that of all the Dallas County justices of the peace, "Judge Rose had the largest amount of funds on hand at a cash count. He had the largest amount of funds that were not received timely." (II R.R. at 209; see id. at 230-31.) Of the courts that "had occurrences of slow deposits or nonreceipts," the auditor testified, "[n]one were as severe as Judge Rose." (Id. at 209; see id. at 230-31.) The auditor also testified that no other court "has had as great an accumulation of backlog" or "as persistent a severity of problem of backlog as Judge Rose's court." (Id. at 232.) The field audit manager, likewise, testified that none of the justices of the peace "had as severe discrepancies in failing to timely make deposits of monies as Judge Rose's court." (Id. at 407.) A review by the auditor of unreceipted checks and deposit delays in the justice courts for Fiscal Year 2000 found that only Judge Rose's court had unreceipted checks on hand, and found that "[d]eposit delays ha[d] frequently occurred there" and only there. (Resp't Ex. R-19; see II R.R. at 342, 344.)
Moreover, Judge Rose did not even use all of the staffing that he was allocated. In June 1997, the Commissioners Court approved funding for five temporary clerks for thirty-five business days in Judge Rose's court in order to alleviate the backlog of 8,415 unprocessed criminal cases. (Exam'r Ex. E-42; II R.R. at 334.) Judge Rose did not expend that appropriation. (II R.R. at 335.) Indeed, there was evidence that Judge Rose cared little whether his staff was in the court. The auditor repeatedly found errors in the court's time and attendance records, including employees who were absent for weeks at the time being reported as present. (See Exam'r Ex. E-6, at 1, Find. 4; id. at 2, Recommend. 5; Exam'r Ex. E-8, at 3, Find. 16; Exam'r Ex. E-21, at 4, Recommend. 5; Exam'r E-34, at [1], Find. 4.)
The Commission's failure to find that the level of staffing in Judge Rose's court justified his conduct is not against the great weight and preponderance of the evidence.
D. Next, Judge Rose complains concerning the Commission's finding on David Henderson's complaint against him. (See Rose Br. at 31-32.) The Commission found:
 David G. Henderson received three tickets in 1997 for the failure to have proof of insurance, a valid inspection sticker, and a current registration. Two years later, in 1999, Judge Rose's court sent Henderson a notice of trial but the case was never set for trial for another two years. On December 17, 2000, three and one-half years after the original citations were issued, Judge Rose's court sent Henderson a notice of trial for January 10, 2001. The computer records from Judge Rose's court do not reflect Henderson's trial, the judgment of conviction rendered, or the fine imposed in January 2001. Henderson was never told which violations he was found guilty of, nor which violation he was found not guilty of.
(IV C.R. No. 58, at 9-10, Find. 43.)
Judge Rose argues that Henderson "knew exactly what he was guilty of and what he was not guilty of" because he "actually `signed' a copy of the *Page 724 
judgments which explained the results of the trial."[34]
(Rose Br. at 31-32, 32 (citing III R.R. at 582-84).) Judge Rose also argues that "the signed judgments are in the record," and that the "court's files (case jackets) do contain computer data printouts and written judgments which were signed by both the Judge and the *Page 725 
Defendant." (Id. at 32 (citing Resp't Ex. R-28).) Judge Rose also argues that Henderson "testified that he was actually guilty of each of the offenses for which he was found guilty." (Id.
(citing III R.R. at 582-84).)
In this regard, Judge Rose misrepresents the testimony and evidence.[35] The testimony and exhibit to which Judge Rose refers do not concern judgments, but concern Orders of the Court for Installment Agreements, or what Henderson called an "installment plan." (III R.R. at 583-84; Resp't Ex. R-28, at [1], [10].) Those orders, though they refer to case numbers, do not state the offenses of which the court found Henderson guilty. (Resp't Ex. R-28, at [1], [10].) They bear the undated facsimile signature of Judge Rose. (Id.) The testimony cited by Judge Rose does not support the statement that "Henderson testified that he was actually guilty of each of the offenses for which he was found guilty." (Cf. Rose Br. at 32.)
However, on the very pages cited by Judge Rose, Henderson testified on direct examination by the Examiner:
 Q Were you told what you were convicted of at the end of that trial?
A No.
(III R.R. at 582.)
Again, on cross-examination by Judge Rose, Henderson also testified:
 Q Well, Mr. Henderson, you knew at the end of the trial that you had been found guilty and fined on two of the tickets and that one of them was being dismissed, correct?
A Correct.
Q So you were told of that result, weren't you?
A Right. Which ones I didn't know.
(III R.R. at 582.) Henderson also testified elsewhere:
 A The Judge told me to — he assigned two tickets to me and dismissed one.
 Q When you say he assigned you two tickets, he held you responsible for two of the tickets?
A Yes, ma'am.
Q Do you know which ones he held you responsible for?
A No.
. . . .
 Q Did you tell him you no longer had the car, that you had gotten rid of it three years before?
A Yes, ma'am.
Q What did he say?
A He didn't say nothing.
Q He just assigned the tickets to you?
A Yes.
(Id. at 571-572.) Henderson testified that as of the date of his testimony, he still did not know the status of the tickets, and that the convictions did not yet appear on his driving record. (Id. at 573, 577, 578.)
Judge Rose testified that the court's docket sheet did not show a trial in Henderson's cases, and did not show the entry of judgments. (VII R.R. at 1371; see Resp't Ex. R-28, at [18]-[26].) *Page 726 
The Commission's finding concerning Henderson is not against the great weight and preponderance of the evidence.
E. Next, Judge Rose complains of two findings concerning his former chief clerk, Freddie Brown. (See Rose Br. at 32-33.) The Commission found, first:
 In Spring 1998, Dallas County Field Auditor Wallace specially [sic] discussed with Judge Rose problems that resulted from the chief clerk's conduct. Wallace believed that the chief clerk was "grossly incompetent." Judge Rose refused to replace the chief clerk.
(IV C.R. No. 58, at 5, Find. 18.) The Commission also found:
 In late March 2000, Dallas County Field Auditor Wallace again discussed with Judge Rose the problems with the conduct of his chief clerk, whom Wallace believed to be grossly incompetent. Judge Rose replied that the woman had "been with him since the 1975 Congressional campaign and would be with him until the end;" and Judge Rose said he did not want to hear any more about the matter.
(Id. at 6, Find. 24.)
Judge Rose argues that those findings are "contrary to the evidence" in that they "imply that the county field auditor told Judge Rose that the chief clerk was grossly incompetent, and that she should be terminated." (Rose Br. at 33.) Judge Rose argues:
 Although the auditor [sic] believed such to be true, he never testified that he told Judge Rose that the clerk was grossly incompetent. He never used the words "grossly incompetent" when discussing the clerk with Judge Rose. He also never suggested that Judge Rose fire (or terminate) the chief clerk, but merely that she be helped with counseling.
(Id. (citing V R.R. at 879, 882-83).)
These citations to the record are, again, misleading. First, as cited by Judge Rose, Wallace testified:
 Q. Were — were there any occasions when you talked to Judge Rose about Freddie Brown's gross incompetence?
 A. No, I would never, ever say to a judge gross incompetence.
(V R.R. at 879-80.)
Next, as cited by Judge Rose, Wallace testified:
 Q. Mr. Wallace, did you tell Judge Rose to fire Freddie Brown?
A. Absolutely not. I would never say that.
 Q. I take it, then, you told him that she needed to — he needed to do something to help her get her work done?
A. She definitely needed counseling.
(V R.R. at 882-83) Thus, Wallace did not use the words "gross negligence" to Judge Rose, and did not tell him that he should fire Freddie Brown.
Immediately after the first of these passages, however, the testimony continued as follows:
 A. . . . . But there were two occasions in which I talked to Judge Rose concerning my great concerns for his chief clerk.
 Q. And why did you take the steps to have a discussion with Judge Rose about that topic?
 A After looking at what she was doing, and believing she was quite deceptive and things of this nature, and she was making big-time errors herself, and I thought it was very necessary to go to the elected official.
 Q. Can you recall every saying the following, that in all your years in the *Page 727 
business, you've never seen anything run as poorly as Judge Rose's court, that it was terribly managed by Freddie Brown?
. . . .
 A. IfI — if I made a statement, I made a statement about Freddie Brown. Because I remember making a statement at least once, maybe more than that, that it was the worst I've ever seen.
(V R.R. at 879-80.)
Immediately after the second passage cited by Judge Rose, Wallace continued to testify as follows:
 Q. Did you suggest to Judge Rose that [counseling] would help?
 A. . . . . [T]he implications on the first time were that he had to do something with her to straighten her out to get her on the right track.
 Q. You said she was one of the worst chief clerks you've seen in — in various courts; is that what you said about Freddie Brown?
 A. I would say she was the worst chief clerk, without exception.
(V R.R. at 883.)
More generally, Wallace testified:
Q. Why do you say that she was grossly incompetent?
 A. All the discussions, I was looking to her — looking at her accounting work, bookkeeping, and organization, everything was terrible.
(V R.R. at 878.) Wallace also testified that the second time he tried to talk to Judge Rose about Freddie Brown's gross incompetence:
 A. . . . . He listened to me for awhile, and then he said that — as I recall, he said during the 1990 — no, 1975 congressional campaign that Freddie Brown had helped him greatly, and that he was very, very loyal to Freddie Brown. And that Freddie Brown would remain with him as his chief clerk as long as he was the justice of the peace.
 Q. And then did you persist and he replied that he didn't want to hear any more about it?
 A. Well, I — I didn't persist. I think once he made that statement and then he said, that's all I want to hear about — I don't want to hear about this again.
 Q. Were you trying to bring to Judge Rose's attention problems about gross incompetence in the management by Freddie Brown of his court?
A. Yes.
(V R.R. at 882.)
The Commission's findings on Wallace's conversations with Judge Rose concerning Freddie Brown are not against the great weight and preponderance of the evidence.
F. Lastly in Judge Rose's sufficiency challenges, he complains that one of the Commission's findings "fail[s] to include additional facts which clarify the factual conclusions stated therein." (Rose Br. at 33.)
Judge Rose complains of the following finding:
 Judge Rose never filed any monthly activity reports for April 2001 or any subsequent month until (i) two reports were filed in October 2002 and (ii) 17 reports were filed on November 8, 2002.
(IV C.R. No. 58, at 9, Find. 39.) Judge Rose argues that this finding "fails to state the relevant underlying facts":
 [T]he chief clerk testified that she was unable to complete the reports due to the heavy workload and the insufficient staffing in the court which created delays in completing the paperwork involved.
(Rose Br. at 34 (citing VI R.R. at 1191-95).) The record cited does not concern *Page 728 
the matter for which Judge Rose cites it. (Cf. VI R.R. at 1191-95.) There, Judge Rose's chief clerk, Belinda Brown, testified that as early as April 2001 she had requested information from the auditor's office concerning the numbers of tickets filed in the court in previous months, in order to facilitate her preparation of the current monthly activity reports. (Id. at 1191-92; see id. at 1186-87.) Brown testified that she later found that the auditor's office had prepared reports for the months of January and February 2001, which contained the historical information that Brown needed. (Id. at 1186.) Brown testified that the auditor's slowness in replying to her request delayed the reports and "made them maybe another month or so late." (Id. at 1188.) Brown testified that after the court moved to its new location in December 2001, she had not yet completed an activity report, because the auditor's reports were still in boxes that had never been unpacked. (Id.
at 1194.) Brown testified that she learned in late August or early September of 2002 that she could prepare reports without the historical information. (Id. at 1196.) But she did not file the reports until November 2002. (Exam'r Ex. E-35.) Brown testified that Judge Rose's attorney had asked her to file the reports before the evidentiary hearing began. (VI R.R. at 1203.) The county budget analyst who prepared monthly activity reports for the court in January and February 2001 testified that each took "approximately ten minutes." (III id. at 502.)
The Commission's failure to make findings concerning the chief clerk's workload is not against the great weight and preponderance of the evidence.
Accordingly, in the case of none of the Commission's findings of fact challenged by Judge Rose is there no or insufficient evidence, and none of the challenged findings or failures to find is against the great weight and preponderance of the evidence. To the extent that Judge Rose's fourth, fifth, sixth, and seventh issues present substantive complaints of the sufficiency of the evidence, we overrule the issues.
 CONCLUSIONS OF LAW
In Judge Rose's eighth issue, he complains in part of the Commission's conclusions of law. (See Rose Br. at ix.) Judge Rose contends that "the conclusions . . . of the State Commission must be supported by, and consistent with, the findings of fact made by the trier of fact." (Id.) Judge Rose briefs this issue in Section VI of his argument. (See id. at 38-45.) We will overrule this issue.
A review tribunal reviews the Commission's conclusions of lawde novo. Barr, 13 S.W.3d at 566 (op. on reh'g). A reviewing "court may review the conclusions drawn from the facts to determine" the conclusions' "correctness." Hall, 34 ST. MARY'S L.J. at 183. "Conclusions of law will not be reversed, unless they are erroneous as a matter of law." Id. at 188-89.
The Constitution generally provides that a judge may be removed from office for four categories of misconduct:
 (1) "willful or persistent violation of rules promulgated by the Supreme Court of Texas,"
 (2) "incompetence in performing the duties of the office,"
 (3) "willful violation of the Code of Judicial Conduct," or
 (4) "willful or persistent conduct that is clearly inconsistent with the proper performance of [the judge's] duties or casts public discredit upon the *Page 729 
judiciary or administration of justice."
Tex. Const. art. V, § 1-a(6)(A).
Where the constitutional grounds for removal are stated in the disjunctive, as in Section 1-a, error as to one of the grounds is harmless. Barr, 13 S.W.3d at 560 (op. on orig. submission);see Tex.R.App. P. 44.1(a); In re A.V., 113 S.W.3d 355, 363
(Tex. 2003) (termination of parental rights). In order to prevail on this issue, Judge Rose must show that none of the Commission's conclusions is correct.
The Commission's conclusions sustained twenty-seven charges against Judge Rose. (See IV C.R. No. 58, at 11-15.)
Judge Rose's argument, again, is premised upon the proposition that the special master was the trier of fact. For the reasons that we state above, although the special master received the evidence and reported it to the Commission, the Commission made an independent review of the evidence and made the controlling findings of fact. See supra pp. 71-74, pp. 712-14.
Judge Rose challenges the Commission's conclusions that he committed incompetence in performing the duties of his office, a willful violation of the Code of Judicial Conduct, and willful or persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public discredit upon the judiciary or administration of justice. (See Rose Br. at 39-43.) Because we hold that Judge Rose's argument fails as to the last of these forms of misconduct, we will overrule the issue.
The former Government Code provided, by way of definition or description, that:
 For purposes of Section 1-a, Article V, Texas Constitution, "wilful or persistent conduct that is clearly inconsistent with the proper performance of a judge's duties" includes:
 (1) wilful, persistent, and unjustifiable failure to timely execute the business of the court, considering the quantity and complexity of the business;
 (2) wilful violation of a provision of the Texas penal statutes or the Code of Judicial Conduct;
 (3) persistent or wilful violation of the rules promulgated by the supreme court; or
 (4) incompetence in the performance of the duties of the office.
Act of May 22, 1999, 76th Leg., R.S., ch. 462, § 1, sec. 33.001(b), 1999 Tex. Gen. Laws at 2884 (amended 2001) (current version at Tex. Gov't Code Ann. § 33.001(b)). The Government Code also provides that this definition of "wilful or persistent conduct that is clearly inconsistent with the proper performance of a judge's duties" is "not exclusive." Tex. Gov't Code Ann. §33.001(c).
Judge Rose argues, "There has been no allegation of a violation of the Penal Code. . . ." (Rose Br. at 44.) Here, Judge Rose misinterprets the statute. The statute defines "willful or persistent conduct that is clearly inconsistent with the proper performance of a judge's duties" to include the "wilful violation of a provision of the Texas penal statutes or the Code of Judicial Conduct." Tex. Const. art. V, § 1 a(6)(A); Act of May 22, 1999, 76th Leg., R.S., ch. 462, § 1, sec. 33.001(b)(4), 1999 Tex. Gen. Laws at 2884. The term "penal statute" encompasses more than the Texas Penal Code. "A `penal statute' is one that defines a criminal offense and specifies a corresponding fine, penalty, or punishment." Pack v. Crossroads, Inc., 53 S.W.3d 492, 509
(Tex.App.-Fort Worth 2001, pet. denied) (plurality op.) (citing Black's Law Dictionary 1421 *Page 730 
(7th ed. 1999)); see State ex rel. Hickman v. Alcorn,78 Tex. 387, 393, 14 S.W. 663, 665 (1890) ("The statute under consideration is one penal in character, and must be construed as though it were one defining a crime and prescribing its punishment."). Some 1,800 penal statutes exist in Texas statutes in some twenty-five statutory codifications outside of the Penal Code. See generally Tex. Dist. County Att'ys Ass'n, Texas Crimes (2003). Among the Commission's conclusions is that in failing to file monthly activity reports Judge Rose violated Local Government Code Section 114.003, and thus violated Code of Judicial Conduct Canon 2(A). (IV C.R. No. 58, at 12, Concl. Charge III, # 4; id. at 14, Concl. Persistent Conduct Charges III IV, # 3.) Though not located in the Penal Code, Section 114.003 creates a misdemeanor offense and establishes the penalty therefor. Tex. Loc. Gov't Code Ann. § 114.003(b). Section 114.003 thus constitutes a penal statute.
The record, then, refutes Judge Rose's argument. The Examiner's First Amended Notice of Formal Proceedings stated one of the standards that Judge Rose violated as follows:
 Canon 2A of the Texas Code of Judicial Conduct imposes two requirements. First, the requirement to comply with the law, which includes all the statutory mandates of Section . . . 114.003 . . . of the Texas Local Government Code. Second, a judge should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
(II C.R. No. 22, at 7, Standard 2.)
The Examiner charged:
 Rose failed to file the required reports, which dereliction of duty involved far more than a few instances, occurred over a period covering almost two years, and continued in spite of requests to submit the monthly reports. Each and every such instance constitutes an instance of willful or persistent conduct in violation of the law or the Code of Judicial Conduct . . . in violation of the standards set forth in . . . Canon 2A of the Texas Code of Judicial Conduct. . . .
(II C.R. No. 22, at 8, Charge III.)
The Commission concluded:
 Judge Rose's failure to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly activity reports was willful conduct that violated the Code of Judicial Conduct, Canon 2A, which provides, in pertinent part, "A judge shall comply with the law . . ." (specifically, by failing to comply with Section . . . 114.003 . . . of the Texas Local Government Code).
(IV C.R. No. 58, at 12, Concl. Charge III, # 4 (first ellipsis in orig.).)
The Commission concluded that Judge Rose willfully and persistently failed "to file the required reports in more than a few instances occurring over a period covering almost two years and continuing in spite of requests to submit the monthly reports." (IV C.R. No. 58, at 12, Concl. Charge III, # 4; id.
at 14, Concl. Persistent Conduct Charges III IV, # 3.) The Commission concluded, too, that such misconduct constituted willful and persistent "conduct that violated the Code of Judicial Conduct, Canon 2A, which provides, in pertinent part, `A judge shall comply with the law . . .' (specifically, by failing to comply with Section 114.003 . . . of the Texas Local Government Code)." (Id. (first ellipsis in orig.))
The Commission's findings support its conclusions. "For at least a decade, Judge Rose . . . has persistently failed to comply with requirements for filing monthly activity *Page 731 
reports. . . ." (IV C.R. No. 58, at 3, Find. 7.) As early as 1993, in an audit memorandum, the Dallas County Auditor "reminded" Judge Rose "of his statutory duty . . . to file the required monthly activity reports," and Judge Rose's chief clerk, Belinda Brown, discussed the auditor's report with Judge Rose. (Id., Find. 9.) In 1995, the auditor again notified Judge Rose "that his court had not filed the required monthly activity report since May of 1994." (Id. at 4, Find. 12.) In 1999, the auditor notified Judge Rose of "discrepancies in the monthly activity reports filed by the court." (Id. at 6, Find. 22c.) In 2001, Judge Rose, for the second time, hired Belinda Brown as his chief clerk. (Id. at 9, Find. 38.) She "had previously been his chief clerk until mid 1994 and had been the chief clerk at the time of the 1992-1994 audit memoranda . . ., which addressed . . . failures to file timely activity reports." (Id.) Thereafter:
 For a period of a year and a half, Judge Rose again failed to file the monthly activity reports required by the Dallas County Auditor. . . . On October 4, 2002 when respective counsel for Judge Rose and the Examiners announced ready for the evidentiary hearing in this procedure, Judge Rose had not filed a monthly activity report for any of the 18 months from April 2001 through September 2002, despite requests to do so by the Dallas County Auditors Officer [sic]. . . . On October 18, 2002, Judge Rose filed untimely monthly reports for August and September 2002. On Friday, November 8, 2002, one business day before testimony commenced, Judge Rose filed 16 additional untimely monthly activity reports for April 2001 through July 2002.
(Id., Find. 42.)
These findings give some support for the conclusion that Judge Rose violated Local Government Code Section 114.003 and thus willfully violated Code of Judicial Conduct Canon 2(A). Judge Rose's failure to file accurate monthly reports is itself some evidence that he intended not to file them. This intention is further manifested by the fact that Judge Rose failed to file in the face of repeated warnings and requests. The intention not to file is blatantly manifested by his re-hiring Belinda Brown, who Judge Rose knew had not filed the reports during her last term of employment with him. Yet when faced with the impending Commission hearing, Judge Rose was able to file all of his many and long-untimely reports.
To the extent that Judge Rose's eighth issue complains of the Commission's conclusions of law, the issue is overruled.
 RECOMMENDATIONS
In Judge Rose's eighth issue in part, and in his ninth, tenth, eleventh, and twelfth issues, he complains concerning the Commission's recommendations. (See Rose Br. at ix-x.) Judge Rose briefs these issues together in Section VII of his argument. (See id. at 45-50.) We will overrule these issues.
Issues 8 and 9
In Judge Rose's eighth issue in part, and in his ninth issue, he complains concerning the relationship between the Commission's recommendations and the special master's reported findings. (See Rose Br. at ix-x.) In his eighth issue, he contends that the "recommendations of the State Commission must be supported by, and consistent with, the findings of fact made by the trier of fact." (Id. at ix.) In his ninth issue, he contends that "the Commission's recommendations should [not] be followed when the `uncontested' and `agreed to' facts do not support its recommendations." (See id. at x.) We will overrule these issues. *Page 732 
Again, Judge Rose's argument is based on the false premise that the special master functioned as the trier of fact. Again, the Commission made the relevant findings of fact, on the basis of which it made conclusions of law and recommendations. We have already overruled Judge Rose's issues contending that the Commission erred in rejecting certain of the special master's reported findings. See supra pp. 69-80, pp. 711-17. And again, Judge Rose does not argue that the Commission's conclusions do not support or are inconsistent with the Commission's recommendations. To the extent that Judge Rose's eighth issue complains of the Commission's recommendations, we overrule the issue; and we overrule his ninth issue.
Issues 10 and 11
In Judge Rose's tenth and eleventh issues, he contends that removal from office and prohibition from judicial office, respectively, are not "the appropriate discipline under the facts of this case." (Rose Br. at x.) We will overrule these issues.
The Constitution directs that if the Commission recommends the removal of a judge, the review tribunal "shall order public censure . . . or removal, as it finds just and proper, or wholly reject the [Commission's] recommendation." Tex. Const. art. V, §1-a(9). The Tribunal "is not bound by the specific recommendations of the State Commission on Judicial Conduct, although the specific recommendations e given great deference when based on legally and factually sufficient evidence." Barr,13 S.W.3d at 560 (op. on orig. submission). "A Review Tribunal is vested with discretion to fashion a sanction which is available, as it finds just and proper." Id.; accord Lowery,999 S.W.2d at 653. The just and proper discipline for judicial misconduct "must necessarily be decided on a case-by-case basis." Canales,113 S.W.3d at 73. "In determining whether a recommended sanction is excessive or otherwise appropriate, a review tribunal must remain mindful that the primary purpose of the Texas Code of Judicial Conduct, and all its ancillary rules, is to protect the citizens of Texas, rather than to discipline judges." Id."[T]he standard for judicial conduct in the State of Texas must be more than effortless obedience to the law, but rather, must be conduct which constantly reaffirms one's fitness for the high responsibilities of judicial office and which continuously maintains, if not furthers, the belief that an independent judiciary exists to protect the citizens from both government overreaching and individual self-help." Id.
As one review tribunal has said:
 The purpose of sanctions in cases of judicial discipline is to preserve the integrity and independence of the judiciary and to restore and reaffirm public confidence in the administration of justice. The discipline we impose must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter respondent from engaging in such conduct; and it must discourage others from engaging in similar conduct in the future. Thus, we discipline a judge not for purposes of vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned.
Barr, 13 S.W.3d at 560 (op. on orig. submission) (quoting Inre Kneifl, 217 Neb. 472, 351 N.W.2d 693, 700 (1984)). The Commission's recommendations will generally be accepted if they are "appropriate to protect the citizens of Texas" and "not excessive." See Canales, 113 S.W.3d at 73. *Page 733 
Removal is, in general, "the most serious sanction that can be imposed by the judicial discipline system." See MODEL R. JUD. DISCIPLINARY ENFORCEMENT 6 cmt. at 23. "The severity of . . . the recommendation of removal from office is illustrated by the fact that if the order of removal is sustained, the offending judge forfeits all of his or her retirement annuity." Canales,113 S.W.3d at 73 (citing Tex. Gov't Code Ann. §§ 834.004, 839.003 (Vernon 1994)). Removal's "use is appropriate when the respondent's misconduct demonstrates that the respondent is unfit to hold judicial office." Model R. Jud. Disciplinary Enforcement 6 cmt. at 23.
The prohibition from holding judicial office in the future, further, "is the most severe consequence for judicial misconduct provided for in the Texas Constitution." Canales,113 S.W.3d at 72-73. The prohibition against judicial officeholding "is not a consideration" that a review tribunal "undertake[s] lightly."Lowery, 999 S.W.2d at 662. "In at least 16 states, a removed judge is ineligible to serve in a judicial office again and may not seek or hold a judicial office." GRAY, STUDY OF STATE JUDICIAL DISCIPLINE SANCTIONS at 27; see id. n. 4. In at least three more, a removed judge is ineligible for a limited period, or may petition for removal of ineligibility after a period of time has passed. Id. at 27. In Texas, however, the prohibition against future judicial officeholding is a separate discipline, above and beyond removal, and can only be ordered by a review tribunal. See Tex. Const. art. V, § 1-a(9).
"[R]emoval is generally appropriate for a pattern of intentional misconduct while carrying out judicial duties (absent substantial mitigating factors) and . . . is generally not appropriate for a single act of misconduct that does not involve a criminal or dishonest act (absent substantial aggravating factors)." GRAY, STUDY OF STATE JUDICIAL DISCIPLINE SANCTIONS at 83. Accordingly, factors that are frequently taken into account in the removal determination include:
 (a) whether the misconduct is an isolated instance or evidenced a pattern of misconduct;
 (b) the nature, extent and frequency of occurrence of the acts of misconduct;
. . . [and]
 (d) whether the misconduct occurred in the judge's official capacity or in his private life. . . .
See id. at 77 (quoting In re Deming, 108 Wash.2d 82,736 P.2d 639, 659 (1987)); accord id. at 60-62. The extent of the misconduct includes "the number of persons affected" by it. SeeMiss. Comm'n on Jud. Perform. v. Dodds, 680 So.2d 180, 200
(Miss. 1996). It also includes that the misconduct took place "over a substantial period of time." In re Jones, 255 Neb. 1,581 N.W.2d 876, 891 (1998). "[M]isconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct," and "misconduct on the bench is usually more serious than the same misconduct off the bench." In re Brown,464 Mich. 135, 626 N.W.2d 403, 405 (.2001) (per curiam). In these regards, Judge Rose's misconduct is extremely serious. The Commission concluded that Judge Rose willfully and persistently did not "timely and properly receipt, deposit, and account for monies received by the court in more than a thousand instances occurring over a period of more than five years." (IV C.R. No. 58, at 11, Concls. Charges I II; id. at 13-14, Concls. Persistent Conduct Charges I II.) The Commission also concluded that Judge Rose willfully and persistently failed "to file required reports in more than a few instances occurring over a period covering almost two years." (Id. at 11-12, Concls. Charges III IV; id. *Page 734 
at 14, Concls. Persistent Conduct Charges III IV.) The Commission also found that Judge Rose willfully and persistently did not timely "execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court." (Id. at 12-13, Concls. Charges v. VI; id. at 14-15, Concls. Persistent Conduct Charges V VI.) Judge Rose's misconduct thus was not an isolated instance, but affected numerous persons over a long period of time, and occurred in his judicial capacity.
Likewise, "misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety," and "misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does." Brown, 626 N.W.2d at 405. In this regard, Judge Rose's misconduct was very serious. The Commission found that Judge Rose willfully and persistently did not "timely execute the business of the court involving approximately 22,000 instances of unprocessed citations and additional instances when litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court." (IV C.R. No. 58, at 12-13, Concls. Charges V VI; id. at 14-15; Concls. Persistent Conduct Charges V VI.) Judge Rose's misconduct was prejudicial to the actual administration of justice.
Another factor that is recognized in the removal determination is "whether the judge has evidenced an effort to change or modify his conduct." In re Michels, 150 Wash.2d 159, 75 P.3d 950, 953
(2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1091,157 L.Ed.2d 900 (2004); see GRAY at 67-75, 77. In this connection, the New York Court of Appeals has held that "the more severe sanctions available to" a judicial conduct commission "should only be deemed appropriate and necessary when the Judge has defied administrative directives or has attempted to subvert the system by, for instance, falsifying, concealing or persistently refusing to file records indicating delays." In re Washington,100 N.Y.2d 873, 768 N.Y.S.2d 175, 800 N.E.2d 348, 350 (2003). Here, too, Judge Rose's misconduct is very serious. The Commission concluded that Judge Rose willfully and persistently failed "to file required reports in more than a few instances occurring over a period covering almost two years" and "continuing in spite of requests to submit the monthly reports." (IV C.R. No. 58, at 11-12, Concls. Charges III IV; id. at 14, Concls. Persistent Conduct Charges III IV.) Very far from evidencing a change in conduct, Judge Rose persisted in his misconduct in the face of numerous administrative directives to change his conduct.
In removal determinations, moreover, "[e]specially in cases where incompetence is at issue, the proper focus in deciding `whether removal is the appropriate solution depends not only on the magnitude of the violation but also on the probability of the violation's recurrence. If the violation is likely to recur, removal is appropriate.'" In re Hunter, (La. 8/19/02), http://www.lasc.org/opinions/2002/02o1975.opn.pdf, p. [15],823 So.2d 325, 336 (quoting In re Field, 281 Or. 623, 576 P.2d 348,354 (1978)). The Commission concluded that Judge Rose's willful and persistent misconduct "constitute[d] incompetence in performing the duties of office." (IV C.R. No. 58, at 11, Concl. Charge II; id. at 12, Concl. Charge IV; id. at 13, Concl. Charge VI; *Page 735 id. at 13-14, Concl. Persistent Conduct Charges I II, # 4;id. at 14, Concl. Persistent Conduct Charges III IV, # 4;id. at 15, Concl. Persistent Conduct Charges V VI, # 4.) Generally, "incompetence" means "[t]he state or fact of being unable or unqualified to do something." BLACK'S LAW DICTIONARY 768 (7th ed. 1999); see generally SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 3.12. The Supreme Court of Louisiana, after reviewing other courts' definitions, has defined the issue of incompetency for purposes of removal from judicial office as "whether the conduct at issue establishes that the respondent lacks the requisite ability, knowledge, judgment, or diligence to consistently and capably discharge the duties of the office he or she holds." Hunter, http://www.lasc.org/opinions/2002/02o1975.opn.pdf, p. [15],823 So.2d at 336 (quoting In re Baber, 847 S.W.2d 800, 803
(Mo. 1993)). The length of time over which Judge Rose persisted, including very recently, in failing to fulfill the duties of his office in the face of repeated admonitions to follow the law can only indicate that such misconduct is likely to recur.
Judge Rose argues, without citing to the record, that "all administrative failures have now been resolved." (See Rose Br. at 46-47.) Courts have sometimes considered, in mitigation of discipline, evidence of a judge's subsequent measures to "mitigate the damage he has caused." See, e.g., In reWimbish, No. 98-O-2882, p. 7 (La. 4/13/99), 733 So.2d 1183, 1188. However, Judge Rose does not point to any such measures on his part. To the contrary, Judge Rose points to remedial measures by Dallas County, including the special project teams that processed the case backlogs in his court, and the judicial redistricting that removed most of his judicial responsibilities. (See Rose Br. at 47.) Indeed, he argues that "[t]hese remedial measures did not require the judges to act, but rather were purely based on county administrative procedures." (Id.) Judge Rose does not point to any authority that evidence of remedial measures by another party should be considered in mitigation of a judge's discipline. We do not perceive that the efforts by the county to remedy the damage that Judge Rose had done has any effect in mitigation of Judge Rose's discipline.
Judge Rose also points to evidence in the record that "trial attorneys who practice in" his "Court, litigants, judges and community leaders all testified that Judge Rose is of high honesty and integrity, and conducts his court professionally and in a fair and impartial manner, with proper decorum and judicial demeanor." (Rose Br. at 47; see id. at 48-49.) Character evidence is, in the first place, inherently suspect in judicial conduct proceedings. "[A]ny elected official should be able to garner a large number of supporters in court." In re Brown,512 S.W.2d 317, 333 (Tex. 1974) (removal) (Johnson, J., dissenting). Evidence of a judge's "reputation for competence, diligence, dedication, and administrative skills, and long record of public service . . . may be relevant to the degree of" discipline, at least where the discipline imposed is less than removal. See
GRAY, STUDY OF STATE JUDICIAL DISCIPLINE SANCTIONS at 64.
 If the only issue were the proper punishment for [the judge], then consideration of [the judge's] good acts or good character as a mitigating circumstance might well be appropriate. However, punishment is not the focus of a removal action; rather a removal action is instituted to protect the public from an overreaching or inadequate judge.
Brown, 512 S.W.2d at 333 (Johnson, J., dissenting). Thus, such evidence "cannot *Page 736 
justify a less severe sanction if removal or at least suspension are otherwise justified." GRAY at 64. In Judge Rose's case, for the reasons that we have stated, removal is justified. Moreover, evidence that some litigants had a favorable experience with a judge does not counter evidence of a judge's misconduct, but "only shows that" the judge's "conduct is not universally contrary to the Code of Judicial Conduct." See In re Elliston,789 S.W.2d 469, 480 (Mo. 1990). A number of instances of improper behavior viewed against a judge's long, otherwise respectable judicial career "would at best `establish that [the] behavior was erratic, which itself is inconsistent with a Judge's role.'" SeeIn re Duckman, 92 N.Y.2d 141, 677 N.Y.S.2d 248, 699 N.E.2d 872,878-89 (1998) (quoting Sardino v. State Comm'n on Jud. Conduct,58 N.Y.2d 286, 461 N.Y.S.2d 229, 448 N.E.2d 83, 85 (1983)). In the instant inquiry, the Commission concluded that Judge Rose willfully and persistently did not "timely execute the business of the court involving 22,000 instances of unprocessed citations and additional instances where litigants desiring adjudication were unable to promptly dispose of criminal matters pending against them in Judge Rose's court." (IV C.R. No. 58, at 12-13, Concls. Charges V VI; id. at 14-15, Concls. Persistent Conduct Charges V VI.) This great number overwhelms the handful of witnesses whom Judge Rose called who testified of their favorable dealings in his court.
As to the substance of the discipline imposed, Judge Rose cites only one case, Lowery. See Lowery, 999 S.W.2d 639. Judge Rose argues that the Lowery review tribunal "found that several acts of personal misconduct did not support removal, however, it was the `lie' and the attempt to `perpetrate a fraud' by trying to persuade a fellow jurist to lie for him, that finally convinced the Tribunal to impose the ultimate sanction of removal." (Rose Br. at 49-50 (quoting Lowery, 999 S.W.2d at 663).) In Lowery, the judge's deceptiveness sealed the decision in favor of removal. See Lowery, 999 S.W.2d at 663. However, Lowery does not stand for the proposition that evidence of deception is a prerequisite for judicial removal.
As the Supreme Court of Mississippi has said of its justice courts: "Official integrity of our Justice Court Judges is vitally important for it is on that level that many citizens have their only experience with the judiciary. We may not tolerate misconduct or misfeasance on any ground, particularly not on grounds of ignorance or incompetence." Miss. Comm'n on Jud.Perform. v. Neal, 2000-JP-01062-SCT, 6 (Miss. 2000),774 So.2d 414, 416. And as the New York State Commission on Judicial Conduct has noted, "The mishandling of public funds by a judge is serious misconduct, even when not done for personal profit."Kosina, http://www.scjc.state.ny.us/Determinations/K/kosina.htm (citing Bartlett v. Flynn, 50 A.D.2d 401, 378 N.Y.S.2d 145
(N.Y.App.Div.), appeal dismissed, 39 N.Y.2d 942,386 N.Y.S.2d 1029, 352 N.E.2d 897 (N.Y. 1976)). The extent of Judge Rose's misconduct, even be it incompetence, and even be it not conduct involving moral turpitude, justifies the Commission's conclusions. In light of the Commission's conclusions, its recommendation that Judge Rose be removed from office is appropriate to protect the citizens of Texas and not excessive. Likewise, an order prohibiting him from holding judicial office in the future is appropriate to protect the citizens of Texas and not excessive. We overrule Judge Rose's tenth and eleventh issues.
Issue 12
In Judge Rose's twelfth issue, he contends that "the Commission's recommendations *Page 737 
should be wholly rejected." (Rose's Br. at x.) For the reasons stated in our analysis of Judge Rose's tenth and eleventh issues, we accept the Commission's recommendations. See supra pp. 732-36. Accordingly, we overrule Judge Rose's twelfth issue.
 CONCLUSION
Having overruled all of Judge Rose's issues, we deny his petition.
We order that Charles Ronald Rose is removed from the office of Justice of the Peace, and we order that Rose is prohibited from holding judicial office in the future.
[2] Proceedings before the special master and the Commission sometimes refer to Judge Rose's office as Justice of Precinct 8-1 or Precinct 8, Place 1. This was the designation of his office before redistricting in 2001. Since then, Judge Rose's office has been designated as Justice of Precinct 1-A. (IV C.R. No. 58, at [2], Find. 1.)
[3] "`Examiner' means an individual, including an employee or special counsel of the commission, appointed by the commission to gather and present evidence before a special master, the commission, . . . or a review tribunal." Tex. Gov't Code Ann. §33.001(a)(5) (Vernon 2004); see Tex.R. Rem'l/Ret. Judg. 1(j) (West 2004). The Commission has the power to "employ persons that it considers necessary to carry out [its] duties and powers," and to "employ special counsel as it considers necessary." Tex. Gov't Code Ann. § 33.021(1)-(2) (Vernon 2004). The Examiners in this inquiry were Margaret J. Reaves, Executive Director of the Commission; and Seana Willing, General Counsel for the Commission. At the evidentiary hearing before the special master and before this Review Tribunal, the Commission was generally represented by special counsel John J. McKetta, III, and Jennifer Piskun Johnson, both of Graves, Dougherty, Hearon Moody, P.C., of Austin. We generally refer to the Examiner in the singular.
[4] E.g.:
 • International: Dallas Traffic Judge 22,000 Cases Behind, CALGARY HERALD (Alta., Can.), Mar. 24, 2001, at A22, LEXIS, NEWS Library, NON-US File
 • National: State Commission on Judicial Conduct Seeks JP's Removal, AP, May 1, 2003, LEXIS, NEWS Library, WIRES File; Dallas Judge Found with Extensive Backlog of Cases, Cash, PHILA. INQUIRER, Mar. 25, 2001, at A22, LEXIS, NEWS Library, MAJPAP File; Ed Housewright, "Mind-Boggling" Backlog Leads to Audit of Dallas Judge, CONTRA COSTA TIMES (Cal.), Mar. 25, 2001, at A19, LEXIS, NEWS Library, USPAPR File; Dallas Judge Accused of Failing His Office, SACRAMENTO OBSERVER, Feb. 26, 2003, at 7, LEXIS, NEWS Library, USPAPR File; Judge is 22,000 Cases Behind, ORLANDO SENTINEL, Mar. 24, 2001, at A17, LEXIS, NEWS Library, USPAPR File; Kevin J. Shay, Texas Judicial Panel Urges Judge's Removal, N.Y. BEACON, May 21, 2003, at 25, LEXIS, NEWS Library, USPAPR File
 • Regional: Panel Accuses DallasJP of Letting Work Pile Up, HOUSTON CHRON., May 2, 2003, § A, at 28, LEXIS, NEWS Library, ALLNWS File
 • Local: Kim Horner, Bickering Dominates Commissioner's Race, DALLAS MORNING NEWS, Mar. 5, 2004, at 1B, LEXIS, NEWS Library, DALNWS File; Gromer Jeffers, Jr., Price's Rivals Have Their Say, DALLAS MORNING NEWS, Jan. 27, 2004, at 2B, LEXIS, NEWS Library, DALNWS File; Kim Horner, Price Faces 2 Challengers for Commission Seat, DALLAS MORNING NEWS, Jan. 3, 2004, at 6B, LEXIS, NEWS Library, DALNWS File; Dave Michaels, State Wants Dallas County JP Out, DALLAS MORNING NEWS, May 2, 2003, at 3B, LEXIS, NEWS Library, DALNWS File; Ed Housewright, Panel Finds JP Incompetent, DALLAS MORNING NEWS, June 29, 2002, at 29A, LEXIS, NEWS Library, DALNWS File; Ed Housewright, Review is Critical of Dallas JP, DALLAS MORNING NEWS, May 1, 2002, at 19A, LEXIS, NEWS Library, DALNWS File; Ed Housewright, Wheels of Justice Don't Spin as Fast for Some JPs, DALLAS MORNING NEWS, Apr. 9, 2001, at 1A, LEXIS, NEWS Library, DALNWS File; Ed Housewright, Dallas Judge Has Backlog of 22,000 Traffic Cases, Didn't Deposit Fines, DALLAS MORNING NEWS, Mar. 24, 2001, LEXIS, NEWS Library, DALNWS File; Ed Housewright, Judge's Backlog Staggering, DALLAS MORNING NEWS, Mar. 23, 2001, at 1A, LEXIS, NEWS Library, DALNWS File; Todd Bensman, County Lawsuit Seeks Funds from JP, DALLAS MORNING NEWS, Feb. 28, 2001, at 27A, LEXIS, NEWS Library, DALNWS File. The case has also received coverage in legal publications. E.g., Mary Alice Robbins, Waivers Delay Decisions on Whether to Remove Judges, Tex. Law., Aug. 18, 2003, at 1, LEXIS, TEX Library, TXLAWR File.
[5] Some Texas courts have used the word "sanction" to refer generally to any result of a judicial conduct proceeding. E.g.,In re Canales, 113 S.W.3d 56, 72-73 (Tex. Rev. Trib. 2003, pet. denied, mot. reh'g filed). But as a special court of review reviewing an order of the Commission has recently emphasized, "`sanction' has a technical, legal meaning in the area of judicial misconduct." In re Jenevein, No. A-2003-1, ___ S.W.3d ___, ___, 2003 WL 21468345, 2003 Tex. LEXIS 80, at * 6 (Tex.Spec.Ct.Rev. Jun. 12, 2003); see Tex. Gov't Code Ann. §§33.001(a)(11), 33.034 (Vernon 2004). "`Sanction' means an order issued by the commission under Section 1-a(8), Article V, Texas Constitution, providing for a private or public admonition, warning, or reprimand or requiring that a person obtain additional training or education." Tex. Gov't Code Ann. §33.001(a)(10) (Vernon 2004). We attempt to use the word "discipline" to refer generically to the result of a judicial conduct proceeding.
[6] We cite Canales throughout with the caveat that Canales has filed a petition for review of the review tribunal's decision in the Texas Supreme Court. See 47 Tex. Sup.Ct. J. 95; Tex. Judiciary Online, Case Information, ht tp://www.supreme.courts.state.tx.us/opinions/Case.asp? FilingID=24422 (last visited June 8, 2004). The Court docketed the petition as In re Terry A. Canales, Judge, 79th DistrictCourt of Texas v. State Commission on Judicial Conduct InquiryNo. 84, Petition No. 03-1044. See id. The Court denied the petition on April 9, 2004. 47 Tex. Sup.Ct. J. 417. Canales has filed a motion for rehearing and the Court has requested a response. Tex. Judiciary Online, Case Information, http:// www.supr eme.courts.state.tx.us/opinions/Case.asp? FilingID=24422.
[7] The Constitution uses the spelling "willful." Tex. Const. art. V, § 1-a(6)(A). The Texas Government Code uses the spelling "wilful." Tex. Gov't Code Ann. § 33.001(b) (Vernon 2004). "Willful" is the preferred American spelling. Bryan A. Garner, The Redbook: A Manual on Legal Style § 12.2, at 243 (2002); see
Webster's Third New International Dictionary of the English Language 2616, 2617 (1993). Except in quotations, we use the spelling "willful."
[8] This inquiry is generally governed by the current version of Chapter 33, but in some particulars is governed by the 1999 version. The conduct alleged against Judge Rose spans at least five years, ending in 2001. Government Code Chapter 33 has been amended at least twice during this period. See Act of May 21, 2001, 77th Leg., R.S., ch. 917, 2001 Tex. Gen. Laws 1831; Act of May 22, 1999, 76th Leg., R.S., ch. 462, 1999 Tex. Gen. Laws 2884. Accordingly, we cite and quote throughout the applicable version of Chapter 33.
Chapter 33 was last amended in 2001. See Act of May 21, 2001, 77th Leg., R.S., ch. 917, §§ 1-18, 2001 Tex. Gen. Laws at 1831-37. Many of these amendments are not effective retroactively, but are effective only prospectively from a triggering event. For example, the new section concerning the training of Commission members applies only to members appointed on or after the effective date of the statute. Id. § 20(d), 2001 Tex. Gen. Laws at 1838; see Tex. Gov't Code Ann. §33.0043. Most of these changes have no bearing on this proceeding. See id.; Act of May 21, 2001, 77th Leg., R.S., ch. 917, § 21(a), 2001 Tex. Gen. Laws at 1838 (changes to complaints and confidentiality of complaints apply only to complaints filed on or after effective date (Tex. Gov't Code Ann. §§ 33.0211, 33.033)); id. § 21(b) (changes to compensation of special master apply only for masters appointed on or after effective date (Tex. Gov't Code Ann. § 33.004)); id. § 21(c) (extension of quasi-judicial immunity to Commission officials applies only to causes of action accruing on or after effective date (Tex. Gov't Code Ann. § 33.006)); id. § 21(d) (suspension pending appeal of, and automatic removal for, certain criminal convictions and deferred adjudications apply only to offenses committed on or after effective date (Tex. Gov't Code Ann. §§ 33.037-33.038)).
The 2001 act also made changes to the definitional section, however, of Chapter 33. See generally Tex. Gov't Code Ann. §33.001. The 2001 amending act provides that amendments to Section 33.001 "apply only to a complaint filed with the State Commission on Judicial Conduct on or after the effective date of this Act, regardless of whether the conduct or act that is the subject of the complaint occurred or was committed before, on, or after the effective date of this Act." Act of May 21, 2001, 77th Leg., R.S., ch. 917, § 21(a), 2001 Tex. Gen. Laws at 1838. The 2001 act took effect on September 1, 2001. Id. § 22. The Dallas County Commissioners Court filed its complaint against Judge Rose with the Commission on February 16, 2001. (Exam'r Ex. E-52.) The other complaints against Judge Rose were filed before March 19, 2001, when the Commission requested a response from Judge Rose to those complaints. (See Exam'r Ex. E-26; III R.R. (11/14/2002) at 540, 566.) Thus, the 2001 amendments to Section 33.001 are not applicable.
Chapter 33 was significantly amended in 1999. See Act of May 22, 1999, 76th Leg., R.S., ch. 462, 1999 Tex. Gen. Laws 2884. The 1999 amending act generally provides that "the change in law made by this Act applies only to an investigation or proceeding under Chapter 33, Government Code, as amended by this Act, instituted on or after the effective date of this Act." Id. § 19(a), 1999 Tex. Gen. Laws at 2890. The effective date of the 1999 amending act was June 18, 1999. See Act of May 22, 1999, 76th Leg., R.S., ch. 462, 1999 Tex. Gen. Laws at 2890. The investigation of Judge Rose by the Commission began on March 1, 2001. The formal proceedings against Judge Rose were initiated on May 17, 2002, when the Examiner filed his original Notice of Formal Proceedings with the Commission. (See I C.R. No. 1.) The only exception to that effective date concerns the 1999 amendments to Government Code Section 33.006, which provides for absolute quasi-judicial immunity from liability for Commission officials. See Act of May 22, 1999, 76th Leg., R.S., ch. 462, § 19(b), 1999 Tex. Gen. Laws at 2890; see generally Tex. Gov't Code Ann. § 33.006. The latter amendments apply "only to a cause of action that accrues on or after the effective date of" the amendments. Act of May 22, 1999, 76th Leg., R.S., ch. 462, § 19(b), 1999 Tex. Laws at 2890. Thus, the 1999 amendments to Chapter 33 are generally applicable.
We note that it is imperative that the dates on which the complaint was filed, and on which the investigation and the proceeding were instituted, appear in the record in order to determine the governing law.
[9] The current rules were generally adopted in 1992. Tex.R. Rem'l/Ret. Judg. 1-17; see State Comm'n Jud. Conduct Ann. Rep. app. (1992), 56 Tex. B.J. 820, 823 (1993). Rule 18 was adopted in 1994. Tex.R. Rem'l/Ret. Judg. 18; see State Comm'n Jud. Conduct Ann. Rep. app. (1993), 57 Tex. B.J. 902, 919 (1994).
[10] Judge Rose contends that there is no or insufficient evidence supporting some of the Commission's findings. (Rose Br. at 18-34.) For the reasons that we state below, we will overrule Judge Rose's sufficiency challenges. See infra pp. 717-28.
[11] We refer to the reporter's record of the evidentiary hearing before the special master by volume number and without date, e.g.,"I R.R." We refer to the reporter's record of the telephone conference before the special master by date and without volume number as "R.R. (10/4/2002)." We refer to the hearing on objections to the special master's report before the Commission by date and without volume number as "R.R. (2/13/2003)."
[12] The Texas Local Government Code authorizes county auditors in counties with populations of 190,000 or more to "count the cash in the custody of" county officers who receive any monies.See Tex. Loc. Gov't Code Ann. § 114.043 (Vernon 1999). We take judicial notice that the population of Dallas County was 1,852,810 in 1990 and 2,218,899 in 2000. See Tex.R. Evid. 201;Barr, 13 S.W.3d at 566 n. 23 (op. on reh'g); Office of Pub.Util. Counsel v. Pub. Util. Comm'n, 878 S.W.2d 598, 600 (Tex. 1994); Pinebrook Props., Ltd. v. Brookhaven Lake Prop. OwnersAss'n, 77 S.W.3d 487, 504 (Tex.App.-Texarkana 2002, pet. denied); U.S. Census Bureau, State County QuickFacts, http:// quickfacts.census.gov/qfd/states/48/48113.html (last visited Jan. 11, 2004); U.S. Census Bureau, American FactFinder, http:// factfinder.census.gov/servlet/BasicFactsTable? lang=en vt name=DEC 1990 STF1 DP1 geo id=05000US48113 (last visited Jan. 11, 2004).
[13] A capias is "a writ issued by the clerk or court, and directed `To any peace officer of the State of Texas', commanding him to arrest a person accused of an offense and bring him before that court immediately, or on a day or at a term stated in the writ." Tex. Code Crim. Proc. Ann. art. 23.01 (Vernon 1989). In a justice court,
 if the defendant fails to satisfy the judgment according to its terms, the court may order a capias pro fine issued for the defendant's arrest. The capias pro fine shall state the amount of the judgment and sentence, and command the appropriate peace officer to bring the defendant before the court or place the defendant in jail until the defendant can be brought before the court.
Id. art. 45.045 (Vernon Supp. 2004).
[14] See Tex. Bus. Com. Code Ann. § 4.404 (Vernon 2002) (stale checks).
[15] Local Government Code Section 113.022 provides:
 A county officer who receives funds shall deposit the funds with the county treasurer on or before the next regular business day after the date on which the funds are received. If this deadline is not met, the officer must deposit the funds, without exception, on or before the seventh business day after the day on which the funds are received.
Tex. Loc. Gov't Code Ann. § 113.002 (Vernon 1999).
[16] The Local Government Code provides that when a county officer collects money belonging to the county with the county treasurer, the "treasurer shall deposit the money in the county depository in a special fund to the credit of the officer who collected the money." See generally Tex. Loc. Gov't Code Ann. § 113.021(b) (Vernon 1999).
[17] Texas Code of Criminal Procedure Article 103.004 generally provides, in relevant part:
 [A]n officer who collects . . . obligations recovered in the name of the state under any provision of [Code of Criminal Procedure Title 2] shall deposit the money in the county treasury not later than the next regular business day after the date that the money is collected. If it is not possible for the officer to deposit the money in the county treasury by that date, the officer shall deposit the money in the county treasury as soon as possible, but not later than the third regular business day after the date that the money is collected.
Tex. Code Crim. Proc. Ann. art. 103.004(a) (Vernon Supp. 2004).
[18] The special master in this inquiry was Hon. Stanton B. Pemberton, Senior District Judge, of Temple. (See IV C.R. No. 12.)
[19] Canon 2(A) provides, "A judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." TEX. CODE JUD. CONDUCT, Canon 2(A), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G app. B (Vernon 1998 Supp. 2004).
The current version of Canon 2(A) was adopted June 30, 1993, and was effective January 1, 1994. 56 TEX. B.J. 832, 833 (1993). The previous version of Canon 2(A), promulgated on and effective on January 21, 1987, provided, "A judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." TEX. CODE JUD. CONDUCT, Canon 2(A), 50 TEX. B.J. 391, 391 (1987, amended 1993); see 50 TEX. B.J. at 394. In any case, "[e]ven though adopted after the commission of an improper act, the Code nevertheless will be considered to apply retroactively to the act if . . . the Code is a revision or replacement of previous norms that similarly prohibited the conduct in question. . . ." JEFFREY M. SHAMAN, STEVEN LUBET JAMES J. ALFINI, JUDICIAL CONDUCT AND ETHICS § 1.06, at 12-13 (3d ed. 2000).
[20] Former Government Code Section 33.001(b) provided:
 For purposes of Section 1-a, Article V, Texas Constitution, "wilful or persistent conduct that is clearly inconsistent with the proper performance of a judge's duties" includes:
 (1) wilful, persistent, and unjustifiable failure to timely execute the business of the court, considering the quantity and complexity of the business;
 (2) wilful violation of a provision of the Texas penal statutes or the Code of Judicial Conduct;
 (3) persistent or wilful violation of the rules promulgated by the supreme court; or
 (4) incompetence in the performance of the duties of the office.
Act of May 22, 1999, 76th Leg., R.S., ch. 462, § 1, sec. 33.001(b), 1999 Tex. Gen. Laws at 2884 (amended 2001) (current version at Tex. Gov't Code Ann. § 33.001(b)).
[21] Canon 3(B)(1) provides, "A judge shall hear and decide matters assigned to the judge except those in which disqualification is required or is appropriate." TEX. CODE JUD. CONDUCT, Canon 3(B)(1).
The current version of Canon 3(B)(1) was adopted June 30, 1993, and was effective January 1, 1994. 56 TEX. B.J. at 833. Former Canon 3(A)(7), promulgated on January 21, 1987, and effective immediately, provided, "A judge should dispose promptly of the business of the court." TEX. CODE JUD. CONDUCT, Canon 3(A)(7), 50 TEX. B.J. at 391 (1987, superseded 1993); see 50 TEX. B.J. at 394.
[22] See TEX.R. REM'L/RET. JUDG. 10(k).
[23] Local Government Code Section 113.021(a) provides: "The fees, commissions, funds, and other money belonging to a county shall be deposited with the county treasurer by the officer who collects the money. The officer must deposit the money in accordance with any applicable procedures prescribed by or under Section 112.001 or 112.002." Tex. Loc. Gov't Code Ann. § 113.021(a) (Vernon 1999). Local Government Code Section 112.002 govern counties with county auditors and with a population of 190,000 or greater. See Tex. Loc. Gov't Code Ann. § 112.002 (Vernon 1999). Section 112.002, in turn, provides, in relevant part:
 (a) [T]he county auditor shall prescribe the system of accounting for the county.
 (b) The county auditor may adopt and enforce regulations, not inconsistent with law or with a rule adopted under Section 112.003, that the auditor considers necessary for the speedy and proper collecting, checking, and accounting of the revenues and other funds and fees that belong to the county or to a person for whom a . . . county officer . . . has made a collection or for whose use or benefit the officer holds or has received funds.
Id. Dallas County has a county auditor. (See II R.R. at 199 (testimony of Dallas County Auditor).) Local Government Code Section 112.003, in turn, authorizes the state comptroller to promulgate recordkeeping requirements. Tex. Loc. Gov't Code Ann. § 112.003 (Vernon 1999).
Next, Local Government Code Section 114.041(b) provides:
 In a county with a population of more than 190,000, a . . . county . . . officer shall keep, as part of a record provided for the purpose by the proper county authorities, a statement of the amounts earned by the officer and of the money received by the officer as fees, commissions, or costs. The officer must make an entry in the record when the fees, commissions, or costs are earned and when they are received.
Tex. Loc. Gov't Code Ann. § 114.041(b) (Vernon 1999).
[24] These sections provide, in relevant parts:
 • "In preparing or monitoring the budget, the budget officer may require . . . any . . . county . . . officer . . . to provide any information necessary for the budget officer to properly prepare or monitor the budget." Tex. Loc. Gov't Code Ann. § 111.065 (Vernon 1999).
• The county auditor shall determine:
 (1) the time and manner for making reports to the auditor; and
(2) the manner for making an annual report of:
(A) office fees collected and disbursed; and
 (B) the amount of office fees refunded to the county in excess of those that the officer is permitted by law to keep.
TEX. LOC. GOV'T CODE ANN. § 114.002 (Vernon 1999).
 • "A county official . . . who is required under [Local Government Code Title 4, Subtitle B] to provide a report, statement, or other information to the county auditor and who intentionally refuses to comply with a reasonable request of the county auditor relating to the report, statement, or information, commits an offense." Tex. Loc. Gov't Code Ann. § 114.003(a) (Vernon 1999).
 • (a) Except as otherwise provided by law, an officer who collects money belonging to and for the use of a county shall immediately report the collection to the county clerk. The officer shall fully state in the report:
(1) from whom the money was collected;
(2) the amount collected;
(3) the time of the collection; and
 (4) under what authority or process the money was collected.
 (b) The officer shall file with the report required by this section any applicable claims information list required by Section 113.063.
 Act approved May 21, 1987, 70th Leg., R.S., ch. 149, § 1, sec. 114.042, 1987 Tex. Gen. Laws 707, 840, repealed by Act of May 30, 2003, 78th Leg., R.S., ch. 301, § 12, 2003 Tex. Gen. Laws 1276, 1278 (formerly codified at Tex. Loc. Gov't Code § 114.042). The repeal of former Section 114.042 took effect on September 1, 2003. Act of May 30, 2003, 78th Leg., R.S., ch. 301, § 14, 2003 Tex. Gen. Laws at 1278.
 • In a county with a population of 190,000 or more, the county auditor may require a . . . county officer . . . to furnish monthly reports, annual reports, or other reports regarding any money, tax, or fee received, disbursed, or remaining on hand. In connection with those reports, the auditor may count the cash in the custody of the officer or verify the amount on deposit in the bank in which the officer has deposited the cash for safekeeping.
TEX. LOC. GOV'T CODE ANN. § 114.043 (Vernon 1999).
 • (a) Each . . . justice of the peace who collects or handles any money for the use of the county shall make a full report at each regular term to the commissioners court on all fines imposed and collected, all judgments rendered and collected for the use of the county, and all jury fees collected by the respective courts in favor of or for the use of the county and, at the time of the report, shall present the receipts and vouchers that show the disposition of the money, fines, or judgments.
(b) Each report must fully state:
 (1) the name of the person fined and the amount of the fine or the name of the person against whom judgment was rendered and the amount of the judgment;
 (2) the style, number, and date of each case in which a fine was imposed or a judgment rendered; and
 (3) the amount of the jury fee collected, the style and number of the case in which each jury fee was collected, and the name of the person from whom the fee was collected.
TEX. LOC. GOV'T CODE ANN. § 114.044 (Vernon 1999).
[25] On the distinction between grounds for review in a petition and argument in a brief supporting those grounds, and the importance of that distinction, see King v. State,125 S.W.3d 517, 518-20 (Tex.Crim.App. 2003) (Cochran, J., concurring).
[26] Documents in Hilton are on file with the Commission.
[27] The Court of Appeals is New York's highest court. N.Y.State Ass'n of Crim. Defense Lawyers v. Kaye, 95 N.Y.2d 556,721 N.Y.S.2d 588, 744 N.E.2d 123, 126 (2000).
[28] See also three cases in which the New York State Commission on Judicial Conduct determined that judges should be removed, and the judges did not appeal the determination to the Court of Appeals. Kosina (N.Y. State Comm'n on Jud. Conduct Nov. 9, 1999) (determination), http://www.scjc.state.ny.us/Determinations/K/kosina.htm (last visited Mar. 19, 2004); Sohns (N.Y. State Comm'n on Jud. Conduct Oct. 19, 1998) (determination), http://www.scjc.state.ny.us/Determinations/S/sohns.htm (last visited Mar. 19, 2004); Tiffany (N.Y. State Comm'n on Jud. Conduct Jan. 26, 1994) (determination), http://www.scjc.state.ny.us/Determinations/T/tiffany.htm (last visited Mar. 19, 2004). In those three cases, the judges were removed for:
 • Failing "to file reports and remit court funds to the state comptroller by the tenth day of the month following collection" as required by statutes. Kosina app. A (over 3 1/2 years, some reports as much as 136 days late); Sohns apps. A B (over one 3-year period, as much as 69 days late; over another 3 1/2-year period, as much as 71 days late); Tiffany.
 • Failing "to deposit court funds within 72 hours of receipt" as required by statute. Kosina (over 1 1/2-year period and one deposit over 3 years late); Tiffany (over 11 months, as much as $3,111.74).
 • Failing "to issue receipts in almost half of the cases in which" the judge "received court funds" as required by statute. Kosina (over 3 years).
 • Failing "to take action on 111 cases." Sohns
(over 11 year period, for as much as 10 years in one case).
 • Failing "to notify the Department of Motor Vehicles of the disposition of 272 traffic tickets" as required by statute, and, "with respect to 170 traffic tickets," failing "to notify the Department of Motor Vehicles of the defendants' failure to appear in court or otherwise answer the charges or to pay fines imposed by the court" as required by statute. Tiffany.
[29] See also the following instances of administrative failures as examples of improper judicial conduct for which judges were sanctioned:
 • "A judge failed to forward abstracts of the record of traffic convictions to the Department of Public Safety showing the names and addresses of the persons charged, the numbers of their drivers license, the registration numbers of the vehicles, the nature of the offense, the dates of the hearings, the pleas, and the judgments." STATE COMM'N JUD. CONDUCT ANN. REP. (1991), 55 TEX. B.J. at 1064; see Uniform Act Regulating Traffic on Highways, 50th Leg., R.S., ch. 421, § 152(b)-(c), 1947 Tex. Gen. Laws at 1001 (repealed 1995) (current versions at Tex. Transp. Code Ann. §§ 543.202-543.204 (Vernon 1999 Supp. 2004)).
 • "A judge failed to report traffic convictions based upon citations issued by city police officers to the Department of Public Safety." STATE COMM'N JUD. CONDUCT ANN. REP. (1989), 53 TEX. B.J. 1037, 1043 (1990); see also STATE COMM'N JUD. CONDUCT ANN. REP. (1988), 52 TEX. B.J. 708, 710 (1989); see, e.g., Act of May 29, 1987, 70th Leg., R.S., ch. 896, § 1(c), 1987 Tex. Gen. Laws 2993, 2993 (formerly codified at Tex.Rev.Civ. Stat. art. 6701a, § 7(c)) (repealed 2003) (current version at Tex. Transp. Code Ann. § 623.082(d) (Vernon 1999)); Act of May 29, 1987, 70th Leg., R.S., ch. 746, § 1(a) 1987 Tex. Gen. Laws 2676, 2676, amended by Act of May 26, 1995, 74th Leg., R.S., ch. 624, § 8(d), 1995 Tex. Gen. Laws 3488, 3492.
Texas judges have also frequently been disciplined for failing to comply with the reporting requirements of the Texas Election Code. E.g., Disciplinary Actions, 66 TEX. B.J. 835, 835 (2003) (public warning); Disciplinary Actions, 65 TEX. B.J. 81, 82 (2002) (reprimand); State Comm'n Jud. Conduct Ann. Rep. (2000), 64 Tex. B.J. 298, 306 (2001) (public warning); DisciplinaryActions, 63 Tex. B.J. 1079, 1081 (2000) (public reprimand);see, e.g., Tex. Elec. Code Ann. §§ 254.061, 254.0611, 254.063, 254.064, 254.093 (Vernon 2003).
[30] At the informal hearing before the Commission, Judge Rose repeatedly, forcefully, and correctly stated that he bore responsibility for the conduct of his court:. "[T]he responsibility is mine, and if anything goes wrong, I'm the bottom line." (Exam'r Ex. E-32, at 5.)
 • "Now, you say, well, Judge, you're the bottom line and you didn't show the responsibility. That is true." (Id. at 6.)
 • "I mean, sure, I'm the bottom line. It's my responsibility. I was elected." (Id. at 7.)
 • "I'm ultimately responsible. . . . [A]nything, anything that happens in the court, it's me. I'm the bottom line. Nobody is responsible but me." (Id. at 10.)
 • "I don't care if it's a penny missing. It's my responsibility. It's my responsibility ultimately." (Id.)
That testimony is in accord with the law. See supra pp. 707-10.
[31] Judge Rose also argues in Section VI of his argument that "Constitutional requirements for removal are not present." (Rose Br. at 38.) We understand that section to present complaints concerning the legal sufficiency of the evidence in this inquiry under constitutional standards. (See id. at 38-45.) We consider that section below with Judge Rose's other sufficiency issues.See infra pp. 80-98, pp. 717-28.
[32] To the extent that the disciplinary system in the American Bar Association's Model Rules is consistent with Texas's system, those rules and their commentary are instructive. See, e.g., SCHUWERK HARDWICK, HANDBOOK OF TEXAS LAWYER AND JUDICIAL ETHICS § 36.02, at 1172-73 nn. 7-10.
[33] Judge Rose makes the same argument as to the findings concerning Local Government Code Section 113.022. (See Rose Br. at 21.) Section 113.022, however, does not even refer to Section 112.002. Cf. Tex. Loc. Gov't Code Ann. § 113.022.
[34] Judge Rose greatly underestimates the gravity of Henderson's complaint. The United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." U.S. CONST. amend. VI; seeBarker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101
(1972). "[T]he right to a speedy trial is `fundamental' and is imposed by the Due Process Clause of the Fourteenth Amendment on the States." Barker at 515, 92 S.Ct. 2182 (quoting Klopfer v.North Carolina, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1
(1967)). The Speedy Trial Clause implicates the rights of both the individual accused and of the people generally. As to the individual accused, even one who is not incarcerated, the Clause is "an important safeguard . . . to minimize anxiety and concern accompanying public accusation and to limit the possibility that long delay will impair the ability of an accused to defend himself." United States v. Loud Hawk, 474 U.S. 302, 312,106 S.Ct. 648, 88 L.Ed.2d 640 (1986). Moreover, "there is a societal interest in providing a speedy trial which exists separate from and at times in opposition to the interests of the accused," in that long delay may hinder the State's ability to prosecute the case, as well. Flanagan v. United States, 465 U.S. 259, 264,104 S.Ct. 1051, 79 L.Ed.2d 288 (1984) (quoting Barker at 519,92 S.Ct. 2182). The Texas Constitution, likewise, provides, "In all criminal prosecutions the accused shall have a speedy public trial. . . ." Tex. Const. art. I, § 10. This provision is "intended to prevent government from oppressing the citizen by holding criminal prosecutions suspended over him for an indefinite time; and it was also intended to prevent delays in the customary administration of justice, by imposing upon the judicial tribunals an obligation to proceed with reasonable dispatch in the trial of criminal accusations." Fariss v.Tipps, 463 S.W.2d 176, 179 (Tex. 1971) (quoting Ex parteTurman, 26 Tex. 708, 710 (1863)); accord Watson v. State,90 Tex.Crim. 576, 578, 237 S.W. 298, 299 (1922); see Shaw v.State, 117 S.W.3d 883, 890 (Tex.Crim.App. 2003). "In general, delay approaching one year is sufficient to trigger a speedy trial inquiry." Shaw at 889; accord Doggett v. United States,505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). "If a violation of the right to a speedy trial is established, the proper remedy is dismissal of the prosecution with prejudice." Shaw at 888; accord Strunk v. United States,412 U.S. 434, 440, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973). Under the Code of Criminal Procedure of 1965, under an article in effect through August 1999, the Code required that trials of criminal cases before justice courts take place within five days of the defendant's appearance. See Act of May 27, 1965, 59th Leg., R.S., ch. 722, § 1, art. 45.23, 1965 Tex. Gen. Laws 317, 525,repealed by Act of May 30, 1999, 76th Leg., R.S., ch. 1545, § 75(a), 1999 Tex. Gen. Laws 5314, 5331.
Here, in 1997, Henderson was cited with notices to appear for "the failure to have proof of insurance, a valid inspection sticker, and a current registration." (IV C.R. No. 58, at 9-10, Find. 43; see Resp't Ex. R-28, at [9], [17]); TEX. TRANSP. CODE ANN. §§ 502.402(a), 548.602(a), 601.051 (Vernon 1999). Henderson appeared as notified in March 1997, but was not permitted to enter a plea. (III R.R. at 567; Resp't Ex. R-28, at [9], [17].) In April 1999, Henderson addressed a letter to Judge Rose concerning the citations, but did not receive a response. (Resp't Ex. R-28, at [7]; III R.R. at 573.) Henderson next heard from the court in December 1999, when the court issued Henderson notices of violation. (IV C.R. No. 58, at 10, Find. 43; III R.R. at 568-69; Resp't Ex. R-28, at [8], [13].) In February 2000, Henderson appeared again and was permitted to plead not guilty. (III R.R. at 570; Resp't Ex. R-28, at [5], [15].) In December 2000, the court set Henderson's trial for January 2001. (IV C.R. No. 58, at 10, Find. 43; III R.R. at 570-71; Resp't Ex. R-28, at [3], [13].) By the time of trial, Henderson no longer owned the vehicle in connection with which he received the complaints, and so no longer had the valid registration, valid inspection certificate, or insurance records that pertained to the vehicle. (III R.R. at 570, 578.) Henderson testified that he was "concerned" about the citations, and "angry" and "frustrated" that it took so long for a hearing and that Judge Rose did not respond to Henderson's letter. (Id. at 573.)
[35] In connection with this complaint, Judge Rose argues:
This finding is but another example of the State Commission's "result oriented" decision in this case. The Commission's finding completely distorts the facts, ignores the testimony and documents in the record, and reaches unfounded conclusions in a vein [sic] attempt to justify its recommendations to remove an elected judge.
(Rose Br. at 32.) In light of Judge Rose's misrepresentation of the record, his argument here is utterly out of place.
 *Page 131